**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA, Plaintiff, | |
| v. | Civil Action No. 05-503 T<br>Judge Thomas C. Wheeler |
| THE UNITED STATES OF AMERICA, Defendant. | |

**APPENDIX B TO PLAINTIFF'S BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR PARITAL SUMMARY JUDGMENT AND IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**PAGE**


Declaration of Frederick H. Robinson .......... B-1

Exhibit 1 April 27, 2001 Statutory Notice of Claim Disallowance for the tax years 1991 through 1997 .......... B-3

Exhibit 2 Excerpts from PricewaterhouseCoopers Report (2007), "2006 Year in Review: Continuing Developments in the Taxation of Insurance Companies," *available at* http://www.pwc.com/us/eng/tax/ins/2006_insurance_tax_monograph.pdf .......... B-17

Exhibit 3 May 12, 2006 Letter from Internal Revenue Service, LMSB Division to an unnamed Blue Cross/Blue Shield organization (taxpayer identification redacted) .......... B-23

Exhibit 4 Sample Form 906-c (Rev. August 1994), Closing Agreement on Final Determination Covering Specific Matters, sent by the Internal Revenue Service .......... B-27

Exhibit 5 Excerpt from Appendix Ernst & Young Valuation Report dated April 10, 1997 .......... B-32

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Civil Action No. 05-503 T<br>Judge Thomas C. Wheeler |

**DECLARATION OF FREDERICK H. ROBINSON**

I, Frederick H. Robinson, hereby declare as follows:

1. I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2. I am currently employed by and a member of Miller & Chevalier Chartered in Washington, D.C. I am the counsel of record in this matter for Plaintiff Hospital Service Association of Northeastern Pennsylvania ("HSA").

3. I also represent other Blue Cross/Blue Shield organizations that (like HSA) have claimed I.R.C. section 165 losses relating to healthcare coverage contracts.

4. Attached hereto as Exhibit 1 are true and correct copies of the Statutory Notices of Claim Disallowance dated April 27, 2001, for HSA's 1991 through 1997 tax years. In these Notices, the Internal Revenue Service ("IRS") disallowed the loss deductions that are described above in paragraph 3 and that are the subject of this case. The IRS also disallowed similar losses claimed by similarly situated Blue Cross/Blue Shield organizations.

5. Attached hereto as Exhibit 2 is a true and correct copy of excerpts from a PricewaterhouseCoopers Report entitled "2006 Year in Review: Continuing Developments in the Taxation of Insurance Companies."

6. Attached hereto as Exhibit 3 is a true and correct copy of a May 12, 2006 letter from the IRS, LMSB Division to an unnamed Blue Cross/Blue Shield organization, with the taxpayer identification redacted. I received identical letters from the IRS on behalf of several Blue Cross/Blue Shield organizations (not including HSA) that I represent.

7. Attached hereto as Exhibit 4 is a true and correct copy of a sample Form 906-c "Closing Agreement on Final Determination Covering Specific Matters" that was sent by the IRS to several of my Blue Cross/Blue Shield organization clients to be used as the standard settlement agreement.

8. In support of its Motion for Summary Judgment, the Government submitted a valuation report prepared by Ernst & Young. That report is Defendant's Exhibit 18 (Def. App. B at B-157 through B-205). However, Defendant's Exhibit 18 does not include the entire Ernst & Young report. In particular, the report also included a 165-page "Appendix" that lists Ernst & Young's individual values for each and every one of HSA's group healthcare coverage contracts. These values range from less than $100 to more than $400,000. Attached hereto as Exhibit 5 is a true and correct copy of the cover page and first page of that Appendix.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 30th day of April, 2007.

/s/ Frederick H. Robinson
Frederick H. Robinson

# Plaintiff's Exhibit 1

**Internal Revenue Service**

**Department of the Treasury**

Date: 4/27/01

Peter G. Wood, Esq./POA
Hospital Service Association
of Northeastern PA. & Subs.
70 North Main Street
Wilkes-Barre, PA 18711

Social Security or Employer Identification Number:
24-0615177
Kind of Tax:
1120
Tax Period Ended:
12/31/1991
Amount Claimed:
$21,176.00
Date Claim Received:
10/16/1996
Person to Contact:
Marvin Rosner - Case Manager
Contact Telephone Number:
(610)992-5160 ext. 191

CERTIFIED MAIL

We are sorry, but we cannot allow your claim for an adjustment to your tax for the reasons stated below. This letter is your legal notice that your claim is fully disallowed.

If you wish to bring suit or proceedings for the recovery of any tax, penalties or other moneys for which this disallowance notice is issued, you may do so by filing such a suit with the United States District Court having jurisdiction, or the United States Claims Court. The law permits you to do this within 2 years from the mailing date of this letter. However, if you signed a waiver of the notice of disallowance (Form 2297), the period for bringing suit began to run on the date the waiver was filed.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely yours,

B.F. Rogers
Director SB/SE (Compliance) Area 3

Reason for disallowance:
See Attached Form 886-A

600 Arch Street, Philadelphia, PA 19106 Letter 906 (DO)

**Internal Revenue Service**

**Department of the Treasury**

Date: 4/27/01

Peter G. Wood, Esq./POA
Hospital Service Association
of Northeastern PA. & Subs.
70 North Main Street
Wilkes-Barre, PA 18711

Social Security or Employer Identification Number:
24-0615177
Kind of Tax:
1120
Tax Period Ended:
12/31/1992
Amount Claimed:
$1,411,287.00
Date Claim Received:
10-16-1992
Person to Contact:
Marvin Rosner - Case Manager
Contact Telephone Number:
(610) 992-5160 ext. 191

CERTIFIED MAIL

We are sorry, but we cannot allow your claim for an adjustment to your tax for the reasons stated below. This letter is your legal notice that your claim is fully disallowed.

If you wish to bring suit or proceedings for the recovery of any tax, penalties or other moneys for which this disallowance notice is issued, you may do so by filing such a suit with the United States District Court having jurisdiction, or the United States Claims Court. The law permits you to do this within 2 years from the mailing date of this letter. However, if you signed a waiver of the notice of disallowance (Form 2297), the period for bringing suit began to run on the date the waiver was filed.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely yours,

B.F. Rogers
Director SB/SE (Compliance) Area 3

Reason for disallowance:
See Attached Form 886-A

600 Arch Street, Philadelphia, PA 19106

Letter 906 (DO)

**Internal Revenue Service**

**Department of the Treasury**

Date: 4/27/01

Social Security or Employer Identification Number:
24-0615177

Kind of Tax:
1120

Tax Period Ended:
12/31/1993

Amount Claimed:
$551,721.00

Date Claim Received:
07-12-2000

Person to Contact:
Marvin Rosner - Case Manager

Contact Telephone Number:
(610) 992-5160 ext. 191

Peter G. Wood, Esq./POA
Hospital Service Association
of Northeastern PA. & Subs.
70 North Main Street
Wilkes-Barre, PA 18711

CERTIFIED MAIL

We are sorry, but we cannot allow your claim for an adjustment to your tax for the reasons stated below. This letter is your legal notice that your claim is fully disallowed.

If you wish to bring suit or proceedings for the recovery of any tax, penalties or other moneys for which this disallowance notice is issued, you may do so by filing such a suit with the United States District Court having jurisdiction, or the United States Claims Court. The law permits you to do this within 2 years from the mailing date of this letter. However, if you signed a waiver of the notice of disallowance (Form 2297), the period for bringing suit began to run on the date the waiver was filed.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely yours,

B.F. Rogers
Director SB/SE (Compliance) Area 3

Reason for disallowance:
See Attached Form 886-A

600 Arch Street, Philadelphia, PA 19106

Letter 906 (DO)

**Internal Revenue Service**

**Department of the Treasury**

Date: 4/27/01

Peter G. Wood, Esq./POA
Hospital Service Association
of Northeastern PA. & Subs.
70 North Main Street
Wilkes-Barre, PA 18711

Social Security or Employer Identification Number:
24-0615177
Kind of Tax:
1120
Tax Period Ended:
12/31/1994
Amount Claimed:
$206,359.00
Date Claim Received:
07-12-2000
Person to Contact:
Marvin Rosner - Case Manager
Contact Telephone Number:
(610) 992-5160 ext. 191

CERTIFIED MAIL

We are sorry, but we cannot allow your claim for an adjustment to your tax for the reasons stated below. This letter is your legal notice that your claim is fully disallowed.

If you wish to bring suit or proceedings for the recovery of any tax, penalties or other moneys for which this disallowance notice is issued, you may do so by filing such a suit with the United States District Court having jurisdiction, or the United States Claims Court. The law permits you to do this within 2 years from the mailing date of this letter. However, if you signed a waiver of the notice of disallowance (Form 2297), the period for bringing suit began to run on the date the waiver was filed.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely yours,

B.F. Rogers
Director SB/SE (Compliance) Area 3

Reason for disallowance:
See Attached Form 886-A

600 Arch Street, Philadelphia, PA 19106

Letter 906 (DO)

**Internal Revenue Service**

**Department of the Treasury**

**Date:** 4/27/01

Peter G. Wood, Esq./POA
Hospital Service Association
of Northeastern PA. & Subs.
70 North Main Street
Wilkes-Barre, PA 18711

Social Security or Employer Identification Number:
24-0615177
Kind of Tax:
1120
Tax Period Ended:
12-31-1995
Amount Claimed:
$733,460.00
Date Claim Received:
07-12-2000
Person to Contact:
Marvin Rosner - Case Manager
Contact Telephone Number:
(610)992-5160 ext. 191

CERTIFIED MAIL

We are sorry, but we cannot allow your claim for an adjustment to your tax for the reasons stated below. This letter is your legal notice that your claim is fully disallowed.

If you wish to bring suit or proceedings for the recovery of any tax, penalties or other moneys for which this disallowance notice is issued, you may do so by filing such a suit with the United States District Court having jurisdiction, or the United States Claims Court. The law permits you to do this within 2 years from the mailing date of this letter. However, if you signed a waiver of the notice of disallowance (Form 2297), the period for bringing suit began to run on the date the waiver was filed.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely yours,

B.F. Rogers
Director SB/SE (Compliance) Area 3

Reason for disallowance:
See Attached Form 886-A

600 Arch Street, Philadelphia, PA 19106

Letter 906 (DO)

**Internal Revenue Service** **Department of the Treasury**

**Date:** 4/27/01

Peter G. Wood, Esq./POA
Hospital Service Assoication
of Northeastern PA & Subs.
70 North Main Street
Wilkes-Barre, PA 18711

Social Security or Employer Identification Number:
24-0615177
Kind of Tax:
1120
Tax Period Ended:
12/31/1996
Amount Claimed:
$147,227.00
Date Claim Received:
07-12-2000
Person to Contact:
Marvin Rosner - Case Manager
Contact Telephone Number:
(610) 992-5160 ext. 191

CERTIFIED MAIL

We are sorry, but we cannot allow your claim for an adjustment to your tax for the reasons stated below. This letter is your legal notice that your claim is fully disallowed.

If you wish to bring suit or proceedings for the recovery of any tax, penalties or other moneys for which this disallowance notice is issued, you may do so by filing such a suit with the United States District Court having jurisdiction, or the United States Claims Court. The law permits you to do this within 2 years from the mailing date of this letter. However, if you signed a waiver of the notice of disallowance (Form 2297), the period for bringing suit began to run on the date the waiver was filed.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely yours,

B.F. Rogers
Director SB/SE (Compliance) Area 3

Reason for disallowance:
See Attached Form 886-A

600 Arch Street, Philadelphia, PA 19106 Letter 906 (DO)

**Internal Revenue Service**

**Department of the Treasury**

**Date:** 4/27/01

Social Security or Employer Identification Number:
24-0615177
Kind of Tax:
1120
Tax Period Ended:
12/31/1997
Amount Claimed:
$57,555.00
Date Claim Received:
07-12-2000
Person to Contact:
Marvin Rosner - Case Manager
Contact Telephone Number:
(610)992-5160 ext. 191

Peter G. Woods, Esq./POA
Hospital Service Association
of Northeastern PA. & Subs.
70 North Main Street
Wilkes-Barre, PA 18711

CERTIFIED MAIL

We are sorry, but we cannot allow your claim for an adjustment to your tax for the reasons stated below. This letter is your legal notice that your claim is fully disallowed.

If you wish to bring suit or proceedings for the recovery of any tax, penalties or other moneys for which this disallowance notice is issued, you may do so by filing such a suit with the United States District Court having jurisdiction, or the United States Claims Court. The law permits you to do this within 2 years from the mailing date of this letter. However, if you signed a waiver of the notice of disallowance (Form 2297), the period for bringing suit began to run on the date the waiver was filed.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely yours,

B.F. Rogers
Dorector SB/SE (Compliance) Area 3

Reason for disallowance:

See Attached Form 886-A

600 Arch Street, Philadelphia, PA 19106 Letter 906 (DO)

| Form 5701 | Department of the Treasury - Internal Revenue Service<br>**Notice of Proposed Adjustment** |
|---|---|

| Name of taxpayer:<br>Hospital Association of Northeastern Pa. | Issue No.<br>001 |
|---|---|
| Name and title of person to whom delivered:<br>Tax Manager<br>Peter Woods, Tax Manager | Date:<br>October 18, 1999 |
| Entity for this proposed adjustment:<br>Parent | |

**Based on the information we now have available and our discussions with you, we believe the proposed adjustments listed below should be included in the Revenue Agent Report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.**

| Years | Amount | Account or Return Line |
|---|---|---|
| 8712 | $ 414,309 | Abandonment Deductions taken on the amended tax return The subscriber relationship abandonment deductions were based on subscribers being valued at $ 32,485,000. A subsequent valuation of the subscribers was made by the IRS and assigned a value of $ 22,396,000. |
| 8812 | $ 6,244,435 | |
| 8912 | $ 3,339,163 | |
| 9012 | $ 2,056,197 | |
| 9112 | $ 3,553,486 | |
| 9212 | $ 1,409,549 | |
| 9312 | $ 1,552,289 | |
| 9412 | $ 534,183 | Abandonment losses are being disallowed, because they are not within the purview of code sections 165 and 1012. |
| 9512 | $ 2,082,601 | |
| 9612 | $ 404,487 | |
| 9712 | $ 154,844 | |

Issues

The taxpayer has taken a deduction for the abandonment/ disposition of a portion of their Subscriber Relationships asset. The taxpayer's initially determined their basis in the asset, using TRA'86 Act Section 1012, to be $ 32,485,000. Upon examination, The IRS adjusted it to a fair market value of $22,396,000.

The IRS has disallowed the deduction based primarily on the fact that this intangible asset cannot be abandoned under the code and regulations section 165. Each individual year in which a deduction was taken on the tax return requires an adjustment to reflect this disallowance.

Argument for Proposed Adjustment

**If the explanation of the adjustment will be longer then the space provided below, the entire explanation should begin on Form 886-A, Explanation of Items.**

Please refer to the attached Form 886-A for a detailed explanation.

Taxpayer Representative's action:

( ) Agreed ( ) Agreed in Part ( ) Disagreed
( ) Have additional information. Will submit by:

| IRS Valuation Specialist, David M. Mielcarek, No. 23-02935<br>Internal Revenue Service | Telephone Number:<br>610-992-5160<br>412-395-5793 |
|---|---|
| | |
| | |

| Form 886-A | Explanation of Items | Schedule or Exhibit |
|---|---|---|
| Name of taxpayer: Hospital Association of Northeastern Pa. | | Year or Period 8712, 8812, 8912, 9012,9112,9212,9312, 9412,9512,9612,9712 |

**TAXPAYER'S POSITION**

Unknown.

**LAW AND DISCUSSION**

Abandonment losses are deductible under I.R.C. section 165(a), which allows any loss sustained during the taxable year and not compensated for by insurance or otherwise.

The requirements for a loss are found in the regulations under section 165. Specifically, Treas. Reg. section 1.165-2(a) allows a loss incurred in a business and arising from the sudden termination of the usefulness of any nondepreciable property, in a case where the business is discontinued or where the property is permanently discarded from use therein, as a deduction under section 165(a) for the taxable year in which the loss is actually sustained.

Treas. Reg. section 1.165-1(b) requires that, to be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, and fixed by identifiable events. Normally, an abandonment loss requires (1) an intention on the part of owner to abandon the asset, and (2) an affirmative act of abandonment. A.J. Industries, Inc. v. United States, 503 F.2d 660, 670 (9th Cir. 1974); Citron, 97 T.C. at 209; CRST, Inc. v. Commissioner, 92 T.C. 1249, 1257 (1989), aff'd, 909 F.2d 1146 (8th Cir. 1990).

It is clear that intangible assets may be the subject of an abandonment loss. Parmelee Transportation Co. v. United States, 351 F.2d 619 (Ct. Cl. 1965). See Massey-Ferguson. Inc. v. Commissioner, 59 T.C. 220 (1959), acq. 1973-2 C.B. 2; Solar Nitrogen Chemicals, Inc. v. Commissioner, T.C. Memo. 1978-486. The most essential issue in the present case is the resolution of whether subscribers can be abandoned individually; or whether the individual components must be treated as part of an indivisible whole, i.e., the subscriber-based intangible or assembled workforce, which itself is the only proper subject for an abandonment loss.

There have been numerous decisions holding that assets indistinguishable from the subscriber-based intangible involved in the present case are single indivisible assets and not an aggregation of individual assets. Ralph W. Fullerton Company v. United States, 550 F.2d 548 (9th Cir. 1977)(customer list); Sunset Fuel Co. v. United States, 519 F.2d 781 (9th Cir. 1975); Skilken v. Commissioner, 420 F.2d 266 (6th Cir. 1969 1969) (contracts for vending machine locations); Meredith Publishing Co. v. Commissioner, 64 F.2d 890 (8th Cir. 1932), cert. denied, 290 U.S. 646 (1933) (magazine subscription list); Golden State Towel and Linen Service, 373 F.2d 938 (Ct. Cl. 1967)(customer list); Ithaca Industries, Inc. v. Commissioner, 97 T.C. 253 (1991), aff'd, 17 F.3d 684 (4th Cir.), cert. denied, 513 U.S. 821 (1994)(workforce); Manhattan Co. of Virginia v. Commissioner, 50 T.C. 78 (1968), acq. 1974-2 C.B. 3 (customer list); Boe v. Commissioner, 35 T.C. 720 (1962), aff'd, 307 F.2d 339 (9th Cir. 1962)(medical service contracts); Thrifticheck Service Corp. v. Commissioner, 33 T.C. 1038 (1960), aff'd, 287 F.2d 1 (2d Cir. 1961)(customer contracts) ; Anchor Cleaning Service v. Commissioner, 22 T.C. 1029 (1954), nonacq. on another issue, 1958-2 C.B. 9 (customer list); Commercial National Insurance Co. v. Commissioner, 12

| Form 886-A | Explanation of Items | Schedule or Exhibit |
| --- | --- | --- |
| Name of taxpayer: Hospital Association of Northeastern Pa. | | Year or Period 8712, 8812, 8912, 9012,9112,9212,9312, 9412,9512,9612,9712 |

B.T.A. 655 (1928)(insurance policyholders); Nickisch v. Commissioner, T.C. Memo. 1984-275 (customer list); Illinois Cereal Mills, Inc. v. Commissioner, T.C. Memo. 1983-469, aff'd, 789 F.2d 1234 (7th Cir.), cert. denied, 479 U.S. 995 (1986) (customer list).

Some of these cases directly held that the loss of an individual component of the indivisible asset could not be separately deducted as an abandonment loss. Thus, for example, as in the present case, taxpayers could not deduct amounts attributable to each customer the taxpayer lost. Ralph W. Fullerton, supra; Sunset Fuel, supra; Golden State Towel, supra; Anchor Cleaning, supra; Illinois Cereal Mills, supra; see Skilken supra; Boe, supra.

The facts of the present case are clearly distinguishable from the circumstances where the taxpayer abandons a portion the indivisible asset which has distinct transferable value that is reasonably severable from the whole. The pivotal case on this issue is Metropolitan Laundry Co. v. United States, 100 F. Supp. 803 (N.D. Cal. 1951), where the taxpayer was permitted an abandonment loss on a portion of a customer list that was attributable to a specific geographic area. The taxpayer had purchased the customer lists of several laundry businesses in San Francisco and Oakland. During World War II, the government seized the taxpayer's San Francisco plant for military purposes. After the war, the taxpayer had trouble reestablishing its business and abandoned its San Francisco routes while it continued its operations in Oakland. The district court recognized that "a list of customers . . . is not to be regarded as an aggregation of disconnected individual subscribers" and was instead treated as "unitary structures irrespective of incidental fluctuations or alterations." Metropolitan Laundry, 100 F. Supp. at 805. However, the court noted that a taxpayer could "dispose of its business in a particular area or in respect to a particular product or service along with incidental goodwill without abandoning its entire business." Id. at 806. "And . . . so long as the business and the goodwill disposed of may be assigned a distinct transferable value, the transaction may properly be recognized, for tax purposes, as a closed one." Id. at 806-07. The court found that the costs attributable to the abandoned San Francisco customer lists met this test and were deductible.

Similarly, Massey-Ferguson held that the taxpayer could deduct the abandonment of a line of business it had purchased from another party and operated at a distinct location, even though the taxpayer continued to manufacture similar products under a different trade name at another location. See also Parmelee Transportation; Strauss v. United States, 199 F. Supp. 845 (W.D. La. 1961). The taxpayers in the present case have not abandoned a segment of their business that is analogous to either Metropolitan Laundry or Massey- Ferguson. The courts have explicitly recognized the distinction between the facts similar to the present case from those found in Metropolitan Laundry. See Skilken, 420 F.2d at 270; Anchor Cleaning, 22 T.C. at 1033-35.

Our conclusion regarding the claimed abandonment losses is left unchanged by the Supreme Court's decision in Newark Morning Ledger Co. v. United States, 507 U.S. 546 (1993), where the Supreme Court held that a comparable asset, a newspaper subscriber list, was amortizable. In coming to this conclusion, the Court reaffirmed the "mass asset" or "indivisible asset" rule that has underscored many of the intangible asset cases we have cited.

> The rule provides that certain kinds of intangible assets are properly grouped and considered as a single entity; even though

| Form 886-A | Explanation of Items | Schedule or Exhibit |
|---|---|---|
| Name of taxpayer: Hospital Association of Northeastern Pa. | | Year or Period 8712, 8812, 8912, 9012,9112,9212,9312, 9412,9512,9612,9712 |

> the individual components of the asset may expire or terminate over time, they are replaced by new components, thereby causing only minimal fluctuations and no measurable loss in the value of the whole.

Newark Morning Ledger, 507 U.S. at 557. The Court also quoted a portion of Golden State Towel, 373 F.2d at 944, as the "usually accepted definition of a mass asset." 507 U.S. at 557. The quote included the following:

> The whole is equal to the sum of its fluctuating parts at any given time, but each individual part enjoys no separate capital standing independent of the whole, for its disappearance affects but does not interrupt or destroy the continued existence of the whole.

Newark Morning Ledger, 507 U.S. at 557-58, quoting, Golden State Towel, 373 F.2d at 944. From this, the Court concluded that "[t]he mass-asset rule prohibits the depreciation of certain customer-based intangibles because they constitute self-regenerating assets that may change but never waste." Newark Morning Ledger, 507 U.S. at 558.

The definition of the mass asset rule quoted from Golden State Towel also stated that its "customer list is .... indistinguishable from – and the principal element of – goodwill, whose ultimate value lies in the expectancy of continued patronage through public acceptance." Newark Morning Ledger, 507 U.S. at 558, quoting, Golden State Towel, 373 F.2d at 944. The Supreme Court traced the precedents linking intangibles to goodwill. It then discussed the argument that the intangibles were not depreciable because they were indistinguishable from goodwill, which itself is not depreciable. It noted that traditionally goodwill was not depreciable because it "does not suffer wear and tear, does not become obsolescent, is not used up in the operation of the business." Newark Morning Ledger, 507 U.S. at 565, quoting, Red Wing Malting Co. v. Willcuts, 15 F.2d 626, 633 (8th Cir. 1926), cert. denied, 273 U.S. 763 (1927). The Court concluded:

> It must follow that if a taxpayer can prove with reasonable accuracy that an asset used in the trade or business or held for the production of income has value that wastes over an ascertainable period of time, that asset is depreciable under section 167, regardless of the fact that its value is related to the expectancy of continued patronage.

Newark Morning Ledger, 507 U.S. at 567. The Court found the subscription list amortizable because it met these criteria. Any relation it might have to goodwill was irrelevant.

In order to understand the impact of Newark Morning Ledger on the present case, it is important to note that some of the cases we have cited regarding whether an intangible asset could be abandoned piecemeal also addressed whether the asset could be amortized. See, e.g., Ralph W. Fullerton, supra; Manhattan Co., supra; Thrifticheck, supra; Illinois Cereal Mills, supra. These were alternative arguments made by the taxpayer which were clearly distinct. The holding of Newark Morning Ledger only addresses the second issue, i.e., amortization. However, the

| Form 886-A | Explanation of Items | Schedule or Exhibit |
|---|---|---|
| Name of taxpayer: Hospital Association of Northeastern Pa. | | Year or Period 8712, 8812, 8912, 9012,9112,9212,9312, 9412,9512,9612,9712 |

rationale of Newark Morning Ledger in its discussion of the "mass asset" rule relates directly to the issue of abandonment of intangible assets like those in the present case.

First, it is clear under Newark Morning Ledger that, if an intangible asset self-regenerates, the mass asset rule applies to have the asset treated indivisibly.

Workforce and subscriber lists are clearly self- regenerating. Further, if the assets are self-regenerating, there is an argument that the asset as a whole is not abandoned so long as the taxpayer remains in business.

On the other hand, as indicated by the quotation from Golden State the mass asset rule has also been linked to goodwill in the context of abandonment. Since the Supreme Court rejected the importance of this link in the context of amortization, it is important to examine the importance of the link in the context of abandonment. The issue for abandonment losses is summarized in Massey-Ferguson, which states,

> some confusion has developed . . . as to whether there can be an abandonment of a part of "goodwill" as long as the business continues to operate . . . . However, there seems to be no real disagreement in the cases; at least now, it seems to be generally recognized that if there is a clearly identifiable and severable asset, its abandonment entitles the taxpayer to a loss deduction.

59 T.C. at 225, (citations omitted). Thus, while goodwill cannot be amortized, it can be abandoned under the same test as is applicable to the intangible asset. See Metropolitan Laundry, 100 F. Supp. at 806; Solar Nitrogen Chemicals, supra. Therefore, the traditional link to goodwill in the context of abandonment losses does raise the same problems as in the context of amortization, where goodwill is still not amortizable.

Further, the issue of whether an asset is indivisible has also been seen to be ultimately severable from the goodwill issue. Thus, Thrifticheck, 33 T.C. at 1047, found that "wholly aside from any goodwill element . . . the acquisition of the 200 contracts [with customers] should be treated as the acquisition of a single asset." See also Ralph W. Fullerton, at Id.; Manhattan Co., 50 T.C. at 87; Boe, 35 T.C. at 726.

Lastly, that partial abandonment and amortization are alternative arguments demonstrates that their practical results are almost the same. In one instance, the taxpayers were attempting to recognize their actual loss and in the other they were estimating that loss through the use of amortization. Thus, allowing the taxpayers to deduct portions of these assets each year amounts to the allowance of amortization, without meeting the prerequisites therefor.

So long as the intangible asset is deemed to be a whole rather than the sum of any of its parts the ability to deduct any part of it as an abandonment loss rests ultimately on whether there has been a recognition event. Under facts like the present case, courts have found that the loss of any individual component only reduces the value of the whole asset. Sunset Fuel, 519 F.2d at 783; Manhattan Co., 50 T.C. at 87; Thrifticheck, 33 T.C. at 1047. The mere diminution in value of property is not enough to establish an abandonment loss. Kraft, Inc. v. United States, 30 Fed. Cl.

| Form 886-A | Explanation of Items | Schedule or Exhibit |
|---|---|---|
| Name of taxpayer: Hospital Association of Northeastern Pa. | | Year or Period 8712, 8812, 8912, 9012,9112,9212,9312, 9412,9512,9612,9712 |

739, 785- 86 (1994); Lakewood Associates v. Commissioner, 109 T.C. 450, 456 (1997). See United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 401 (1927). Specifically, diminution in value fails to satisfy the requirement under the regulations that a loss be "evidenced by closed and completed transactions, fixed by identifiable events." Sunset Fuel, 519 F.2d at 783. See S.S. White Dental, at Id. Instead, the taxpayer normally must wait until the entire indivisible asset is abandoned before it can take any deduction under section 165(a). See Massey-Ferguson, 59 T.C. at 226- 27; Anchor Cleaning; 22 T.C. at 1035; Nickisch v. Commissioner, T.C. Memo. 1984-275.

Further, as indicated above, the intention to abandon standing alone is not sufficient to establish a recognition event; instead, there must be an affirmative act of abandonment. See Brountas v. Commissioner, 692 F.2d 152 (1st Cir. 1982), cert. denied, 462 U.S. 1106 (1983); Beus v. Comissioner, 261 F.2d 176, 180 (9th Cir. 1958); Citron, 97 T.C. at 210; Zurn v. Commissioner, T.C. Memo. 1996-386. As a result, there is arguably an inherent requirement for an abandonment loss that the taxpayer, rather than some other party, take the action to abandon permanently the property in question. Further, an abandonment does not result simply from cessation of use. Beus, at Id.; Citron, at Id.

Thus, participation in a government program which required the taxpayer to discontinue his dairy operation, was not an abandonment where there was no showing of the irrevocable intent to abandon or never use the property again. Strandley v. Commissioner, 99 T.C. 259 (1992), aff'd on another issue, 73 AFTR 2d (RIA) 2118 (9th Cir. 1994). Similarly, in denying an abandonment loss for the individual members of a customer list, the court in Anchor Cleaning, 22 T.C. at 1035, noted that the taxpayer had not "put itself in a position where it would be unable to solicit or to serve such customers should they later decide to return to it." Golden State Towel, 373 F.2d at 943, also relied upon this language in denying an abandonment loss for the loss of individual customers. There is no showing in the present case that, given the chance, the entities would not become similarly involved with these subscribers and employees or that the taxpayers were in any way prevented from doing so. Similarly, other cases have held that the actions of another party only affect the value of the property the taxpayer continues to hold. See CRST, 92 T.C. at 1259-61; Consolidated Freight Lines, Inc. v. Commissioner, 37 BTA 576 (1938), aff'd, 101 F.2d 813 (9th Cir. 1939); Beatty v. Commissioner, 46 T.C. 835 (1966).

Lastly, the way in which the taxpayers have valued their assets may argue against the abandonment of individual subscribers or employees. As stated in Sunset Fuel, 510 F.2d at 783, "the indivisible asset rule prevents a loss deduction when the nature of the purchased asset is such that the individual assets cannot be accurately valued." Thus,

> Sunset Fuel made clear that valuation of customer accounts by resort to a formula applied indiscriminately to all accounts does not sufficiently establish the portion of the purchase price allocable to the individual accounts so as to avoid the application of the mass [i.e.; indivisible] asset rule. Indeed, resort to a formula was felt to be an indication that the individual value of the accounts cannot be satisfactorily ascertained.

| Form 886-A | Explanation of Items | Schedule or Exhibit |
|---|---|---|
| Name of taxpayer: Hospital Association of Northeastern Pa. | | Year or Period 8712, 8812, 8912, 9012,9112,9212,9312, 9412,9512,9612,9712 |

Ralph W. Fullerton, 550 F.2d at 550. Similar conclusions are reached in Skilken, 420 F.2d at 270; Golden State Towel, 373 F.2d at 943; and Boe, 35 T.C. at 725. Compare Commissioner v. Seaboard Finance Corp., 367 F.2d 646 (9th Cir. 1966), where the taxpayer was able to establish the cost of a particular account lost.

# Plaintiff's Exhibit 2

2006
The Year in Review

# Continuing Developments in the Taxation of Insurance Companies*



*connectedthinking

PRICEWATERHOUSECOOPERS

# Continuing Developments in the Taxation of Insurance Companies

# 2006

The Year in Review

## Contents


01

02

03

04

05

06

07

08

09

10

11

12

13

accounting described in Rev. Proc. 2002-46 does not override Sections 404(a)(5) and (d). Accordingly, the IRS denied Taxpayer's request for relief under Section 7805(b).

Ranks Of Uninsured Americans Grow[101]




# Intangible Asset Abandonment Losses

The LMSB Division of the IRS evaluated the Intangible Asset Abandonment Loss Issue as claimed by many Blue Cross Blue Shield entities in calendar year 1987 and subsequent tax periods, and in May 2006, made a settlement offer to many Blue Cross Blue Shield organizations.[102] Most plans have accepted the offer and have begun revising settlement calculations accordingly in hopes of reaching ultimate resolution with the receipt of the IRS' signed closing agreement.

## LMSB Settlement Offer

The IRS promised to resolve the issue on the following terms:

1. The government agrees that a loss deduction is allowable upon termination of an individual subscriber or provider contract with respect to which the taxpayer claims an adjusted basis derived from Section 1012(c)(3)(A)(ii) of the Tax Reform Act of 1986.

101 Appleby, Julie. "Ranks of Uninsured Americans Grow," USA Today, August 29, 2006.

102 Internal Revenue Service, LMSB Division, "Intangible Asset Abandonment Losses" Settlement Offer, May 12, 2006.

08

2. The Taxpayer will concede that no deduction is allowed for the termination of employment contracts or workforce in place intangibles.

3. If the appraised value of the subscriber intangible asset is not more than 20 percent of the December 31, 1986 net subscriber premiums, the government will allow 80 percent of the appraised value of the subscriber intangible asset. If the appraised value of the subscriber intangible asset is more than 20 percent of the December 31, 1986 net subscriber premiums, the government will adjust the appraised value down to 20 percent of the December 31, 1986 net subscriber premiums, then allow 80 percent of the new value, effectively allowing 16 percent of the December 31, 1986 net subscriber premiums. For purposes of this offer, appraised values shall be the value determined in the most recent appraisal used by the Taxpayer in claiming loss deductions for years through 2004.

4. If the appraised value of the provider intangible asset is not more than 2 percent of the December 31, 1986 net subscriber premiums, the government will allow 50 percent of the appraised value of the provider intangible asset, If the appraised value of the provider intangible asset is more than 2 percent of the December 31,1986 net subscriber premiums, the government will adjust the appraised value down to 2 percent of the December 31,1986 net subscriber premiums, then allow 50 percent of the new value, effectively allowing 1 percent of the December 31,1986 net subscriber premiums. For purposes of this offer, appraised values shall be the value determined in the most recent appraisal used by the Taxpayer in claiming loss deductions for years through 2004.

5. The government will accept the timing of the loss deductions claimed for years through 2004.

6. The remaining adjusted basis of subscriber and provider intangible assets as of January 1, 2005 will be computed on an allowed or allowable basis and included in a Closing Agreement (Form 906). For years after 2004, the Taxpayer must establish the timing of any deduction claimed and the amount of the remaining adjusted basis allocable to each contract for which a deduction is claimed.

7. For each year at issue, Taxpayer must establish that it is an organization entitled to use the adjusted basis provided in Section 1012(¢)(3)(A)(1l) of the Tax Reform Act of 1986.

The Taxpayer must provide the following information in order to enter into this settlement:

a. The December 31, 1986 net subscriber premiums.

b. The appraisal used to claim the loss for the years 1987 through 2004.

c. The amount of the loss deducted or claimed for each year from 1987 through 2004.

d. The status of each of those years (i.e., in LMSB, in Appeals, docketed, closed, claim disallowed, claim partially allowed, claim allowed, etc.).

In addition, if the IRS requests supplemental information or documents necessary to effect a settlement, the Taxpayer must agree to provide those documents within 20 calendar days of the request. The Internal Revenue Service will grant extensions only in exceptional circumstances and subject to its sole discretion.

The agreement is favorable, but fails to address some of the difficulties Plans are encountering in applying the agreement, including:

1. Incorporating the intangibles abandonment deductions into the calculations of Adjusted Surplus pursuant to Section 833(a)(2)

2. Determining the amount of documentation required by IRS agents in supporting the valuation of the intangibles abandonment deductions

3. Applying the premium cap provisions to the intangibles—on an individual asset basis, a line of business basis or in the aggregate.

# Plaintiff's Exhibit 3

**Internal Revenue Service**
LMSB Division

**Department of the Treasury**

Date: May 12, 2006

**Person to Contact:**
Kenneth W. Black
**Telephone Number:**
904-665-0954
**Refer Reply to:**
AP:ATCL: JAX:KWB
**In Re:**
Intangible Asset Abandonment Losses

Dear Mr.

This letter is to inform you that Appeals has evaluated the Intangible Asset Abandonment Loss Issue as claimed by many Blue Cross Blue Shield entities in calendar year 1987 and subsequent tax periods.

Under Delegation Order 4-25, the Service proposes to resolve this tax issue as described below. This offer must be accepted within 30 days from the date of this letter. This offer may not be available for any case currently under the jurisdiction of a federal court or those previously litigated.

This resolution reflects the Appeals assessment of the hazards of litigation. Appeals has concluded that the settlement proposed in this letter is an equitable resolution of the typical case. Absent atypical facts and circumstances, the Taxpayer should not expect a resolution of the tax issue on terms that are more favorable than the terms offered in this letter. If you do not accept this offer, the resolution of your case in Appeals will be based on the merits of the issue presented and may be less favorable than the terms of this letter.

If you accept this offer, the Service will resolve the issue on the following terms:

1. The Government agrees that a loss deduction is allowable upon termination of an individual subscriber or provider contract with respect to which the taxpayer claims an adjusted basis derived from §1012(c)(3)(A)(ii) of the Tax Reform Act of 1986.
2. The Taxpayer will concede that no deduction is allowed for the termination of employment contracts or workforce in place intangibles.
3. If the appraised value of the subscriber intangible asset is not more than 20 percent of the 12/31/1986 net subscriber premiums, the Government will allow 80 percent of the appraised value of the subscriber intangible asset. If the appraised value of the subscriber intangible asset is more than 20 percent of the 12/31/1986 net subscriber premiums, the Government will adjust the appraised value down to 20 percent of the 12/31/1986 net subscriber premiums, then allow 80 percent of the new

value, effectively allowing 16 percent of the 12/31/1986 net subscriber premiums. For purposes of this offer, appraised values shall be the value determined in the most-recent appraisal used by the Taxpayer in claiming loss deductions for years through 2004.

4. If the appraised value of the provider intangible asset is not more than 2 percent of the 12/31/1986 net subscriber premiums, the Government will allow 50 percent of the appraised value of the provider intangible asset. If the appraised value of the provider intangible asset is more than 2 percent of the 12/31/1986 net subscriber premiums, the Government will adjust the appraised value down to 2 percent of the 12/31/1986 net subscriber premiums, then allow 50 percent of the new value, effectively allowing 1 percent of the 12/31/1986 net subscriber premiums. For purposes of this offer, appraised values shall be the value determined in the most-recent appraisal used by the Taxpayer in claiming loss deductions for years through 2004.
5. The Government will accept the timing of the loss deductions claimed for years through 2004.
6. The remaining adjusted basis of subscriber and provider intangible assets as of 1/1/2005 will be computed on an allowed or allowable basis and included in a Closing Agreement (Form 906). For years after 2004, the Taxpayer must establish the timing of any deduction claimed and the amount of the remaining adjusted basis allocable to each contract for which a deduction is claimed.
7. For each year at issue, Taxpayer must establish that it is an organization entitled to use the adjusted basis provided in §1012(c)(3)(A)(ii) of the Tax Reform Act of 1986.

The Taxpayer must provide the following information in order to enter into this settlement:

a. The 12/31/1986 net subscriber premiums.
b. The appraisal used to claim the loss for the years 1987 through 2004.
c. The amount of the loss deducted or claimed for each year from 1987 through 2004.
d. The status of each of those years, (i.e. in LMSB, in Appeals, docketed, closed, claim disallowed, claim partially allowed, claim allowed, etc.)

In addition, if the Service requests supplemental information or documents necessary to effect a settlement, the Taxpayer must agree to provide those documents within 20 calendar days of the request. The Internal Revenue Service will grant extensions only in exceptional circumstances and subject to its sole discretion.

This is a binding settlement only if the Taxpayer signs the specific matters closing agreement, Form 906, and returns them to us and we sign on behalf of the Commissioner of Internal Revenue.

If applicable, a proposed settlement will be reported to the Joint Committee on Taxation in accordance with section 6402 of the Internal Revenue Code.

If you choose not to accept the proposed settlement, development of the issue will continue where warranted. If the issue is still in dispute at completion of Compliance's review, you may request an Appeals conference through the usual Appeals process.

This settlement is solely a settlement of civil tax matters among the parties, and represents a compromise of issues based on, among other things, efficient tax administration. No statement contained herein shall be deemed to be an admission by the IRS or the Commissioner, and nothing herein shall preclude the IRS from asserting a position on the merits that is different from this settlement in contexts other than those concerning the civil tax liability of the parties.

If you have any questions, please contact the individual whose name and telephone number appear at the top of this letter.

Sincerely,

Kenneth W. Black
Appeals Team Case Leader

Attachment- Offer Acceptance Form

cc. Mr. Frederick Robinson

ATTACHMENT

Blue Cross Blue Shield Industry

INTANGIBLE ASSET ABANDONMENT LOSS ISSUE

I hereby agree to settle the following issues under the terms set forth in this letter.

Taxpayer's Name:_______________________________

TIN: ____________________

Issue: Intangible Asset Abandonment Loss

<u>Years at Issue</u> <u>Deduction in Dispute</u>

Signature:___________________________

Name: _________________________________

Title: __________________________________

Date: _______________________

# Plaintiff's Exhibit 4

Form **906**-c
(Rev. August 1994)

Department of the Treasury --- Internal Revenue Service

# Closing Agreement on Final Determination Covering Specific Matters

Under section 7121 of the Internal Revenue Code

______________________________________________

(Taxpayer's name, address, and identifying number)

______________________________________________

and the Commissioner of Internal Revenue make the following closing agreement:

A) WHEREAS, the Tax Reform Act of 1986 ("the Act") revoked the tax-exempt status of Blue Cross Blue Shield organizations and added I.R.C. § 833, which treats those organizations as taxable stock insurance companies;

B) WHEREAS, section 1012(c)(3) of the Act provided "special rules for existing Blue Cross or Blue Shield organizations";

C) WHEREAS, under § 1012(c)(3)(A)(ii) of the Act, each organization's adjusted bases in its assets, for purposes of determining gain or loss, is deemed equal to the assets' fair market values as of the first day of its first taxable year beginning after December 31, 1986;

D) WHEREAS, Blue Cross Blue Shield organizations have claimed annual or periodic loss deductions under I.R.C. § 165 with respect to certain intangible assets, including subscriber, provider and employee contracts, using the fair market value basis provided under § 1012(c)(3)(A)(ii) of the Act;

E) WHEREAS, the Taxpayer has claimed deductions for the loss of [subscriber], [provider], [and employee] contracts based upon an appraisal by [name of appraiser] dated [insert date] to determine fair market value;

F) WHEREAS, a dispute has arisen between the parties with respect to the fair market value of these intangible assets and the allowance of such losses;

NOW IT IS HEREBY DETERMINED AND AGREED for Federal income tax purposes:

1. As of January 1, 1987 the fair market value of the subscriber contracts intangible asset is __________.

2. For taxable years beginning before December 31, 2004, the amount of the Taxpayer's loss upon the termination of each individual subscriber contract as claimed and as corrected per this agreement are as follows:

| Taxable Year | Appraisal Amount* | Agreed Amount** |
|---|---|---|

3. The Taxpayer's corrected adjusted basis in its subscriber contracts intangible asset at January 1, 2005, is _______.

4. For each taxable year after December 31, 2004, the Taxpayer must establish the date of termination of each subscriber contract and the allocable value determined based upon the adjusted basis amount of the remaining contracts shown in paragraph 3.

[# 5 - 8 if necessary]

5. As of January 1, 1987, the fair market value of the provider intangible asset is _________.

6. For the taxable years beginning before December 31, 2004, the amount of the Taxpayer's loss upon the termination of each individual provider contract as claimed and as corrected are as follows:

| Taxable Year | Appraisal Amount* | Agreed Amount** |
|---|---|---|

7. The Taxpayer's corrected adjusted basis in its provider contracts intangible asset at January 1, 2005 is _________.

8. For each taxable year after December 31, 2004, the Taxpayer must establish the date of termination of each provider contract and the allocable value determined based upon the adjusted basis amount of the remaining contracts shown in paragraph 7.

* The amounts shown in this column represent the amounts that could have been claimed by the Taxpayer based upon the appraisal described in paragraph E above, without regard to any amount shown on the return as filed, or any formal or informal claim. The purpose of this column is to establish the portion of the total appraised value which is allocable to each taxable year.

** The amounts shown in this column represent the amounts allocable to each taxable year under the terms of a settlement proposal for Blue Cross Blue Shield Intangible Asset Abandonment Losses, or if some greater amount was allowed or allowable in a closed year this column shows the amount allowed. For open years, the purpose of this column is to establish the amounts allowable as a loss deduction under the terms of the settlement proposal. For closed years, the purpose of this column is to establish the portion of the total settlement amount that is allocable to each taxable year beginning before December 31, 2004, in order to determine the remaining adjusted basis as of January 1, 2005.

9. The Taxpayer is not entitled to use the fair market value basis provided under §1012(c)(3)(A)(ii) of the Act to claim a loss upon the termination of individual employee contracts or other components of workforce in place.

10. With respect to the subscriber and provider abandonment losses described by this agreement, the Taxpayer agrees not to assert any claim under the mitigation provisions of IRC §§1311 through 1314.

11. Unless the Taxpayer establishes it is eligible to use the fair market value basis provided under §1012(c)(3)(A)(ii) of the Act, the Taxpayer is not entitled to the deductions for the losses described in this agreement.

This agreement is final and conclusive except:

*(1)* the matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of material fact;

*(2)* it is subject to the Internal Revenue Code sections that expressly provide that effect be given to their provisions (including any stated exception for Code section 7122) notwithstanding any other law or rule of law; and

*(3)* if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.

**By signing, the above parties certify that they have read and agreed to the terms of this document.**

Your signature ______________________ Date Signed ______________

Spouse's signature (if a joint return was filed) ______________________ Date Signed ______________

Taxpayer's representative ______________________ Date Signed ______________

Taxpayer (other than individual) ______________________________________

By ______________________ Date Signed ______________

Title ______________________

Commissioner of Internal Revenue

By ______________________ Date Signed ______________

Title ______________________

# Instructions

This agreement must be signed and filed in triplicate. (All copies must have original signatures.)

The original and copies of the agreement must be identical.

The name of the taxpayer must be stated accurately.

The agreement may relate to one or more years.

If an attorney or agent signs the agreement for the taxpayer, the power of attorney (or a copy) authorizing that person to sign must be attached to the agreement. If the agreement is made for a year when a joint income tax return was filed by a husband and wife, it should be signed by or for both spouses. One spouse may sign as agent for the other if the document (or a copy) specifically authorizing that spouse to sign is attached to the agreement.

If the fiduciary signs the agreement for a decedent or an estate, an attested copy of the letters testamentary or the court order authorizing the fiduciary to sign, and a certificate of recent date that the authority remains in full force and effect must be attached to the agreement. If a trustee signs, a certified copy of the trust instrument or a certified copy of extracts from that instrument must be attached showing:

*(1)* the date of the instrument;

*(2)* that it is or is not of record in any court;

*(3)* the names of the beneficiaries;

*(4)* the appointment of the trustee, the authority granted, and other information necessary to show that the authority extends to Federal tax matters; and

*(5)* that the trust has not been terminated, and that the trustee appointed is still acting. If a fiduciary is a party, Form 56, Notice Concerning Fiduciary Relationship, is ordinarily required.

If the taxpayer is a corporation, the agreement must be dated and signed with the name of the corporation, the signature and title of an authorized officer or officers, or the signature of an authorized attorney or agent. It is not necessary that a copy of an enabling corporate resolution be attached. See 26 C.F.R. §601.504(b)(2)(ii) as to dissolved corporations.

Use additional pages if necessary, and identify them as part of this agreement.

Please see Revenue Procedure 68-16, 1968-1 C.B. page 770, for a detailed description of practices and procedures applicable to most closing agreements.

| I have examined the specific matters involved and recommend the acceptance of the proposed agreement. | I have reviewed the specific matters involved and recommend approval of the proposed agreement. |
| --- | --- |
| (Receiving Officer) (Date) | (Reviewing Officer) (Date) |
| (Title) | (Title) |

# Plaintiff's Exhibit 5

# *Appendix*

Blue Cross of Northeastern Pennsylvania

Values Assigned to Employer Group Contracts
and Individual Employees

***BlueCross of Northeastern Pennsylvania***
***Values of Employer Group Contracts***
*as of January 1, 1987*

| Group Number | Group Name | Start Date | Cancel Date | Fair Market Value $ |
|---|---|---|---|---|
| 000001000 | HOWELL AND JONES | 12/1/38 | | 663 |
| 000002000 | BIG BASS LAKE | 12/1/71 | | 1,958 |
| 000003000 | HANOVER HOMES NORTH CORP | 10/1/71 | | 1,385 |
| 000003001 | HANOVER HOMES | 7/1/77 | 4/1/96 | 659 |
| 000005000 | FERN HILL BLDRS INC | 3/1/85 | 2/1/91 | 200 |
| 000006000 | A X A USED CARS & TRUCKS | 12/1/71 | 3/1/95 | 582 |
| 000007000 | WM & HARRY CAREY | 5/1/86 | 10/1/88 | 1,333 |
| 000008000 | CARL'S BODY SHOP | 1/1/79 | 2/1/90 | 237 |
| 000010000 | REGENCY CATERING | 12/1/71 | | 1,165 |
| 000014000 | CHILDRENS SERVICE | 12/1/38 | | 3,215 |
| 000016000 | CONNOR HELRING ASSO INC | 12/1/71 | 7/1/89 | 1,669 |
| 000017000 | CONTINENTAL | 1/1/85 | | 1,041 |
| 000018000 | HAIR SCENE | 5/1/86 | 3/1/89 | 213 |
| 000019000 | OSTERHOUT FREE LIBRARY | 1/1/39 | | 1,583 |
| 000020000 | BUSY BEE LUNCH ROOM | 1/1/79 | 3/1/91 | 145 |
| 000021000 | PENN PATIO INC | 1/1/79 | 4/1/96 | 548 |
| 000024000 | SEARLES & COMPANY | 3/1/85 | 10/1/87 | 1,280 |
| 000025000 | PAUL B SLAWTER INC | 9/1/86 | 3/1/91 | 84 |
| 000027000 | BUTZ LUMBER CO INC | 3/1/85 | 1/1/92 | 320 |
| 000028000 | ROBERTS' COIN AND JEWELRY | 1/1/79 | 4/1/89 | 130 |
| 000029000 | BUTLER'S DISPOSAL | 1/1/79 | | 855 |
| 000030000 | WYOMING VALLEY UNITED WAY | 1/1/39 | | 298 |
| 000030001 | ASSOCIATION FOR | 2/1/84 | | 146 |
| 000030002 | PA ASSOCIATION FOR | 2/1/84 | | 420 |
| 000030003 | FAMILY SERVICE ASSOC | 2/1/84 | 7/1/91 | 525 |
| 000032000 | W P KEENE CONSTR CO INC | 5/1/86 | 4/1/92 | 254 |
| 000033000 | ARBYS ROAST BEEF RES | 1/1/79 | | 166 |
| 000034000 | PERCHAK TRUCKING | 11/1/78 | 2/1/91 | 763 |
| 000035000 | WYO VALLEY CHAPTER | 2/1/85 | 6/1/91 | 471 |
| 000036000 | DUPONT MONUMENT SHOP | 3/1/85 | 7/1/96 | 184 |
| 000038000 | SUS GASTRO ASSOC LTD | 1/1/79 | 1/1/96 | 534 |
| 000039000 | CLEVELAND'S AUTO | 1/1/79 | | 93 |
| 000040000 | JIM BYRNE & CO | 3/1/85 | 12/1/93 | 198 |
| 000041000 | PA MILLERS MUTUAL | 2/1/39 | 7/1/88 | 1,300 |
| 000042000 | B E M INC | 2/1/85 | 11/1/89 | 379 |
| 000043000 | KEYSTONE PROPANE | 1/1/79 | 4/1/89 | 591 |
| 000044000 | TOMANS CONSTRUCTION CO | 3/1/85 | | 218 |
| 000045000 | DONA MICHELE HAIR | 3/1/85 | | 309 |
| 000047000 | Y M C A | 2/1/39 | 12/1/93 | 208 |
| 000048000 | SACRED HEART OF | 1/1/79 | 1/1/91 | 190 |
| 000050000 | REGENCY MFG CO INC | 1/1/85 | 1/1/92 | 6,324 |
| 000051000 | F E PARKHURST | 3/1/49 | 2/1/88 | 1,300 |
| 000053000 | CAANAN BIBLE CHAPEL INC | 1/1/79 | | 2,234 |
| 000054000 | BAKERS SERVICE CNTR | 2/1/85 | 3/1/89 | 1,280 |
| 000055000 | MR Z'S FOOD MART | 4/1/86 | 1/1/95 | 4,713 |
| 000057000 | PAGE DELLERT CONTRACTING | 3/1/85 | 4/1/89 | 1,280 |
| 000058000 | SACKETT CERAMICS | 1/1/79 | 1/1/92 | 1,372 |
| 000059000 | COOPERS SEA FOOD | 3/1/85 | 2/1/89 | 1,779 |
| 000060000 | ALLEN STEVENS CORP | 2/1/85 | | 2,335 |
| 000061000 | P AND S GARAGE | 1/1/79 | | 581 |
| 000062000 | LARRY & ROBERT O'MALIA | 3/1/85 | | 198 |
| 000064000 | R M FRANTZ | 1/1/72 | | 508 |
| 000065000 | GRANT REALTY INC | 1/1/79 | 11/1/88 | 1,199 |
| 000066000 | TONY'S AUTO SALES | 3/1/85 | | 206 |