05-503 T
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S REPLY BRIEF IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
W.C. RAPP
KAREN SERVIDEA
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 616-3423
(202) 514-9440 (Fax)

TABLE OF CONTENTS

Page:

INTRODUCTION . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 2

I. PLAINTIFF HAS FAILED TO SHOW THAT IT SUSTAINED AN ACTUAL LOSS UPON THE TERMINATION OF EACH CONTRACT . . . . . . . . . . 2

A. Under Supreme Court Precedent, A Taxpayer Must Sustain an Actual Loss to Claim a Loss Deduction . . . . . . . . . . 3

B. The Holdings of *Flannery* and *Ludington* Apply Here . . . . . . . . . . 5

C. Defendant Is Entitled to Summary Judgment Because Plaintiff Has Made No Showing of the Cost of Each Terminated Contract . . . . . . . . . . 5

II. THE FRESH-START BASIS RULE DOES NOT GIVE PLAINTIFF AN ADJUSTED BASIS IN ITS HEALTHCARE COVERAGE CONTRACTS . . . . . . . . . . 7

A. The Internal Revenue Code Does Not Allow Loss Deductions for Property, Like Plaintiff's Contracts, in which a Taxpayer Has No Unrecovered Investment . . . 7

B. Defendant's Interpretation Does Not Lead to Anomalous Results or the Taxation of Pre-1987 Appreciation . . . . . . . . . . 10

C. Congress Did Not Intend for the Fresh-Start Basis Rule to Create Millions of Dollars' Worth of Deductions . . . . . . . . . . 12

III. RELIANCE ON THE LEGISLATIVE HISTORY, WHICH SHOWS THAT CONGRESS PROVIDED THE FRESH-START BASIS RULE SOLELY FOR GAIN OR LOSS ARISING FROM THE SALE OR EXCHANGE OF AN ASSET, IS APPROPRIATE . . . . . . . . . . 14

A. The Phrase "Gain or Loss" Is Ambiguous . . . . . . . . . . 15

B. The Purpose for the Fresh-Start Basis Provision Renders Its Application to the Deductions Plaintiff Claims Ambiguous . . . . . . . . . . 16

C. The Equivalence Between the Deductions Plaintiff Claims and Depreciation Deductions Renders Application of the Fresh-Start Basis Provision Ambiguous . . . . . . . . . . 18

TABLE OF CONTENTS (CONTINUED)

Page:

IV. PLAINTIFF MADE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING WHEN IT CHANGED FROM TREATING ITS CONTRACTS AS ONE ASSET TO TREATING THEM AS DISCRETE ASSETS . . . . . 21

A. Plaintiff's Mass-Asset Treatment Constitutes a Method of Accounting . . . . . 21

B. Plaintiff's Original Returns Show that Plaintiff Treated Its Contracts as a Single Asset . . . . . 24

V. PLAINTIFF MADE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING BY CHANGING ITS TREATMENT OF THE COSTS OF CREATING CONTRACTS FROM CURRENT EXPENSES TO CAPITAL EXPENDITURES . . . . . 28

VI. ADDITIONAL GENUINE ISSUES AS TO MATERIAL FACT AND LAW REMAIN . . . . . 30

CONCLUSION . . . . . 30

APPENDIX A (Separately Bound) . . . . . A-1

Internal Revenue Code of 1986 (26 U.S.C.):

§ 833 . . . . . A-1

§ 1014 . . . . . A-4

§ 1031 . . . . . A-5

§ 1033 . . . . . A-6

§ 1231 . . . . . A-7

§ 2001 . . . . . A-8

§ 2031 . . . . . A-8

§ 4940 . . . . . A-8

§ 6110 . . . . . A-9

TABLE OF CONTENTS (CONTINUED)

Page:

APPENDIX A (CONTINUED):

Revenue Act of 1916, Pub. L. No. 64-271, 39 Stat. 756 . . . . . . . . . . . . . . . . . . . . . . . . . . A-10

Revenue Act of 1918, Pub. L. No. 65-254, 40 Stat. 1057 . . . . . . . . . . . . . . . . . . . . . . . . . . A-14

Revenue Act of 1921, Pub. L. No. 67-98, 42 Stat. 227 . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

Treasury Regulation (26 C.F.R.):

§ 1.446-1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-30

§ 1.446-1 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-32

TABLE OF AUTHORITIES

Cases: Page:

*Ambassador Division Florsheim Shoe v. United States*, 748 F.2d 1560 (Fed. Cir. 1984) . . . . . 16

*Anchor Cleaning Serv., Inc. v. Commissioner*, 22 T.C. 1029 (1954) . . . . . 21

*Burnet v. Houston*, 283 U.S. 223 (1931) . . . . . 4

*Butschky v. United States*, 1981 U.S. Dist. LEXIS 16944 (D. Md. Sept. 28, 1981) . . . . . 26

*Capital Blue Cross v. Commissioner*, 431 F.3d 117 (3d Cir. 2005) . . . . . 19, 22, 30

*Cargill Inc. v. United States*, 91 F. Supp. 2d 1293 (D. Minn. 2000) . . . . . 23, 24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . 6

*Charron v. United States*, 200 F.3d 785 (Fed. Cir. 1999) . . . . . 6

*Cummin v. United States*, 1994 U.S. Dist. LEXIS 6493 (D.N.J. Apr. 28, 1994) . . . . . 26

*Dickman v. Commissioner*, 465 U.S. 330 (1984) . . . . . 20

*Diebold, Inc. v. United States*, 891 F.2d 1579 (Fed. Cir. 1990), *cert. denied*, 498 U.S. 823 (1999) . . . . . 23, 24, 26

*Garrett v. Commissioner*, 73 T.C.M. (CCH) 2799 (May 19, 1997) . . . . . 8

*Golden State Towel & Linen Serv. v. United States*, 373 F.2d 938 (Ct. Cl. 1967) . . . . . 19, 20, 30

*Haskell v. Commissioner*, 7 B.T.A. 697, 701 (1927) . . . . . 6

*INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992) (2006) . . . . . 28

*Korn Industries, Inc. v. United States*, 532 F.2d 1352 (Ct. Cl. 1976) . . . . . 26

*Kraft, Inc. v. United States*, 30 Fed. Cl. 739 (1994) . . . . . 20

*Maytag v. Commissioner*, 32 T.C. 270 (1959) . . . . . 22

*McCaughn v. Ludington*, 268 U.S. 106 (1925) . . . . . 2, 3, 4, 5, 6

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993) . . . . . 20, 30

TABLE OF AUTHORITIES (CONTINUED)

Cases (Continued): Page:

*Oliver Iron Mining Co. v. Commissioner*, 13 T.C. 416 (1949), *acq.*, 150-1 C.B. 4 . . . . . . . . . . . . 22

*Pioneer Cooperage Co. v. Commissioner*, 53 F.2d 43 (8th Cir. 1931), *cert. denied*, 284 U.S. 686 (1932) . . . . . . . . . . . . 4

*Reaver v. Commissioner*, 42 T.C. 72 (1964) . . . . . . . . . . . . 25

*Richard S. Miller & Sons, Inc. v. United States*, 537 F.2d 446 (Ct. Cl. 1976) . . . . . . . . . . . . 20

*Sepulveda v. United States*, 2000 U.S. Dist. LEXIS 17570 (N.D. Ga. Nov. 2, 2000) . . . . . . . . 26

*Slodov v. United States*, 436 U.S. 238 (1978) . . . . . . . . . . . . 16

*Standard Oil Co. v. Commissioner*, 77 T.C. 349 (1981) . . . . . . . . . . . . 24

*Steverson v. Commissioner*, 18 B.T.A. 1099 (1930) . . . . . . . . . . . . 6

*S.C. Toof & Co. v. Commissioner*, 21 B.T.A. 916 (1930) . . . . . . . . . . . . 6

*United States v. Flannery*, 268 U.S. 98 (1925) . . . . . . . . . . . . 2, 3, 4, 5, 6

*United States v. Janis*, 428 U.S. 433 (1976) . . . . . . . . . . . . 6

*Wierschem v. Commissioner*, 82 T.C. 718 (1984) . . . . . . . . . . . . 25

*Witte v. Commissioner*, 513 F.2d 391 (D.C. Cir. 1975) . . . . . . . . . . . . 23

*Zakon v. Commissioner*, 7 B.T.A. 687 (1927) . . . . . . . . . . . . 4, 6

Statutes:

Internal Revenue Code of 1986 (26 U.S.C.):

§ 1 . . . . . . . . . . . . 10

§ 165 . . . . . . . . . . . . *Passim*

§ 263 . . . . . . . . . . . . 28

§ 301 . . . . . . . . . . . . 9

§ 446 . . . . . . . . . . . . 21, 23, 24, 27, 28

TABLE OF AUTHORITIES (CONTINUED)

Statutes (Continued): Page:

Internal Revenue Code of 1986 (26 U.S.C.):

§ 723 . . . . . 9

§ 833 . . . . . 13

§ 1001 . . . . . 15

§ 1011 . . . . . 15

§ 1012 . . . . . 7, 8, 9, 12

§ 1014 . . . . . 8, 9

§ 1031 . . . . . 9

§ 1033 . . . . . 9

§ 1202 . . . . . 9

§ 1231 . . . . . 15

§ 2001 . . . . . 9

§ 2031 . . . . . 9

§ 4940 . . . . . 17

§ 6110 . . . . . 20

Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494 . . . . . 16, 17

Revenue Act of 1916, Pub. L. No. 64-271, 39 Stat. 756 . . . . . 3

Revenue Act of 1918, Pub. L. No. 65-254, 40 Stat. 1057 . . . . . 3, 5

Revenue Act of 1921, Pub. L. No. 67-98, 42 Stat. 227 . . . . . 10

Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085 . . . . . 1, 5, 12, 13, 14

TABLE OF AUTHORITIES (CONTINUED)

Miscellaneous: Page:

H.R. Conf. Rep. No. 99-841 (1986),
*reprinted in* 1986 U.S.C.C.A.N. 4075 . . . . . . . . . . 9, 14, 16

H.R. Rep. No. 99-426 (1985) . . . . . . . . . . 12, 13

Internal Revenue: Hearings Before the Senate Finance Comm. on H.R. 8245, 67th Cong. 1st Sess. (pt. 2) at 27 (Confidential Print 1921) (testimony of Dr. T.S. Adams, Tax Advisor, Treasury Dept.) . . . . . . . . . . 10

Michael J. Graetz & Michael M. O'Hear, *The "Original Intent" of U.S. International Taxation*, 46 Duke L.J. 1021, 1031 (1997) . . . . . . . . . . 10

Priv. Ltr. Rul. 6709295070A (Sept. 29, 1967) . . . . . . . . . . 26

Rev. Rul. 65-297, 1965-2 C.B. 152 (1965), *amplified*, Rev. Rul. 76-44, 1976-1 C.B. 127 . . . 25

Rev. Rul. 90-38, 1990-1 C.B. 57 (1990) . . . . . . . . . . 23

Rev. Proc. 97-27, C.B. 680 (1997) . . . . . . . . . . 24-25

Rule 56 . . . . . . . . . . 5, 6

Treasury Regulations (26 C.F.R.):

§ 1.165-1 . . . . . . . . . . 30

§ 1.263 . . . . . . . . . . 28

§ 1.446-1 . . . . . . . . . . 21, 22, 23, 24, 25, 26

Technical Advice Memorandum 9533003 (May 2, 1995) . . . . . . . . . . 20

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-503 T
(JUDGE WHEELER)

HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant files this reply brief in support of its motion for summary judgment and in opposition to plaintiff's cross-motion for summary judgment.

INTRODUCTION

In this suit for a refund of federal income taxes paid for the years 1992 through 1997, plaintiff claims a deduction under § 165 of the Internal Revenue Code[1] for each health insurance contract it held on January 1, 1987, that terminated in the years 1987 through 1997. For this purpose, plaintiff claims that, as part of the Tax Reform Act of 1986,[2] plaintiff received a stepped-up basis in the contracts. In its motion for summary judgment, the Government demonstrated that the basis provision does not apply to the deductions claimed, because plaintiff's contracts have a zero

[1] Unless otherwise noted, the section symbol ("§") or the word "section" shall refer to the Internal Revenue Code of 1986, codified in Title 26 of the United States Code, as amended and in effect during the relevant period.

[2] Tax Reform Act of 1986 ("TRA 1986"), Pub. L. No. 99-514, § 1012, 100 Stat. 2085, 2390 (1986).

cost basis, and because the provision applies only to gain or loss upon the sale or exchange of an asset. The Government further showed that plaintiff is not entitled to the deductions claimed, because they constitute a change in method of accounting for which plaintiff failed to secure the consent of the Commissioner.

Plaintiff filed a brief opposing defendant's motion for summary judgment, arguing that the fresh-start basis provision applies to the deductions it claims and that plaintiff did not change its method of accounting. *See* Pl.'s Br. in Supp. of Its Cross-Mot. for Partial Summ. J. & in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Br."). In addition, plaintiff asks the Court to enter partial summary judgment in its favor, holding that the basis adjustment provision and § 165 apply to the loss deductions plaintiff claims and that plaintiff did not make an unauthorized change in its method of accounting. As explained herein, plaintiff's contentions lack merit.

## ARGUMENT

### I. PLAINTIFF HAS FAILED TO SHOW THAT IT SUSTAINED AN ACTUAL LOSS UPON THE TERMINATION OF EACH CONTRACT

Plaintiff claims a deduction under § 165 for each healthcare coverage contract that terminated in the years 1987 through 1997. *See* Compl. ¶¶ 18, 22. Section 165 allows a deduction, however, only if, and to the extent that, a taxpayer sustains an actual loss – as measured by the difference between the amount of the taxpayer's capital investment in an asset and the amount that the taxpayer received upon the disposition of the asset. *See* § 165(a) ("There shall be allowed as a deduction any *loss sustained* during the taxable year and not compensated by insurance or otherwise" (emphasis added)). This rule applies regardless of the enactment of an intervening fresh-start basis provision. *McCaughn v. Ludington*, 268 U.S. 106 (1925); *United States v. Flannery*, 268 U.S. 98 (1925). Plaintiff's claims fail because plaintiff has made no showing that it invested any specific amount of capital in each contract that was actually lost upon the contract's termination.

A. Under Supreme Court Precedent, A Taxpayer Must Sustain an Actual Loss to Claim a Loss Deduction

The rule that a taxpayer is not entitled to a loss deduction greater than the amount the taxpayer actually lost on its investment – notwithstanding the potential applicability of a basis adjustment provision – was established long ago by Supreme Court cases arising under the early revenue acts. When Congress enacted the first income tax statute in 1913, subjecting all taxpayers to income tax for the first time, it faced the same question that arose when it revoked the tax exemption of BC/BS organizations in 1987: How to assign basis to property held by an entity during the period that it was not subject to tax after the entity becomes taxable. Congress answered that question at that time by providing a fresh-start basis rule functionally identical to the one at issue here, giving taxpayers a fair market value basis in property held as of the day they first became subject to the income tax (*i.e.*, March 1, 1913, the effective date of the first income tax statute). The rule provided: "[F]or the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be (1), [i]n the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date."[3] Revenue Act of 1918, Pub. L. No. 65-254, § 202(a), 40 Stat. 1057, 1060.

In a pair of cases in the 1920s, the Supreme Court rejected attempts by taxpayers to use the 1913 fresh-start basis provision to claim inflated loss deductions upon the disposition of assets. *Ludington*, 268 U.S. at 106-07; *Flannery*, 268 U.S. at 99-100. At that time, the general loss statute provided "[t]hat in computing net income there shall be allowed as deductions: . . . (5) [l]osses sustained during the taxable year and not compensated for by insurance or otherwise." Revenue Act

[3] The fresh-start basis rule originally appeared in the Revenue Act of 1916 as two separate sections – one for loss, the other for gain – but otherwise identical to the 1918 enactment. *See* Revenue Act of 1916, Pub. L. No. 64-271, §§ 2(c), 5(a), 39 Stat. 756, 757, 759.

of 1918, Pub. L. No. 65-254, § 214(a)(5), 40 Stat. 1057, 1067. Relying on that statute, the Supreme Court held that "the Act of 1918 . . . allowed a deduction to the extent only that . . . an actual loss [was] sustained from the investment." *Flannery*, 268 U.S. at 422. The "actual loss" on the "investment," to which the Court referred, was the difference between the price at which the taxpayer purchased an asset (before 1913) and the amount the taxpayer received upon the disposition of the asset. *Id.*; *Ludington*, 268 U.S. at 107. The Court therefore held that, regardless of the 1913 fresh-start basis rule, the taxpayers were entitled to deductions only if, and to the extent that, they paid more for the assets than they received upon the disposition of the assets. *Ludington*, 268 U.S. at 107 (allowing a deduction in the amount of the difference between the selling price and the purchase price of an asset); *Flannery*, 268 U.S. at 105 (disallowing the entire deduction because the taxpayer sold the asset for more than it cost). That is, the taxpayers could not use the fresh-start basis rule to claim loss deductions greater than the losses they actually sustained.

As the Supreme Court later explained, "the effect of the provision in respect of value on March 1, 1913, [was] to limit the deductible loss by that value if it be less than the original cost." *Burnet v. Houston*, 283 U.S. 223, 227 (1931). In other words, the basis provision could *reduce* the amount of a taxpayer's deductible loss if the asset cost more before 1913 than it was worth on March 1, 1913, but it could not *increase* the amount of a taxpayer's deductible loss if the asset cost less before 1913 than it was worth on March 1, 1913. *See id.*[4] Where the amount of a taxpayer's investment in an asset did not exceed the amount received on disposition, the taxpayer could not use the 1913 fresh-start basis provision to manufacture a deductible loss.

---

[4] Other courts applied the holdings of *Flannery* and *Ludington* to non-sale dispositions. *See, e.g.*, *Pioneer Cooperage Co. v. Comm'r*, 53 F.2d 43, 44 (8th Cir. 1931), *cert. denied*, 284 U.S. 686 (1932) (casualty loss); *Zakon v. Comm'r*, 7 B.T.A. 687, 690 (1927) (worthlessness of a license).

B. The Holdings of *Flannery* and *Ludington* Apply Here

Although arising in the context of a different fresh-start basis rule, the holdings of these cases are equally applicable to plaintiff's claims. Both those holdings and plaintiff's claims are based on the statute governing loss deductions, which has not changed materially in the intervening years. Like the early revenue acts, the current Code requires a "loss sustained" to qualify for a loss deduction. *See* § 165(a); Revenue Act of 1918, Pub. L. No. 65-254, § 214(a)(5), 40 Stat. 1057, 1067. Moreover, as explained above, both the 1913 provision and the instant fresh-start basis rule were enacted to address the same problem – how to assign basis to property held by formerly non-taxable entities. Similarly, the text of the instant fresh-start basis provision substantially parallels that of the 1913 provision. *Compare* TRA 1986, Pub. L. No. 99-514, § 1012(c)(3)(ii), 100 Stat. 2085, 2394 ("for purposes of determining gain or loss, the adjusted basis of any asset held on [January 1, 1987] shall be treated as equal to its fair market value as of such day") *with* Revenue Act of 1918, Pub. L. No. 65-254, § 202(a), 40 Stat. 1057, 1060 ("for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property . . . , the basis shall be [i]n the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date"). Finally, applying the holdings of *Flannery* and *Ludington* to this case would accomplish the congressional purpose behind the fresh-start basis rule – shielding from taxation pre-1987 appreciation and depreciation – while harmonizing its effects with Congress's larger goal of subjecting BC/BS organizations to income tax.

C. Defendant Is Entitled to Summary Judgment Because Plaintiff Has Made No Showing of the Cost of Each Terminated Contract

Under the *Flannery* and *Ludington* rule, plaintiff's claims fail because plaintiff has made no showing of the amount of capital it invested in each terminated contract. Pursuant to Rule 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). Thus, a party is entitled to summary judgment when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Here, because this is a tax refund suit, plaintiff bears the burden of proving a deductible loss and the amount of such loss. *United States v. Janis*, 428 U.S. 433, 440 (1976) ("In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover"); *Charron v. United States*, 200 F.3d 785, 792 (Fed. Cir. 1999) ("Since the [plaintiffs] were seeking refunds of taxes they had paid, they have the burden of proving they are entitled to the amount sought").

As demonstrated above, the fact and extent of the actual loss that a taxpayer experienced, as measured by the difference between the cost of an asset and the amount that the taxpayer received upon its disposition, is an essential element of a claim for a deduction under § 165. *See S.C. Toof & Co. v. Comm'r*, 21 B.T.A. 916, 939-40 (1930) (disallowing loss deductions in 1918 for the obsoleteness of assets acquired before 1913 because there was no evidence of their cost); *Steverson v. Comm'r*, 18 B.T.A. 1099, 1102 (1930) (disallowing loss deductions for timber acquired before 1913 and destroyed by fire in 1919 and 1920 because the taxpayer failed to prove the cost of the timber); *Haskell v. Comm'r*, 7 B.T.A. 697, 701 (1927) (disallowing a deduction in 1918 for the loss of good will because "[i]t [was] not contended that [the] good will was acquired by the [taxpayers] at any cost to them"); *Zakon v. Comm'r*, 7 B.T.A. 687, 690 (1927) ("The good will [lost in 1919] . . . appears to have cost the taxpayer nothing and under [*Flannery* and *Ludington*] there is no deductible loss on account of that item").

Plaintiff has made no showing of the cost of each contract. The only amount of loss alleged in the complaint is the fair market value of each contract as of January 1, 1987 (Compl. ¶ 21), but plaintiff has not provided any basis (nor would it make sense) to conclude that plaintiff's actual

investment in each contract is equal to that value. Nor has plaintiff produced any other documents, responses, or computations that show the amount of plaintiff's investment in each contract.[5] Because the pleadings and discovery record demonstrate a lack of evidence of plaintiff's cost of developing each terminated contract – an essential element of plaintiff's claim – defendant is entitled to summary judgment.

## II. THE FRESH-START BASIS RULE DOES NOT GIVE PLAINTIFF AN ADJUSTED BASIS IN ITS HEALTHCARE COVERAGE CONTRACTS

In its opening brief, defendant argued that the fresh-start basis provision does not apply to plaintiff's healthcare coverage contracts because plaintiff never incurred a capital cost to create or acquire the contracts. Br. for the United States in Supp. of Mot. for Summ. J. ("Def.'s Br.") at 11-13. Defendant further demonstrated how application of the fresh-start basis rule to the contracts at issue would conflict with the legislative purpose for § 1012 of the Tax Reform Act – subjecting Blue Cross and Blue Shield ("BC/BS") organizations to taxation – by enabling such organizations to shield from taxation millions of dollars of post-1986 income. Def.'s Br. at 14-16.

### A. The Internal Revenue Code Does Not Allow Loss Deductions for Property, Like Plaintiff's Contracts, in which a Taxpayer Has No Unrecovered Investment

The Internal Revenue Code establishes, as a fundamental prerequisite to having a positive basis in property, that a taxpayer incur a capital cost. *See* § 1012 ("The basis of property shall be the cost of such property"). A capital cost can be the cost of purchasing the asset or the capital expenditures incurred in creating the asset. Plaintiff incurred neither of these types of costs with respect to the contracts for which it claims deductions in this case. Therefore, as plaintiff concedes,

---

[5] *See, e.g.*, Pl.'s Answers to Def.'s Second Set of Interrogs. No. 2 (Def. Ex. 4, App. B. to Def's. Br. at B-51-B-52) (responding to an interrogatory asking for the facts upon which plaintiff relies to support its claim that a tax deductible "loss of intangible assets" occurred, plaintiff stated that each contract was a "valuable asset" and that plaintiff "sustained a loss" upon the termination of each contract, but did not include the amount of capital plaintiff had invested in each contract).

its basis in the contracts, before application of the fresh-start basis, is zero.[6] Plaintiff nonetheless invokes the fresh-start basis provision, arguing that there is nothing anomalous about having a basis equal to zero and allowing other provisions of the internal revenue laws to increase the basis above zero.

Although it is true that, for any number of reasons, a taxpayer's basis in a particular asset might be zero, the Internal Revenue Code generally does not provide an upward adjustment from a zero basis without the expenditure of capital. As demonstrated by *Garrett v. Commissioner*, cited by plaintiff (Pl.'s Br. at 9), a taxpayer who is unable to prove that he paid to acquire an asset, for example, will generally have a zero basis in the asset. *See Garrett v. Comm'r*, 73 T.C.M. (CCH) 2799 (May 19, 1997). The court in *Garrett* held just that, "sustain[ing] [the Commissioner's] determination that petitioners [were] not entitled to any basis in the automobiles sold in 1989." *Id.* at 2804. The court did not hold, as plaintiff asks this Court to do, that the taxpayers had obtained a positive basis in their assets through application of a basis adjustment provision even though the taxpayers had never incurred a capital cost to acquire or create the asset.

The one example cited by plaintiff that, at first glance, appears to support plaintiff's position is the treatment of property acquired from a decedent. *See* Pl.'s Br. at 8. Such property receives a fair market value basis as of the date of the decedent's death. § 1014(a). As plaintiff explains, this rule would establish a positive basis in an asset even if the decedent had a zero basis in the asset before his death. This treatment does not provide precedent, however, for plaintiff's use of the fresh-start basis provision to obtain a positive basis in its healthcare coverage contracts.

First, the Internal Revenue Code explicitly recognizes the stepped-up basis rule for property received from a decedent as an exception to the cost-basis rule. Section 1012 provides that the basis of property is its cost "except as otherwise provided in [§§ 1001-1092] and subchapters C . . . ,

---

[6] Plaintiff rejects defendant's assertion that plaintiff has *no* cost basis in its healthcare coverage contracts, claiming instead that plaintiff has a cost basis equal to *zero* in the contracts. *See* Pl.'s Br. at 9. For purposes of its present argument, defendant sees no reason to distinguish between the concepts of no cost basis and zero cost basis and therefore has adopted plaintiff's terminology in this brief.

K . . . , and P." The basis rule for property received from a decedent falls within the first exception. The fresh-start basis rule here at issue, on the other hand, is not within any of the exceptions. Moreover, the fresh-start basis provision supplies an "adjusted basis," not a "basis." In contrast, § 1014, like the other provisions that fall within an exception to § 1012, provides a "basis." *See* § 1014(a) ("[T]he *basis* of property in the hands of a person acquiring the property from a decedent . . . shall . . . be the fair market value of the property at the date of the decedent's death" (emphasis added)).[7] Nor does the fresh-start basis provision use any other language to convey the notion that Congress intended it to supplant the § 1012 cost-basis rule. To the contrary, the Conference Committee's reference to the fresh-start basis rule as a "basis adjustment" demonstrates that Congress did not intend it to act as an exception to the normal cost-basis rule.[8]

Second, while the § 1014 basis step-up is an exception to the general cost-basis rule, it is consistent with another well-established tax principle – that is, avoiding double taxation of the same economic gain.[9] Pursuant to I.R.C. §§ 2001 and 2031, the estate of a decedent incurs a tax on the fair market value of the estate's assets as of the date of the decedent's death. Thus, if a decedent

---

[7] *See also, e.g.,* § 301(d) [part of subchapter C] ("The *basis* of property received in a distribution to which subsection (a) applies shall be the fair market value of such property" (emphasis added)); § 723 [part of subchapter K] ("The *basis* of property contributed to a partnership by a partner shall be the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized" (emphasis added)); § 1202(i) [part of subchapter P] ("[T]he *basis* of [certain] stock in the hands of the taxpayer shall in no event be less than the fair market value of the property exchanged" (emphasis added)).

[8] H.R. Conf. Rep. No. 99-841, at II-350 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4438 ("The basis adjustment is provided because the conferees believe that such formerly tax-exempt organizations should not be taxed on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation").

[9] This principle is also demonstrated by the Code's treatment of like-kind exchanges and involuntary conversions, pursuant to which a taxpayer's basis in an asset received upon the exchange or conversion is increased by the amount of gain recognized in the transaction. *See* §§ 1031(d); 1033(b).

held an asset with a zero cost basis that appreciated in value to $100 as of the date of death, the $100 would be included in the decedent's estate and be subject to estate tax. If the law did not provide the heir with a corresponding $100 basis step-up in the asset, the heir would incur another layer of taxation on the same $100 of appreciation upon the sale or exchange of the asset. As the legislative history confirms,[10] Congress provided the basis step-up for inherited property to prevent this result. Here, there is no risk that the appreciated value of plaintiff's contracts will be subject to more than one layer of taxation. Thus, the stepped-up basis rule for inherited property does not support plaintiff's proposed departure from the cost-basis rule to increase its basis in its contracts from zero to over $32 million.

### B. Defendant's Interpretation Does Not Lead to Anomalous Results or the Taxation of Pre-1987 Appreciation

Plaintiff further argues that a rule that would require a BC/BS organization to have incurred a capital cost before January 1, 1987, to invoke the fresh-start basis provision would lead to the anomalous result that the applicability of the fresh-start basis provision would hinge on whether the organization incurred a capital cost before January 1, 1987, or after January 1, 1987. *See* Pl.'s Br. at 10. Under the annual reporting convention established by the Internal Revenue Code, however, the difference of a day often leads to different tax results. A taxpayer who sells a capital asset on December 31 of a year in which he earns substantial income, for example, will be taxed at a higher rate than if he sells the asset on January 1 of the following year in which he earns less income. *See* § 1(h). This consequence of annual reporting is amplified in a case, such as this, where an entity

[10] The basis provision for inherited property was first enacted in the Revenue Act of 1921. *See* Revenue Act of 1921, Pub. L. No. 67-98, § 202(a)(3), 42 Stat. 227, 229. T.S. Adams, the "father" of the 1921 Act (*see, e.g.,* Michael J. Graetz & Michael M. O'Hear, *The "Original Intent" of U.S. International Taxation*, 46 Duke L.J. 1021, 1031 (1997)), explained that the step-up was provided "because the estate or inheritance tax has been imposed." Internal Revenue: Hearings Before the Senate Finance Comm. on H.R. 8245, 67th Cong. 1st Sess. (pt. 2) at 27 (Confidential Print 1921) (testimony of Dr. T.S. Adams, Tax Advisor, Treasury Dept.).

is tax-exempt one day and taxable the next. If a BC/BS organization made a charitable contribution on January 1, 1987, for example, it would be entitled to deduct the amount of that contribution in computing its 1987 taxable income even though the organization would not have been allowed to deduct the contribution if it was made just one day earlier. Nor is plaintiff's interpretation of the fresh-start basis immune from the effects of the annual reporting convention. Under plaintiff's interpretation, if a contract worth thousands of dollars terminated on January 1, 1987, plaintiff would be entitled to a deduction for that amount in 1987, shielding that much of plaintiff's 1987 income from taxation. If the contract had terminated just one day earlier, however, the termination would have no effect on plaintiff's 1987 taxable income.

Not only is the anomaly identified by plaintiff no more anomalous than many other effects of annual tax accounting, but the example itself, which posits the *sale* of a self-created asset by a BC/BS organization, is readily distinguishable from this case, which is premised on the worthlessness or abandonment of a self-created asset. While plaintiff invokes Congress's intent not to tax pre-1987 appreciation to support its position, the possibility of taxing pre-1987 appreciation is not implicated in the issue before the Court. Under defendant's position, no pre-1987 appreciation is taxed. Under plaintiff's position, however, pre-1987 appreciation is used to shield from appropriate taxation the income plaintiff earned after January 1, 1987, income which is completely unrelated to the terminating contracts. *See* Def.'s Br. at 14-16. In plaintiff's example, the difference between the two alternative scenarios is only the amount of post-1986 income shielded from taxation – either an amount equal to the capital expenditure (if it occurred on or after January 1, 1987) or an amount equal to the capital expenditure plus all pre-1987 appreciation (if the expenditure occurred before January 1, 1987). In neither situation would plaintiff incur a tax on pre-1987 appreciation.

A closer analogy to this case is the ordinary turnover of basic office supplies. An

organization will generally account for such supplies in the same way that plaintiff accounts for its healthcare coverage contracts: by expensing the costs of acquisition/creation. Like plaintiff's contracts, therefore, such supplies will normally have a zero cost basis. Under plaintiff's interpretation of the fresh-start basis provision, however, a BC/BS organization would be able to step up that basis to the fair market value as of January 1, 1987, and claim a deduction in subsequent years as each supply was exhausted. The absurdity of allowing such deductions demonstrates why the Court should hold that the fresh-start basis provision does not apply to assets with respect to which a taxpayer has a zero cost basis.

C. Congress Did Not Intend for the Fresh-Start Basis Rule to Create Millions of Dollars' Worth of Deductions

In its opening brief, defendant demonstrated how application of the fresh-start basis provision to the deductions plaintiff claims would frustrate Congress's goal of revoking the tax exemption of BC/BS organizations by enabling them to shield from taxation millions of dollars (over $32 million, in plaintiff's case) of post-1986 income. Def.'s Br. at 14-16. Defendant also showed how the unavailability of this tax benefit to commercial insurers would undermine Congress's larger goal of leveling the competitive playing field between BC/BS organizations and commercial insurers. *Id.*; *see* H.R. Rep. No. 99-426, at 664 (1985) ("The committee believes that the tax-exempt status of organizations engaged in insurance activities provides an unfair competitive advantage to these organizations").

In its response, plaintiff argues that its interpretation of the fresh-start basis rule does not conflict with the congressional purpose behind § 1012 of the Tax Reform Act, claiming that the rule is but one of a number of devices designed to ease the transition of BC/BS organizations from tax-exempt organizations to taxable entities by providing BC/BS organizations with advantages over their commercial counterparts. *See* Pl.'s Br. at 18-19. Although Congress enacted the fresh-start

basis rule because of its simultaneous revocation of the tax-exempt status of BC/BS organizations, the rule was intended to alleviate the unfairness of taxing BC/BS organizations on pre-1987 appreciation, not to reduce the general burden of taxation by providing advantages over commercial insurers. A comparison of the fresh-start basis rule with the parts of § 1012 that Congress did intend to provide tax advantages to BC/BS organizations confirms this interpretation.

Section 1012 of the Tax Reform Act provides BC/BS organizations with two specific tax advantages over their competitors. These devices were designed to enable BC/BS organizations to continue providing coverage to high-risk individuals and small groups.[11] The first advantage, which plaintiff mentions, is a "special deduction" based on the excess of the organization's reserves over its claims and expenses. TRA 1986, Pub. L. No. 99-514, § 1012(b)(1), 100 Stat. 2085, 2391 (codified as § 833(a)(2)). The second tax advantage provides that, unlike other insurers, a BC/BS organization does not have to reduce its unearned premiums by 20% before deducting them from its income. *See id.* (codified as § 833(a)(3)). These two provisions demonstrate that, to the extent that Congress intended to provide BC/BS organizations with substantive tax advantages over their competitors, it did so directly, straightforwardly, and unambiguously.[12]

Unlike the tax advantages found in subsection (b), the "Special Rules" found in (c)(3) (including the fresh-start basis rule here at issue) are technical in nature and narrow in scope (which also explains why they, unlike subsection (b), were never codified). *See* TRA 1986, Pub. L. No. 99-

[11] *See* H.R. Rep. No. 99-426, at 665 (1985) (stating, in its explanation of the part of the House bill that evolved into subsection (b) of the statute, that "in the case of activities of Blue Cross and Blue Shield and their affiliates with respect to high risk individuals and small groups, the bill authorizes the Treasury Department to issue regulations providing for special treatment to such organizations").

[12] These special advantages also appear in a different subsection of the statute than the fresh-start basis rule. The tax advantages that Congress provided BC/BS organizations are not, as plaintiff suggests, part of subsection (c)(3) ("Special Rules for Existing Blue Cross Or Blue Shield Organizations"), the subsection that contains the fresh-start basis rule. *See* Pl.'s Br. at 18. They are found in subsection (b) ("Treatment of Blue Cross and Blue Shield Organizations"). *See* TRA 1986, Pub. L. No. 99-514, § 1012(b), 100 Stat. 2085, 2391 (codified as I.R.C. § 833).

514, § 1012(c)(3), 100 Stat. 2085, 2394 (not codified). These special rules address (1) application of the change of accounting method rules to a BC/BS organization's first taxable year; (2) the basis in assets held by BC/BS organizations on January 1, 1987 (the fresh-start basis rule); and (3) how distributions and reserve weakening occurring in the few months before BC/BS organizations became taxable should be treated for purposes of calculating adjusted surplus as necessary for the "special deduction" of subsection (b)(2). *Id.* None of these provisions supplies BC/BS organizations with a significant tax advantage over commercial insurers, unless plaintiff's mis-reading of the fresh-start basis rule is adopted by the Court.

Thus, although Congress provided certain tax advantages to BC/BS organizations at the same time that it revoked their tax-exempt status, the overall structure of § 1012 confirms that Congress did not intend for the fresh-start basis rule to derogate from its goal of revoking the tax exemption of BC/BS organizations by providing them with millions of dollars of deductions.

## III. Reliance on the Legislative History, which Shows that Congress Provided the Fresh-Start Basis Rule Solely for Gain or Loss Arising from the Sale or Exchange of an Asset, Is Appropriate

Even if the Court were to find that plaintiff is entitled to § 165 deductions and may invoke the fresh-start basis rule despite never having incurred a capital cost with respect to its contracts, plaintiff's claims fail because they do not arise from the sale or exchange of an asset. As demonstrated in defendant's opening brief, Congress intended the fresh-start basis rule to apply solely to gain or loss upon the sale or exchange of an asset. This is confirmed by the report of the Conference Committee, where the provision originated, which states: "The basis step-up is provided solely for purposes of determining gain or loss upon sale or exchange of the assets, not for purposes of determining amounts of depreciation or for other purposes." H.R. Conf. Rep. No. 99-841, at II-350 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4438.

In its opening brief, defendant provided three justifications for reliance on the legislative

history to determine how the statute applies to plaintiff's claims. First, the phrase "gain or loss" is facially ambiguous when considered in light of the use of that phrase elsewhere in the Internal Revenue Code and in contrast to the use of the phrase "any loss" in § 165(a). *See* Def.'s Br. at 16-19. Second, application of the provision to plaintiff's claims is inconsistent with the legislative purpose for the provision. *See id.* at 20-22. Third, application of the provision to plaintiff's claims conflicts with Congress's deliberate withholding of the basis step-up for purposes of determining depreciation or amortization. *See id.* at 23-25.

A. The Phrase "Gain or Loss" Is Ambiguous

Plaintiff argues that the phrase "gain or loss" unambiguously includes any type of loss because, when Congress intends to limit the phrase "gain or loss" to sales and exchanges, it does so explicitly. Pl.'s Br. at 11-15. In some provisions of the Code, however, Congress uses the phrase "gain or loss" interchangeably with more explicitly limited phrases. For example, § 1001 uses the phrase "gain or loss" as a heading to describe provisions that apply solely to "gain or loss" from the "sale or other disposition" or "sale or exchange" of an asset. Section 1011 similarly uses the phrase "gain or loss" as a heading for provisions that apply solely to "gain or loss" from the "sale or other disposition" of an asset. In addition, § 1231(a)(3) uses the heading "gains and losses," without modification, to refer to gain or loss from the "sale or exchange" or "involuntary conversion" of an asset. Thus, the phrase "gain or loss," by itself, does not unambiguously refer to all types of gain and loss.

Plaintiff further contends that the absence of the word "any" before the phrase "gain or loss" does not limit the breadth of the term. Although the absence of the word "any," by itself, might not limit the scope of the term "gain or loss," it does contribute to the ambiguity of the statute. Section 165(a) allows a deduction for "any loss." Some types of losses that fall within this broad phrase *do not* fall within other, more limited, meanings of the term "loss" (such as loss from

the sale or exchange of an asset). Thus, when confronted with a type of loss, such as loss arising from the termination of a contract, that does not fall within all recognized categories of loss, a court must consider the legislative history of the provision to determine its intended scope. Moreover, that Congress *did* use the phrase "any loss" in the fresh-start basis rule provided to the Federal Home Loan Mortgage Association when its tax exemption was revoked raises further doubt that Congress intended the instant provision to apply to all types of § 165 losses. *See* Deficit Reduction Act of 1984, Pub. L. 98-369, § 177(d)(2), 98 Stat. 494, 711 (1984) ("[T]he adjusted basis of any asset . . . held on January 1, 1985, shall . . . for purposes of determining *any loss*, be equal to the lesser of the adjusted basis of such asset or the fair market value of such asset as of such date" (emphasis added)).

B. The Purpose for the Fresh-Start Basis Provision Renders Its Application to the Deductions Plaintiff Claims Ambiguous

Even if the Court were to find that the statute seems plain on its face, reliance on the Conference Committee report would still be justified because of the odd results that flow from plaintiff's interpretation.[13] As demonstrated above, the purpose of the fresh-start basis provision was not to grant BC/BS organizations a tax advantage over their competitors by allowing sizeable deductions against otherwise taxable income. Congress provided the fresh-start basis rule, rather, to avoid taxing BC/BS organizations on changes in the value of their assets that took place during the time that the organizations were tax-exempt. *See* H.R. Conf. Rep. No. 99-841, at II-350 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4438 ("The basis adjustment is provided because the conferees

---

[13] *Slodov v. United States*, 436 U.S. 238, 247 (1978) (relying on the legislative history of a provision of the Internal Revenue Code after determining that while neither party's "construction [was] inconsistent with the language of the statute, . . . [the] petitioner's [was] inconsistent with its purpose"); *Ambassador Div. Florsheim Shoe v. United States*, 748 F.2d 1560, 1563 (Fed. Cir. 1984) ("We may concede arguendo that as a matter of cold parsing of statutory language the [Court of International Trade] has somewhat the better of the argument . . . . What tips the scale towards reversal . . . is application of the technique of testing an interpretation of a statute by the absurdity of its consequences, joined with the lack of support in legislative history for the result proposed").

believe that such formerly tax-exempt organizations should not be *taxed* on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation" (emphasis added)).[14] This goal is applicable, however, only when a BC/BS organization *receives something of value* upon the disposition of an asset and not, as here, when a contract lapses in the ordinary course of business.

In its response, while plaintiff agrees that the purpose of the fresh-start basis rule is to "tax BC/BS organizations only on gains and income arising after January 1, 1987," it then disputes defendant's assertion that such goal is applicable only when an organization receives potentially taxable consideration in exchange for an asset. *See* Pl.'s Br. at 5, 17-18. Plaintiff never explains, though, how a transaction in which a taxpayer receives no consideration, such as the termination of a contract, might result in tax on gains or income arising *before* January 1, 1987. This is true of plaintiff's "burning building" hypothetical, where plaintiff posits a building purchased by a BC/BS organization in 1985, which is then destroyed by a fire in 1994. *See id.* at 16-17. Under defendant's interpretation of the fresh-start basis rule, the taxpayer would be entitled to a deduction, but only in the amount of the organization's cost basis in the building. Plaintiff asserts that this would somehow lead to the taxation of the building's pre-1987 appreciation. *See id.* at 17. To be sure, the taxpayer would have more *taxable* 1994 income under defendant's interpretation, since the taxpayer would not be able to deduct the pre-1987 appreciation from its 1994 income. But, each dollar of

---

[14] The other fresh-start basis provisions cited in plaintiff's brief also confirm that, when Congress subjects an entity to income taxation for the first time, its primary purpose in establishing a basis adjustment is to shield from taxation gains attributable to appreciation during the entity's nontaxable period. *See* Pl.'s Br. at 14-15 (referring to the fresh-start basis rules provided to Federal Home Loan Mortgage Association and private foundations). While neither adjustment provision entitles a newly taxable entity to a stepped-up basis for purposes of claiming loss deductions, both allow use of the step-up for purposes of determining gain. *See* Deficit Reduction Act of 1984, Pub. L. 98-369, § 177(d)(2), 98 Stat. 494, 711 (1984); I.R.C. § 4940(c)(4)(B).

income taxed in 1994 would have been earned in 1994. Moreover, contrary to plaintiff's contention (Pl.'s Br. at 17), this result does not conflict with the availability of the basis adjustment rule for purposes of determining loss from the sale or exchange of an asset. Pl.'s Br. at 17. Depending on the amount received and the taxpayer's basis in an asset, a sale or exchange may result in either a gain or a loss. Therefore, the fresh-start basis adjustment is necessary to ensure that the taxpayer does not recognize a gain on the transaction and thereby incur a tax on pre-1987 appreciation. Thus, far from leading to absurd results, defendant's interpretation fulfills the legislative purpose for the fresh-start basis rule.

C. The Equivalence Between the Deductions Plaintiff Claims and Depreciation Deductions Renders Application of the Fresh-Start Basis Provision Ambiguous

As defendant demonstrated in its opening brief, the deductions plaintiff claims are functionally indistinguishable from deductions for the depreciation of plaintiff's subscriber base as of January 1, 1987. Def.'s Br. at 23-25. While the equivalence between plaintiff's claims and depreciation deductions might not legally or factually convert plaintiff's claims into depreciation deductions, it does call attention to the ambiguity of the fresh-start basis rule. The fact that Congress specifically denied the basis adjustment for purposes of determining depreciation deductions surely casts doubt on whether Congress intended the statute to apply to the type of loss deductions plaintiff claims.

Plaintiff seeks to distinguish its claimed loss deductions from depreciation deductions, explaining that § 165 losses are episodic and take place only after an identifiable event establishes the loss, whereas depreciation deductions are periodic and take place regardless of actual events. *See* Pl.'s Br. at 22-23. The deductions claimed by plaintiff amount to depreciation, however. Thus, plaintiff is claiming a deduction each year for the gradual exhaustion of the January 1, 1987, subscriber base as an asset useful in its trade or business.

As explained in defendant's opening brief, plaintiff's method of valuing the contracts at issue renders the occurrence of the losses that plaintiff claims little more than a depreciation schedule for the value attributable to the entire subscriber base. Def.'s Br. at 24. The valuation report plaintiff submitted to support its refund claims gathered and averaged data from all or broad categories of contracts to determine the purported fair market value of each contract as of January 1, 1987. *See* Pl.'s Resp. to Def.'s Proposed Findings of Fact ¶ 38; *see also id.* ¶¶ 20, 22-36; (detailing the types of contract-specific information not considered in the Ernst & Young report); Def.'s Proposed Findings of Fact ¶ 21. It did not analyze all of the unique characteristics of each contract, as would be necessary for plaintiff's deductions actually to represent the value of individual terminated contracts. *Id.*[15] Accordingly, much like depreciation deductions, each loss deduction plaintiff actually claims represents a percentage of the value of the larger asset that plaintiff actually valued – plaintiff's subscriber base (or large blocks of it). Thus, although the timing of the deductions plaintiff claims might be controlled by the actual termination of contracts, the resulting pattern of deductions – like a depreciation schedule – does not reflect the loss sustained each year.

Finally, plaintiff maintains that the deductions it claims are not the equivalent of depreciation deductions for plaintiff's subscriber base because, according to *Capital Blue Cross v. Commissioner*, 431 F.3d 117 (3d Cir. 2005), healthcare coverage contracts constitute separate assets. *See* Pl.'s Br. at 24. Whatever may be the law in that Circuit, precedent in *this* Circuit holds that customer-based intangibles like plaintiff's contracts are properly considered as single assets. In *Golden State Towel &*

---

[15] While plaintiff disputes this characterization of its valuation report, the report itself shows that the author failed to consider several important contract-specific variables. For example, notwithstanding each contract's actual pre-1987 premium growth rate, the author projected that each contract's premium would grow at a 7% annual rate after 1987. *See* Excerpt from Ernst & Young Valuation Report (Def. Ex. 18, App. B to Def.'s Br. at B-180). Similarly, ignoring the actual pre-1987 claims expense ratio of each contract, the author projected that all of the contracts in each of four categories would experience the same post-1987 claims expense ratios notwithstanding the actual pre-1987 claims expense ratios of each contract. *Id.*

*Linen Serv. v. United States*, 373 F.2d 938, 944 (Ct. Cl. 1967), for example, the Court held that a taxpayer who purchased an at-will customer list was not entitled to § 165 deductions for each customer who ceased doing business with the taxpayer, because each customer "enjoy[ed] no separate capital standing independent of the whole." *See also Richard S. Miller & Sons, Inc. v. United States*, 537 F.2d 446, 451 (Ct. Cl. 1976) ("In most sales, the insurance expirations are valuable only collectively and they are considered to be a single asset rather than a collection of individual policies").[16] Moreover, regardless of the proper legal characterization of the contracts, plaintiff has not demonstrated that it *actually* accounts for its contracts as individual assets. And, since deductions for the wasting of a single asset constitute depreciation deductions, plaintiff's invocation of the fresh-start basis rule here is in tension with the inapplicability of the rule for purposes of depreciation.

In sum, reliance on the legislative history of the fresh-start basis rule is justified because its text, its purpose, and its inapplicability to depreciation deductions, render its applicability to deductions for terminated contracts indeterminate.[17]

---

[16] While *Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993), overturned the "mass-asset rule" to the extent that it holds that a customer-based intangible asset cannot be depreciated because of its relationship to goodwill, *Newark Morning Ledger* did not hold that the individual components of a customer-based intangible constitute separate assets. *See id.* at 565 (citing with approval the Court of Claims's conclusion that the contract expirations at issue in *Richard S. Miller & Sons, Inc. v. United States*, 537 F.2d 446 (Ct. Cl. 1976) constituted one mass asset that was nonetheless depreciable because the taxpayer had established that the asset had a determinable useful life). *See also Richard S. Miller & Sons, Inc.*, 537 F.2d at 452 ("[T]he mass asset rule does not prevent a depreciation deduction in a case where the expirations *as a single asset* can be valued separately [from goodwill] and the requisite showing made that the useful life of the information contained in the intangible asset as a whole is of limited duration" (emphasis added)); *Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 791-92 (1994) (citing *Golden State Towel* after the Supreme Court's *Newark Morning Ledger* decision and treating a network of milk suppliers as a single asset).

[17] Plaintiff's reliance on Technical Advice Memorandum 9533003 to support its position is misplaced. *See* Pl.'s Br. at 20-21 (citing I.R.S. Tech. Adv. Mem. 9533003 (May 2, 1995)). Technical Advice Memoranda may not be cited as precedent. § 6110(k)(3) ("[A] written determination may not be used or cited as precedent"); § 6110(b)(1)(A) ("The term 'written determination' means a . . . technical advice memorandum"); *see also Dickman v. Comm'r*, 465 U.S. 330, 343 (1984) ("[I]t is well established that the Commissioner may change an earlier interpretation of the law, even if such a

## IV. Plaintiff Made an Unauthorized Change in Its Method of Accounting When It Changed from Treating Its Contracts as One Asset to Treating Them as Discrete Assets

In its opening brief, defendant demonstrated that plaintiff's refund claims for terminated contracts are premised on a change in its method of accounting for which plaintiff failed to secure the consent of the Commissioner, as required by § 446(e). Def.'s Br. at 25-32. As evidenced by plaintiff's failure to claim deductions for individual contract terminations on its original 1987 through 1995 returns, plaintiff previously accounted for its contracts as one asset: plaintiff's subscriber base. Plaintiff retroactively changed from that method, without the Commissioner's consent, when in 1996 it first claimed deductions based on the termination of *individual* contracts.

### A. Plaintiff's Mass-Asset Treatment Constitutes a Method of Accounting

Plaintiff argues that its refund claims do not involve a matter of timing, as is necessary to constitute a method of accounting, because § 165 controls the timing of loss deductions. *See* Pl.'s Br. at 31; *see also* 26 C.F.R. § 1.446-1(e)(2)(ii)(a)(1996) (explaining that a method of accounting includes the treatment of a "material item," which is "any item which involves the proper time for the inclusion of the income or the taking of a deduction"). According to plaintiff, because § 165 requires a taxpayer to claim a deduction in the year that the taxpayer sustains the loss, once plaintiff determined that a contract termination constituted a loss deductible under § 165, it had no choice but to claim the deduction in the year of termination. *See* Pl.'s Br. at 31. The law permits a deduction only when an entire asset is lost (*see Anchor Cleaning Serv., Inc. v. Comm'r*, 22 T.C. 1029, 1035 (1954)), however, and therefore how a taxpayer defines its assets affects the timing of § 165 deductions. That is, while § 165 provides the proper timing for claiming a loss deduction *once it is*

---

change is made retroactive in effect").

*determined that a loss has been sustained*, a taxpayer's method of defining its assets *affects the determination* of when a loss is sustained and therefore the *timing* of the taxpayer's § 165 deductions.[18]

As demonstrated in defendant's opening brief (Def.'s Br. at 29), plaintiff's choice to account for its contracts as one asset (plaintiff's subscriber base) or multiple, discrete assets affects the timing of plaintiff's loss deductions for terminated contracts. If plaintiff treats the contracts as one asset, plaintiff does not sustain a loss of that asset until all of the contracts terminate, and therefore may not claim a § 165 deduction until then. If plaintiff treats the contracts as multiple, discrete assets, plaintiff sustains a loss, and therefore may claim a deduction under § 165, upon the termination of each individual contract. Under either treatment, plaintiff eventually deducts its entire basis in all of the contracts, the difference between the two treatments being only the *timing* of the deductions. Because the choice to account for contracts as a mass asset or as discrete assets involves a matter of timing, it constitutes a method of accounting.

In response, plaintiff maintains that the law requires plaintiff to treat its contracts as separate assets. Pl.'s Br. at 27-28. The only authority that plaintiff marshals for that proposition, however, is from a different Circuit (*Capital Blue Cross v. Comm'r*, 431 F.3d 117, 132 (3d Cir. 2005)). Precedent in this Circuit, to the contrary, holds that customer-based intangible assets, like plaintiff's healthcare coverage contracts, constitute single assets, each individual part of which enjoys no separate capital standing apart from the whole. *See supra* Section III.C. Thus, while an argument might be constructed to support the proposition that the law requires some types of property (such as the mineral leases that were at issue in *Maytag v. Commissioner*, 32 T.C. 270 (1959), and *Oliver Iron Mining*

---

[18] In addition to its method of defining its assets, a taxpayer's other accounting methods might also affect the timing of § 165 deductions. For example, a manufacturer may account for sales of its product when the goods are shipped, when the goods are delivered or accepted, or when title to the goods passes to the buyer. *See* 26 C.F.R. § 1.446-1(c)(1)(ii)(C). The method chosen controls the time for reporting gains and losses on the sale of such goods.

*Co. v. Commissioner*, 13 T.C. 416 (1949), *acq.*, 150-1 C.B. 4) to be treated as separate assets, no such argument can be made with respect to customer-based intangibles, such as plaintiff's contracts.

Moreover, the consent requirement of § 446(e) applies even when a taxpayer changes from an impermissible to a permissible method of accounting. *Diebold, Inc. v. United States*, 891 F.2d 1579, 1583 (Fed. Cir. 1990), *cert. denied*, 498 U.S. 823 (1999); 26 C.F.R. § 1.446-1(e)(2)(i) ("Consent must be secured whether or not such method is proper"); *id.* § 1.446-1(e)(2)(iii) (illustrating, in examples 6, 7 and 8, that changes from impermissible to permissible methods of accounting require the Commissioner's consent). Thus, even if the law required plaintiff to define its contracts as separate assets, plaintiff was still required to obtain the Commissioner's consent to change to that treatment from plaintiff's prior mass-asset method. In *Diebold*, a manufacturer treated certain replacement parts as nondepreciable inventory on its original tax returns for 1976 and 1977. *Diebold*, 891 F.2d at 1581. On amended returns, the taxpayer claimed depreciation deductions for the parts. *Id.* Responding to the Government's argument that the taxpayer had made an unauthorized change in its method of accounting, the taxpayer contended that, because the replacement parts were not held for sale, they could not properly be treated as inventory under any accounting method. *Id.* at 1583. The Federal Circuit disallowed the refund claims, holding that "[e]ven if [the taxpayer] were correcting an erroneous characterization of the replacement modules, the correction would still be considered a change in the method of accounting." *Id.*[19]

---

[19] *See* Rev. Rul. 90-38, 1990-1 C.B. 57 (1990) ("A taxpayer may not, without the Commissioner's consent, retroactively change from an erroneous to a permissible method of accounting by filing amended returns, even if the period for amending the return for the first year in which the erroneous method was used has not expired"); *see also Witte v. Comm'r*, 513 F.2d 391, 394 (D.C. Cir. 1975) (holding that § 446(e) applies even when a taxpayer changes from an impermissible method to a permissible method of accounting, because "[t]he danger of distortion of income detrimental to governmental revenues exists regardless of whether the change in method is from one proper method to another or from an improper method to a proper one"); *Cargill Inc. v. United States*, 91 F. Supp. 2d 1293, 1296 (D. Minn. 2000) ("Even if [the taxpayer] is correct that its prior treatment . . . was legally improper, the Commissioner's consent is required for it to change to the proper method").

In so holding, the court also rejected the related argument that plaintiff makes here – that a change respecting the "character" of an item does not constitute a change in method of accounting. *See* Pl.'s Br. at 32. In *Diebold*, the court distinguished *Standard Oil Co. v. Commissioner*, 77 T.C. 349 (1981) (the primary case upon which plaintiff at bar relies) on the basis that the taxpayer there had not treated the material item in question consistently enough to constitute a method of accounting. *See Diebold*, 891 F.2d at 1582.[20] Thus, under *Diebold*, a change from an impermissible to a permissible treatment of an item that has timing consequences constitutes a change in method of accounting even if it involves the proper characterization of the item. Accordingly, even if "the only change [plaintiff] made [was] to recognize the proper character of [its healthcare coverage contracts]" (*see* Pl.'s Br. at 32), plaintiff was still required to obtain the Commissioner's consent.

B. Plaintiff's Original Returns Show that Plaintiff Treated Its Contracts as a Single Asset

Plaintiff argues that the absence of an item from a return is too ambiguous an action to qualify as an election of a method of accounting, and thus that plaintiff never adopted a method of accounting contrary to the method reflected in its refund claims. Pl.'s Br. at 27, 29. Neither the law nor the facts support this contention.

To begin, neither § 446(e) nor the primary Treasury Regulation interpreting § 446(e) (26 C.F.R. § 1.446-1) requires an item to explicitly appear on a return for a method of accounting to have been adopted. In general, to adopt a method of accounting, a taxpayer must show consistency in its treatment of a particular item. *See* 26 C.F.R. § 1.446-1(e)(2)(ii)(a) (1996); Rev. Proc. 97-27 § 2.01(2), 1997-1 C.B. 680 (1997). One way to establish the requisite consistency of treatment is to treat the item "in the same way in determining the gross income or deductions in two or more

[20] *See also Cargill Inc. v. United States*, 91 F. Supp. 2d 1293, 1297-98 (D. Minn. 2000) (rejecting the taxpayer's argument that, "because the timing consequences flow automatically from the characterization of its interest in the lease, its proposed recategorization of this interest is not a change in its method of accounting").

consecutively filed tax returns." Rev. Proc. 97-27 § 2.01(2). While this definition requires the taxpayer's treatment of an item to have affected the taxpayer's determination of its taxable income, it does not require the treatment to appear directly on a return. A taxpayer can adopt a method of accounting by treating an asset as nondepreciable property,[21] for example, even though the treatment does not appear on the taxpayer's return. In the same way, plaintiff's treatment of its contracts as a single asset constituted the adoption of an accounting method because, even though the treatment did not appear directly on plaintiff's returns, it affected plaintiff's taxable income by causing plaintiff not to claim deductions for individual contract terminations.

Plaintiff's reliance on *Reaver v. Commissioner*, 42 T.C. 72 (1964), is misplaced. *See* Pl.'s Br. at 27. *Reaver* does not (as plaintiff would have it) stand for the proposition that a taxpayer can establish a method of accounting for an item *only* if the item itself appears on the taxpayer's return. The taxpayer in *Reaver* failed to report the sale of an asset on its original return. *Reaver*, 42 T.C. at 75-76. The Commissioner assessed a deficiency, thus forcing the taxpayer to adopt a different method of accounting. *Id.* at 76. The court held that the taxpayer could then elect either of two valid methods for recognizing the gain from the sale. *Id.* at 81-82. Because *Reaver* involved only one transaction – a one-time sale of a single asset – there was no pattern of treatment from which to determine the taxpayer's method of accounting. The taxpayer had not demonstrated the consistency of treatment necessary to establish a method of accounting.[22]

---

[21] 26 C.F.R. § 1.446-1(e)(2)(ii)(d)(2), (e)(2)(iii)(Ex. 18) (2006).

[22] The Tax Court has also repudiated *Reaver*'s implication that a taxpayer must make a "conscious election" to adopt a method of accounting, explaining that such a requirement would "clearly undermine[] the policy of orderly administration of the revenue laws." *Wierschem v. Comm'r*, 82 T.C. 718, 724 (1984).

The other authority plaintiff cites to support its assertion that an item must appear on a return for a method of accounting to have been adopted (Revenue Ruling 65-297, 1965-2 C.B. 152, *amplified*, Rev. Rul. 76-44, 1976-1 C.B. 127) is also inapposite. The Revenue Ruling addresses the requirements for formally electing the installment method without discussing the issue of whether a taxpayer is changing from an already established method of accounting. The provision of the Ruling

Similarly, there exist fact patterns where the failure to claim a § 165 deduction might not be sufficient to constitute the adoption of a method of accounting. Where a taxpayer fails to claim a deduction upon the loss of a single asset, for example, the taxpayer generally will not have treated an item with sufficient consistency to have adopted a method of accounting. This explains why the Government does not raise an accounting method argument every time a taxpayer claims a § 165 deduction on an amended return. *See* Pl.'s Br. at 33.[23] Moreover, where the lost property is not susceptible to alternative asset definitions, the omission might not clearly demonstrate any particular method of accounting. Similarly, if the taxpayer treats the lost asset as a single asset (and not as part of a larger asset) for other purposes, the failure to claim a deduction might fall within the "posting-error doctrine," which allows a taxpayer who inadvertently deviates from an otherwise consistent method of accounting to correct its error without the Commissioner's consent. *See* 26 C.F.R. § 1.446-1(e)(2)(ii)(b) (1996) ("A change in method of accounting does not include correction of mathematical or posting errors").[24]

---

that allows a taxpayer to elect the installment method on an amended return is expressly limited to cases where "the facts indicate no election inconsistent with the installment election." *See id.*

[23] Unlike plaintiff, each of the taxpayers in the other § 165 cases and the Private Letter Ruling cited by plaintiff (*Sepulveda v. United States*, 2000 U.S. Dist. LEXIS 17570 (N.D. Ga. Nov. 2, 2000); *Cummin v. United States*, 1994 U.S. Dist. LEXIS 6493 (D.N.J. Apr. 28, 1994); *Butschky v. United States*, 1981 U.S. Dist. LEXIS 16944 (D. Md. Sept. 28, 1981); I.R.S. Priv. Ltr. Rul. 6709295070A (Sept. 29, 1967)) sustained a single loss, for which the taxpayer failed to claim a § 165 deduction on its original return.

[24] As the Federal Circuit explained the posting-error doctrine, a taxpayer who seeks to account for an item in the same manner that it accounts for other similar items or to correct the omission of an item from a method of accounting that it otherwise consistently applies to a single category of related items does not need the Commissioner's consent. *Diebold*, 891 F.2d at 1582; *see also Korn Indus., Inc. v. United States*, 532 F.2d 1352, 1355 (Ct. Cl. 1976) (holding that the taxpayer's refund claims, seeking to include three additional elements of cost in computing its finished goods inventory, did not constitute a change in method of accounting because the fact that the taxpayer had included such costs for purposes of its raw materials inventory, work-in-progress inventory, and supplies inventory showed that it had established the items as materials costs and merely inadvertently left them out of its calculation of the cost of finished goods).

In this case, however, the omission of deductions from plaintiff's original returns was consistent enough to constitute the adoption of a method of accounting, unambiguously demonstrates that plaintiff formerly treated its contracts as a single asset, and does not fall within the posting-error doctrine. According to the complaint, plaintiff sustained *multiple* losses due to the termination of contracts in each of the *nine* years between 1987 and 1995 and yet failed to claim *any* deductions on its original returns. *See* Compl. ¶ 18. Not only does the recurring nature of plaintiff's failure to claim deductions for these losses establish the consistency of treatment necessary for plaintiff to have adopted method of accounting, but it leaves only one explanation for that failure: plaintiff was accounting for its contracts as a single asset. That is the *only* treatment consistent with plaintiff's failure to claim deductions on its original returns. If plaintiff had accounted for its contracts as separate assets at the time it filed its original returns, then it would have claimed § 165 loss deductions for them at that time. Plaintiff has offered no alternative to the mass-asset treatment that could explain the omission of deductions from its original returns. Nor has plaintiff shown that it formerly accounted for its contracts as separate assets for other purposes and merely inadvertently deviated from that treatment when it failed to claim § 165 loss deductions on its original returns. There is simply no evidence that plaintiff accounted for its contracts as separate assets for any purpose when it filed its original returns for 1987 through 1995.[25]

In sum, because the omission of deductions from plaintiff's original returns is consistent only with mass-asset treatment (and with no other treatment) and was not a mere posting error committed under a different method, it demonstrates that plaintiff formerly adopted a mass-asset accounting method.[26] Thus, plaintiff's current claim is predicated upon an unauthorized change in

---

[25] Nor does the record show that plaintiff treated its other self-created intangible assets (such as contracts with hospitals or employees) as separate assets.

[26] Even if the Court were to find that § 446(e) requires additional indicia of the adoption of a method, however, such indicia are present here. First, plaintiff's prior mass-asset treatment of its

accounting method and must be denied pursuant to § 446(e).

## V. PLAINTIFF MADE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING BY CHANGING ITS TREATMENT OF THE COSTS OF CREATING CONTRACTS FROM CURRENT EXPENSES TO CAPITAL EXPENDITURES

In its opening brief, defendant explained how plaintiff also changed its method of accounting for the costs of creating its healthcare coverage contracts without securing the consent of the Commissioner. Def.'s Br. at 32-36. Under plaintiff's original method of accounting, plaintiff treated such costs as currently deductible business expenses for both financial and tax reporting. Pl.'s Resp. to Def.'s Proposed Findings of Fact ¶ 42-43. By later claiming that the fresh-start basis provision applies to the contracts plaintiff held on January 1, 1987, plaintiff is changing its characterization of the costs of creating contracts to capital expenditures, which constitutes a change in its method of accounting.

Plaintiff argues that application of the fresh-start basis rule to the contracts that plaintiff held on January 1, 1987, bears no relationship to plaintiff's treatment of its costs of creating contracts. Pl.'s Br. at 34-36. As explained above, however, the Code uses the concept of basis to measure the *cost* of an

---

contracts is reflected on its annual accounting statements, which are part of plaintiff's original returns. The "assets" exhibits on the annual statements do not list individual healthcare coverage contracts. *See, e.g.*, Excerpt from Plaintiff's 1991 Annual Statement (Def. Ex. 6, App. B. to Def.'s Br. at B-72); Excerpt from Plaintiff's 1992 Annual Statement (Def. Ex. 7, App. B. to Def.'s Br. at B-82); Excerpt from Plaintiff's 1993 Annual Statement (Def. Ex. 8, App. B. to Def.'s Br. at B-97); Excerpt from Plaintiff's 1994 Annual Statement (Def. Ex. 9, App. B. to Def.'s Br. at B-110); Excerpt from Plaintiff's 1995 Annual Statement (Def. Ex. 10, App. B. to Def.'s Br. at B-121). The value that plaintiff now attributes to individual contracts, rather, is lumped together on the exhibits into general asset categories such as "uncollected premiums," and "accounts receivable." *See id.*

Second, plaintiff's original returns reflect plaintiff's former mass-asset treatment of contracts also through the deductions claimed for the costs of creating contracts. *See* Pl.'s Resp. to Def.'s Proposed Findings of Fact ¶ 43. As explained in defendant's opening brief (Def.'s Br. at 32), such treatment is inconsistent with the view that each contract constitutes a separate capital asset and therefore shows that plaintiff accounted for the contracts as a single asset. *See INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 86 (1992) ("A[n] . . . expenditure that 'serves to create or enhance . . . a separate and distinct' asset should be capitalized under § 263" (quoting *Comm'r v. Lincoln Savings & Loan Ass'n*, 403 U.S. 345, 354 (1971)); 26 C.F.R. § 1.263(a)-4(b)(1)(iii) (2006) (providing that "[a]n amount paid to create or enhance a separate and distinct intangible asset" must be capitalized").

asset. Under plaintiff's original method of expensing its costs of creating contracts, plaintiff never obtained positive basis in its contracts because it recovered (deducted) its costs at the time they were incurred. Plaintiff's current claim that some of its contracts have positive basis therefore shifts plaintiff's recovery of its investment from when the costs are incurred to when each contract terminates. Because this shift involves a matter of timing, it constitutes a change in method of accounting.

Plaintiff analogizes this case to one where a taxpayer purchases a piece of software in one year, and, when the software becomes obsolete in a later year, claims a loss deduction while also claiming deductions for the expenses of creating its own software program. Pl.'s Br. at 35. Although the taxpayer in plaintiff's example recovers its basis in the two different software programs at different times – *after* the first program becomes worthless, but *while* the second program is being developed – this difference results from the fact that the taxpayer incurred two different types of costs with respect to the programs. For the former, the taxpayer paid an amount to *acquire* the software. For the latter, the taxpayer incurred expenses to *create* the software. Thus, claiming a deduction for the former after the software becomes worthless does not shift the taxpayer's recovery of the same category of costs to a different time.

Here, in contrast, plaintiff incurred the same types of costs with respect to the contracts for which it claims deductions upon termination and its other contracts for which it claims deductions during the process of their creation – that is, the costs of creating healthcare coverage contracts. Thus, by claiming deductions upon the termination of certain contracts after formerly claiming deductions during the process of creating contracts, plaintiff is shifting its recovery of the same item, its costs of developing contracts, to a different time. Plaintiff's claims therefore constitute a change in method of accounting, for which plaintiff failed to obtain the consent of the Commissioner.

## VI. ADDITIONAL GENUINE ISSUES AS TO MATERIAL FACT AND LAW REMAIN

Even if the Court were to reject defendant's arguments in support of its motion for summary judgment, the Court should deny plaintiff's cross-motion for partial summary judgment. Aside from the issues raised in defendant's motion, the law and uncontroverted facts do not establish that the fresh-start basis rule and § 165 apply to the loss deductions plaintiff claims for the termination or cancellation of its healthcare coverage contracts. First, plaintiff has not established that the termination of a contract constitutes a loss under § 165. Pursuant to Treasury Regulation (26 C.F.R.) § 1.165-1(b), to be allowable as a deduction under § 165(a), "a loss must be evidenced by closed and completed transactions, fixed by identifiable events." Precedent in this Circuit holds that a customer-based intangible constitutes a single asset, each individual part of which enjoys no separate capital standing apart from the whole. *See Golden State Towel & Linen Serv. v. United States*, 373 F.2d 938, 944 (Ct. Cl. 1967). It is only when "all or a substantial, identifiable, vendible portion of [the customer-based intangible] . . . terminate[s] . . . that a tax loss may be claimed." *Id.* Plaintiff has not yet established – as a matter of fact – that the deductions it claims meet that standard. Second, even if the Court were to follow the Third Circuit's interpretation of *Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993), to qualify for § 165 deductions upon the termination of individual contracts, plaintiff would still have to establish – as a matter of fact – that its contracts are susceptible of separate valuation. *See Capital Blue Cross v. Comm'r*, 431 F.3d 117, 132 (3d Cir. 2005). In addition, certain other factual issues (which plaintiff appears not to have intended to include within its cross-motion) remain to be determined. These include the questions of (1) whether each contract existed on January 1, 1987; (2) whether each contract terminated in the year in which plaintiff claims a deduction; and (3) what the January 1, 1987, fair market value of each contract was.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in favor of the United States.

Respectfully submitted,

/s/ Karen Servidea
KAREN SERVIDEA
*Attorney of Record*
*United States Department of Justice*
*Tax Division*
*Court of Federal Claims Section*
*Post Office Box 26*
*Ben Franklin Post Office*
*Washington, D.C. 20044*
*Voice: (202) 616-3423*
*Fax: (202) 514-9440*
*Email: karen.e.servidea@usdoj.gov*

EILEEN J. O'CONNOR
*Assistant Attorney General*
DAVID GUSTAFSON
*Chief, Court of Federal Claims Section*
W.C. RAPP
*Senior Trial Attorney*

May 31, 2007
Date

/s/ W.C. Rapp
Of Counsel