**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 05-503 T<br>Judge Thomas C. Wheeler |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Frederick H. Robinson
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005
(202) 626-5800
(202) 628-0858 (facsimile)

Counsel of Record for Plaintiff

*Of Counsel:*
Clarence T. Kipps, Jr.
Maria O. Jones
Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005
(202) 626-5800
(202) 628-0858 (facsimile)

Dated: June 18, 2007

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..... i

TABLE OF CONTENTS (APPENDIX) ..... iii

TABLE OF AUTHORITIES ..... v

ARGUMENT ..... 1

I. HSA IS ENTITLED TO LOSS DEDUCTIONS FOR THE TERMINATION OR CANCELLATION OF ITS HEALTHCARE COVERAGE CONTRACTS ..... 1

A. The Different Statutory Scheme At Issue in Flannery and Ludington Makes the Holdings of Those Cases Inapplicable in This Case ..... 2

B. Congress's Subsequent Actions After the Supreme Court's Decisions in *Flannery* and *Ludington* Show an Uncertainty and Ambiguity that Did Not Exist in 1986 ..... 4

II. THE FRESH START BASIS RULE GIVES HSA AN ADJUSTED BASIS IN ITS HEALTHCARE COVERAGE CONTRACTS ..... 7

A. The Internal Revenue Code Allows Loss Deductions for HSA's Terminated Contracts ..... 8

B. The Defendant's Interpretation Would Lead to Anomalous Results and the Taxation of Pre-1987 Appreciation ..... 10

C. Congress Intended the Fresh Start Basis Rule to Apply to All of HSA's Assets in Existence on January 1, 1987, Including Its Healthcare Coverage Contracts ..... 11

III. RELYING ON THE LEGISLATIVE HISTORY TO INTERPRET THE UNAMBIGUOUS FRESH START BASIS RULE IS INAPPROPRIATE ..... 12

A. The Phrase "Gain or Loss" Is Not Ambiguous ..... 13

B. The Purpose of the Fresh Start Basis Rule is Consistent With Application of the Rule to the Types of Losses HSA Claims ..... 14

C. The Government's Repetitious Analogy to Depreciation Deductions Is Another Attempt to Find Ambiguity Where None Exists ..... 15

IV. HSA DID NOT MAKE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING ........................................ 18

A. HSA Has Never Treated Its Contracts as One Mass Asset ................................ 19

B. Expensing the Costs to Create its Contracts is Consistent with Loss Treatment ........................................ 24

CONCLUSION ........................................ 25

# TABLE OF CONTENTS

## APPENDIX

**Page**

Internal Revenue Code of 1986 (26 U.S.C.):

§ 165 ..... A-1

§ 1001 ..... A-1

§ 1011 ..... A-2

§ 1012 ..... A-2

§ 1014 ..... A-2

§ 1053 ..... A-3

§ 1231 ..... A-3

§ 7806 ..... A-4

Deficit Reduction Act of 1984, H.R. 4170, 98th Congress, P.L. 98-369, § 177(d)(2), 98 Stat. at 709-12 (1984) ..... A-5

Income Tax Law of 1913 § II.D., P.L. 63-16, 38 Stat. 114, 166 (1913) ..... A-9

Revenue Act of 1916 §§ 2(c), 5(a), P.L. 64-171, 39 Stat. 756, 758-59 (1916) ..... A-11

Revenue Act of 1918 §§ 202(a)(1), 214(a)(5), P.L. 65-254, 40 Stat. 1057, 1060, 1067 (1919) ..... A-14

Revenue Act of 1921 § 202(b), P.L. 67-98, 42 Stat. 227, 229-30 (1921) ..... A-17

Revenue Act of 1924 § 204(b), P.L. 68-176, 43 Stat. 253, 259-60 (1924) ..... A-19

Revenue Act of 1934 § 113(a)(14), P.L. 73-216, 48 Stat. 680, 708-09 (1934) ..... A-22

Tax Reform Act of 1986, P.L. 99-514, § 1012, 100 Stat. 2085, 2390 (1986) ..... A-26

H.R. Conf. Rep. 179, 68th Cong. 1st Sess. at 18 (1924) ..... A-31

H.R. Conf. Rep. 704, 73d Cong. 2d Sess. at 28-29 (1933) ..... A-35

H.R. Conf. Rep. 814, 99th Cong. 2d Sess. Vol. II (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075 ..... A-37

S. Rep. 398, 68th Cong. 1st Sess. At 13 (1924) ........................................................... A-46

Treasury Regulation (26 C.F.R.) § 1.83-4(b)(1) ........................................................... A-48

Treasury Regulation (26 C.F.R.) § 1.1011 ........................................................... A-50

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519 (1947) .......... 13

*Burlington N. R.R. v. Okla. Tax Commission*, 481 U.S. 454 (1987) .......... 12

*Capital Blue Cross v. Commissioner*, 122 T.C. 224 (2004).......... *passim*

*Capital Blue Cross & Subsidiaries v. Commissioner*, 431 F.3d 117 (3d Cir. 2005) ..*passim*

*Eisner v. Macomber*, 252 U.S. 189 (1920).......... 3

*Golden State Towel & Linen Service, Ltd. v. United States*, 373 F.2d 938 (Ct. Cl. 1967).......... 17, 23

*Goodrich v. Edwards*, 255 U.S. 527 (1921).......... 3

*Manhattan Co. of Virginia v. Commissioner*, 50 T.C. 78 (1968).......... 23

*McCaughn v. Ludington*, 268 U.S. 106 (1925) .......... 1

*Metropolitan Laundry Co. v. United States*, 100 F. Supp. 803 (N.D. Cal. 1951) .......... 23

*Newark Morning Ledger Company v. United States*, 507 U.S. 546 (1993).......... 17, 23

*Reaver v. Commissioner*, 42 T.C. 72 (1964), *nonacq. withdrawn*, 1965-2 C.B. 6 (I.R.S. 1965) .......... 23

*Stephens Marine, Inc. v. Commissioner*, 28 T.C.M. (CCH) 199 (1969), *aff'd* 430 F.2d 679 (9th Cir. 1970).......... 19

*Trigon Insurance Co. v. United States*, 215 F. Supp. 2d 687 (E.D. Va. 2002) .......... *passim*

*United States v. Flannery*, 268 U.S. 98 (1925) .......... 1

*West Virginia University Hospitals v. Casey*, 499 U.S. 83 (1991).......... 12

## FEDERAL STATUTES

Internal Revenue Code of 1986 (26 U.S.C.):

§ 165 .......... *passim*

§ 1001 .......... 5, 11

§ 1011 .......... 5
§ 1012 .......... 7, 11, 13
§ 1014 .......... 10, 11
§ 1053 .......... 7, 8, 9, 11
§ 7806 .......... 15

Deficit Reduction Act of 1984, P.L. 98-369, § 177(d)(2), 98 Stat. (1984) .......... 6

Income Tax Law of 1913 § II.D., P.L. 63-16, 38 Stat. 114 (1913) .......... 2

Revenue Act of 1916, §§ 2(c), 5(a), P.L. 64-271, 39 Stat. 756 (1916) .......... 2

Revenue Act of 1918 § 202(a)(1), P.L. 65-254, 40 Stat. 1057 (1919) .......... 2, 3, 4

Revenue Act of 1924 § 204(b), P.L. 68-176, 43 Stat. 253 (1924) .......... 5

Revenue Act of 1934 § 113(a)(14), P.L. 73-216, 48 Stat. 680 (1934) .......... 5

Tax Reform Act of 1986, P.L. 99-514, § 1012, 100 Stat. 2085 (1986) .......... 3, 9, 14

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. 179, 68th Cong. 1st Sess. (1924) .......... 5

H.R. Conf. Rep. 704, 73d Cong. 2d Sess. (1933) .......... 5

H.R. Conf. Rep. No. 99-841, at II-350 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4438 .......... 14, 15

S. Rep. 398, 68th Cong. 1st Sess. (1924) .......... 3

**FEDERAL REGULATIONS**

Treas. Reg. § 1.1011 .......... 9

Treas. Reg. § 1.83-4(b)(1) .......... 9

**MISCELLANEOUS**

I.R.S. Technical Advice Memorandum 9533003 (May 2, 1995) .......... 1, 7, 11

# ARGUMENT

## I. HSA IS ENTITLED TO LOSS DEDUCTIONS FOR THE TERMINATION OR CANCELLATION OF ITS HEALTHCARE COVERAGE CONTRACTS

Plaintiff Hospital Service Association of Northeastern Pennsylvania ("HSA") is claiming loss deductions to which it is entitled under Code section 165 and section 1012(c)(3)(A)(ii) of the Tax Reform Act of 1986 (the "Tax Reform Act"), the Fresh Start Basis Rule. The Fresh Start Basis Rule provides, in straightforward fashion, that a Blue Cross/Blue Shield ("BC/BS") organization's basis in its assets, for purposes of determining gain or loss, is the fair market value of those assets on January 1, 1987. The Internal Revenue Service, the Third Circuit Court of Appeals, the Tax Court, and a United States District Court have all consistently held that the basis of a BC/BS organization's intangible assets, including healthcare coverage contracts, is their January 1, 1987 fair market value for purposes of claiming loss deductions under Internal Revenue Code section 165.[1] *See Capital Blue Cross v. Comm'r,* 122 T.C. 224, 237-38 (2004) ("Capital I"), *rev'd on other grounds*, 431 F.3d 117, 125 (3d Cir. 2005) ("Capital II"); *Trigon Ins. Co. v. United States*, 215 F. Supp. 2d 687, 701 (E.D. Va. 2002); I.R.S. Tech. Adv. Mem. ("TAM") 9533003 (May 2, 1995). The defendant asserts that all of these prior determinations were wrong.

In Defendant's Reply Brief in Support of its Motion for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Summary Judgment (Doc. No. 37) (hereinafter, "Def.'s Reply Br."), the defendant raises, for the first time in any context in which this issue has been considered, Supreme Court case law that discusses the Revenue Act of 1918: *United States v. Flannery*, 268 U.S. 98 (1925) and *McCaughn v. Ludington*, 268 U.S. 106 (1925). The Government's superficial analysis of these cases makes them seem relevant. Closer analysis,

---

[1] All section references are to the Internal Revenue Code of 1986, as amended, unless otherwise indicated.

however, reveals that they have no bearing on this case. First, *Flannery* and *Ludington* concern a different basis step-up rule (Section 202(a) of the Revenue Act of 1918) from that involved here. Moreover, the holdings of these cases result from a statutory scheme (or, rather, the absence of one) that bears no resemblance to the statutory scheme applicable in the instant case. Congress's constant revision of the basis step-up rule at issue in *Flannery* and *Ludington,* and its reliance on these revisions when it enacted a different basis step-up provision in 1984, demonstrates Congress's conscious intent for the Fresh Start Basis Rule to be different from the 1918 basis step-up provision.

### A. The Different Statutory Scheme At Issue in *Flannery* and *Ludington* Makes the Holdings of Those Cases Inapplicable in This Case

The federal income tax was first enacted in 1913. The Revenue Act of 1913 provided that only income accruing after the effective date of the Act – March 1, 1913 – would be subject to tax. Income Tax Law of 1913 § II.D., P.L. 63-16, 38 Stat. 114, 166 (1913). Congress did not provide basis rules for determining gain or loss on the sale or other disposition of property, however, until the 1916 Revenue Act. Revenue Act of 1916, §§ 2(c), 5(a), P.L. 64-271, 39 Stat. 756, 758-59 (1916). Two years later, in the 1918 Revenue Act, Congress amended this basis rule by combining the two basis provisions covering gains and losses from the 1916 Revenue Act into one section as follows:

> [F]or the purposes of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be . . . (1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of such date . . .

Revenue Act of 1918 § 202(a)(1), P.L. 65-254, 40 Stat. 1057, 1060 (1919). The 1918 Revenue Act also provided "[t]hat in computing net income there shall be allowed as deductions: . . . (5) [l]osses sustained during the taxable year and not compensated for by insurance or otherwise, if



768659.1

incurred in any transaction entered into for profit, though not connected with the trade or business." *Id*. at § 214(a)(5), 40 Stat. 1057, 1067. These basis and loss provisions from the 1918 Revenue Act are the provisions at issue in *Flannery* and *Ludington*.

The Government claims that the basis and loss provisions in the 1918 Revenue Act and the Fresh Start Basis Rule and Code section 165, respectively, are "functionally identical," but this characterization is simply wrong. While the words of the two provisions are substantially similar, the defendant neglects to mention that in 1918 there were no underlying statutory provisions defining the terms "gain," "loss," or "adjusted basis" analogous to sections 1001 and 1011 of the modern Internal Revenue Code.

The forerunner of section 1001 defining the terms "gain" and "loss" by reference to the difference between basis and amounts realized first came into the Code as section 202(a) of the 1924 Act. *See* S. Rep. 398, 68th Cong., 1st Sess 12 (1924). The absence of a statutory definition of these terms is critical to the Court's decision in *Flannery* where the Court found the result to be governed by its prior decision in *Goodrich v. Edwards*, 255 U.S. 527 (1921). In the *Goodrich* case, in the absence of a statutory definition, the Court reasoned that the term "gain" in the 1918 Act had independent meaning as the "profit gained through a sale [or] conversion of capital assets," citing its decision in *Eisner v. Macomber*, 252 U.S. 189, 207 (1920). In *Flannery*, the Court felt constrained to attribute a symmetrical construction for the term "loss."

The Supreme Court in *Flannery* and *Ludington* was writing on a clean slate without any statutory framework for determining a deductible loss. The Fresh Start Basis Rule presents an entirely different situation because its interpretation is governed by detailed, self-limiting definitions of loss and basis that did not exist in 1918. *See* Pl.'s Opening Br. at 6-8 (detailing the overlap of Code section 165, Code section 1011, and the Fresh Start Basis Rule). Simply stated, the

Court in *Flannery* interpreted a statutory scheme that no longer exists. While the words of the basis and loss deduction provisions in the 1918 Revenue Act are similar to those of the Fresh Start Basis Rule and section 165(a), respectively, the comparison ends there. If the 1986 statutory framework had existed in 1918, the Supreme Court could not have interpreted the language of the 1918 Revenue Act as it did in *Flannery* and *Ludington*. Accordingly, the Court's reasoning in these cases says nothing about how the Fresh Start Basis Rule should be interpreted, and the holdings of these cases are inapplicable to the instant case.

### B. Congress's Subsequent Actions After the Supreme Court's Decisions in *Flannery* and *Ludington* Show an Uncertainty and Ambiguity that Did Not Exist in 1986

After 1918, Congress continued to revise the 1913 basis step-up provision, doing so four times in a span of 18 years. These revisions show that Congress has been deliberate and knowledgeable in choosing the rules governing the step up in basis granted, and not casual and heedless as suggested by the defendant.

First, the Revenue Act of 1921 altered the basis provisions to provide one formula for calculating gains and one formula for calculating losses on sales or dispositions of pre-March 1, 1913 assets. Revenue Act of 1921 § 202(b), P.L. 67-98, 42 Stat. 227, 229-30 (1921). Specifically, it provided that for purposes of determining gain on pre-taxable period assets, the basis would be the higher of fair market value or adjusted basis, and for purposes of determining loss, the basis would be the lower of fair market value or adjusted basis.

Later, the Revenue Act of 1924 further changed the basis rules, swinging the pendulum back in favor of the taxpayer. Congress eliminated the dual-basis rules for gain and for loss and provided, instead, that the basis for pre-March 1, 1913 property would be the greater of cost basis or fair market value on March 1, 1913, for purposes of determining gain or loss from a sale or other



768659.1

disposition of the asset. Revenue Act of 1924 § 204(b), P.L. 68-176, 43 Stat. 253, 25960 (1924). The House Ways and Means Committee Report on the 1924 Act explained: "This provision changes the existing law in the interests of the taxpayer. It simplifies exceedingly the rule in effect under the present law without appreciable loss to the Treasury." H.R. Rep. 179, 68th Cong. 1st Sess. (1924) at 18.

In 1934 the pendulum swung back against the taxpayer, but not quite as far as it had reached in 1921. Specifically, the 1934 Revenue Act provided that the basis for determining gains on the sale or other disposition of pre-March 1, 1913 assets would be the higher of cost or the March 1, 1913 fair market value. Revenue Act of 1934 § 113(a)(14), P.L. 73-216, 48 Stat. 680, 708-09 (1934). The 1934 Revenue Act basis provision was later codified into Code section 1053 and is still applicable today. Neither the 1934 Revenue Act nor current Code section 1053 mentions losses, so a taxpayer uses an asset's cost for basis when determining a loss, pursuant to Code section 1012.

The Revenue Act of 1934 changes are particularly significant because Congress enacted the changes precisely because prior law allowed a loss measured by the March 1, 1913 fair market value even where original cost basis was less. Congress declared in this regard:

> Under section 113(a)(14) of existing law, the basis for determining gain or loss in the case of property acquired prior to March 1, 1913, is its cost or fair market value as of that date, whichever is greater. This rule when applied to losses in some instances grants the taxpayer a loss when no loss has actually been sustained. For instance, suppose a taxpayer bought property for $20,000 prior to March 1, 1913, which was worth $75,000 on that date. If he sells such property in 1933 for $60,000, he is allowed a loss of $15,000, although he has in fact sold it for more than he paid for it.

H.R. Conf. Rep. 704, 73d Cong., 2d Sess, 28-29 (1933). Obviously, Congress's understanding of the law was inconsistent with the continued viability of *Flannery* and *Ludington*.

Fifty years later, in 1984, two years before enacting the Fresh Start Basis Rule at issue

here, Congress passed another basis step-up provision. Specifically, when Congress subjected the Federal Home Loan Mortgage Corporation ("Freddie Mac") to federal income taxation for the first time in the Deficit Reduction Act of 1984, P.L. 98-369, § 177(d)(2), 98 Stat. at 709-12 (1984) (the "Deficit Reduction Act"), it provided a special basis rule for assets Freddie Mac held on the effective date of the Act. Obviously aware of the history of the first basis step-up provision, Congress limited the basis step-up for Freddie Mac as it had for all new taxpayers in the 1921 Revenue Act: for purposes of determining gain on pre-taxable period assets, the basis would be the higher of fair market value or adjusted basis, and for purposes of determining loss, the basis would be the lower of fair market value or adjusted basis. Deficit Reduction Act § 177(d)(2). It is important to note that Congress *did not* choose to model the language for the Freddie Mac fresh-start basis provision on the most recent formulation of the 1913 fresh-start basis provision contained in the 1934 Revenue Act and section 1053 of the Code. The only rational explanation for this is that Congress did not want to treat Freddie Mac as it had treated all new 1913 taxpayers from 1934 on. Rather, Congress intentionally chose to model the Deficit Reduction Act's basis provision on the 1921 Revenue Act.

When Congress enacted the Fresh Start Basis Rule two years after having enacted the Deficit Reduction Act, however, it did not use the language it had used in the Freddie Mac fresh start basis provision (or even section 1053 of the Code). It chose a different statutory framework. Rather than having two different dual-basis rules for gains and losses, Congress simply stated that the fair market value as of the relevant date (January 1, 1987) would be used for determining the basis for gain or loss. The only conclusion that can be drawn in light of Congress's extensive history of addressing fresh start basis provisions is that Congress did not want the distinction inherent in the Deficit Reduction Act or section 1053 to be in the Fresh Start

Basis Rule. Had Congress wanted to use cost basis as the measure of an allowed loss, it certainly knew how to do so. The history of the 1934 Act also shows that Congress knew from prior experience that by making fair market value the measure, a loss would be allowable where that value exceeded historic cost. The defendant's implicit arguments that Congress adopted the Fresh Start Basis Rule sloppily without understanding its ramifications cannot be reconciled with the deliberation shown by almost one hundred years of dealing with fresh start basis rules.

Because the Fresh Start Basis Rule is a qualitatively different basis provision from those of the Deficit Reduction Act and section 1053, it is apparent that Congress did not intend to restrict application of the fair market value basis step-up in any specific instances. Congress, unrestrained by Code section 1053, the Deficit Reduction Act, or the *Flannery* and *Ludington* rationales, decided that "for purposes of determining gain or loss, the adjusted basis of any asset held [by a BC/BS organization] on [January 1, 1987] shall be treated as equal to its fair market value as of such day." Tax Reform Act of 1986, § 1012(c)(3)(A)(ii).[2] Accordingly, the Supreme Court case law that arose out of the early revenue laws and its limited application of the fair market value basis step-up for determination of losses on pre-March 1, 1913 assets are inapplicable to the Fresh Start Basis Rule. The *Flannery* and *Ludington* cases are historical artifacts from the early days of the Internal Revenue Code and should be ignored.

## II. THE FRESH START BASIS RULE GIVES HSA AN ADJUSTED BASIS IN ITS HEALTHCARE COVERAGE CONTRACTS

As was explained in HSA's Opening Brief, the Fresh Start Basis Rule applies to adjust the basis of each of HSA's healthcare coverage contracts from zero to the contract's fair market value as of January 1, 1987. *See Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 701;

[2] The IRS has explicitly stated that an asset's fair market value as of January 1, 1987, "should be used in computing the amount of [the taxpayer's] loss under section 165." TAM 9533003.

*Capital I*, 122 T.C. at 237-38. Specifically, the Fresh Start Basis Rule provides that "for purposes of determining gain or loss, the adjusted basis of any asset held on [January 1, 1987] shall be treated as equal to its fair market value as of such day." Tax Reform Act § 1012(c)(3)(A)(ii). The phrase "any asset" in the Fresh Start Basis Rule includes intangible assets such as HSA's healthcare coverage contracts. *Trigon*, 215 F. Supp. 2d at 696; *see also Capital II*, 431 F.3d at 124-127; *Capital I*, 122 T.C. at 234-38.

**A. The Internal Revenue Code Allows Loss Deductions for HSA's Terminated Contracts**

The Government reiterates its argument that, because HSA incurred no capital costs with respect to the contracts entered into prior to January 1, 1987, it had no "cost" basis on that date and therefore could not receive an "adjusted" basis equal to fair market value. As was explained in HSA's Opening Brief, the Government's argument is in direct conflict with the plain language of the statute and the opinions of all three courts that have decided this issue, and it is inconsistent with the Code, the Regulations, and the Tax Reform Act. *See* Pl.'s Opening Brief at 7.

The defendant asserts categorically that "a fundamental prerequisite to having a positive basis in property" is "a capital cost." Def.'s Reply Br. at 7. In the very next paragraph, the Defendant conceeds that "the Internal Revenue Code *generally* does not provide an upward adjustment for a zero basis without the expenditure of capital." *Id.* at 8 (emphasis supplied). Provisions such as the Fresh Start Basis Rule itself show that there is no general principle in the Internal Revenue Code requiring a capital investment to obtain basis.

In its Opening Brief, HSA discussed by way of example one provision for obtaining a basis without capital cost: the step up in basis at death provided by section 1014 of the Internal Revenue Code. *See* Pl.'s Opening Br. at 8-9. The Government attempts to distinguish this provision with the same type of pettifogging arguments it employs generally throughout its briefs. Primarily, the

Government suggests that under section 1012 of the Internal Revenue Code exceptions to the postulated requirement that basis requires a capital outlay must be found in sections 1001 through 1092 or subchapters C, K and P. Def.'s Reply Br. at 9. This statutory provision of large areas of the Internal Revenue Code for finding exceptions shows in and of itself that the fundamental principle asserted by the Government does not exist. In any event, even under the Government's strained analysis, the Fresh Start Basis Rule is brought within the scope of section 1012 by the Treasury Regulations. Treas. Reg. § 1.1011, interpreting a section within the section 1012 list, provides:

> The adjusted basis for determining the gain or loss from the sale or other disposition of property is the cost or other basis prescribed in section 1012 . . . adjusted to the extent provided in section 1016, 1017, or 1018 or as otherwise specifically provided for under applicable provisions of the internal revenue laws.

The Fresh Start Basis Rule is precisely such an internal revenue law providing adjustments to basis. Thus, contrary to the Government's suggestion (Def.'s Reply Br. at 9), the use of the term "adjustment" in the legislative history brings the Fresh Start Basis Rule squarely within the scope of what the Government characterizes as the exception to its cost rule.

Whatever trivial characteristics might distinguish the section 1014 basis step up from the Fresh Start Basis Rule, it is important to recognize that section 1014 is simply one of a number of similar provisions. *See, e.g.*, Treas. Reg. § 1.83-4(b)(1) (a taxpayer receives a positive basis equal to the fair market value of the property received as compensation as of the date received.) The most analogous, of course, are those discussed above dealing with similar step-ups in basis to fair market value: the post Revenue Act of 1924 provisions dealing with a fresh start basis for pre-1913 property, culminating in the present section 1053 of the Internal Revenue Code, and the provisions dealing with Freddie Mac which were not codified. Over a period spanning almost the entire history of the Internal Revenue Code, Congress has provided

in these provisions that for gain purposes, the higher of cost or fair market value will be the basis of property. It is not possible to reconcile this history with the Government's bold statement that "a fundamental prerequisite to having a positive basis in property" is "a capital cost." Def.'s Reply Br. at 7.

**B. The Defendant's Interpretation Would Lead to Anomalous Results and the Taxation of Pre-1987 Appreciation**

The defendant's justification for its interpretation of the applicability of the Fresh Start Basis Rule, with its attempted analogies to annual reporting conventions and distinctions between sales and abandonment of self-created assets, is nonsensical. In its Opening Brief, HSA explained how the defendant's interpretation of the Fresh Start Basis Rule would cause HSA to incur a tax on pre-1987 appreciation. *See* Pl.'s Opening Br. at 10. The taxation of pre-1987 appreciation is contrary to the undisputed intent of Congress in passing the Fresh Start Basis Rule. Nonetheless, the defendant is arguing that Congress intended this anomalous result.

The defendant states that under its interpretation of HSA's position, "pre-1987 appreciation is used to shield from appropriate taxation the income plaintiff earned after January 1, 1987, income which is completely unrelated to the terminating contracts." Def.'s Reply Br. at 11. But what is wrong with that? Under the internal revenue laws, there never is a connection between a loss and the income it shelters from taxation. Generally the income against which losses are offset is unrelated to the losses themselves. For instance, a loss on the sale of an asset may economically represent a decline in value over many years so that the only connection with current income is that the sale triggering the loss occurs in the same year as the income sheltered from taxation. Closer still to the facts of this case, if after 1986 HSA had *sold* a pre-1987 asset for less than its January 1, 1987 fair market value, it would unquestionably be entitled to that loss. Yet that loss would bear no relationship to the post-1986 income against which it was

offset. The defendant's conjured images of income inappropriately shielded from taxation is out of touch with reality.

In addition, rather than highlighting an "absurdity," the defendant's analogy between HSA's healthcare coverage contracts and basic office supplies proves HSA's point that all assets are the same and therefore should be treated in the same way. The Fresh Start Basis Rule, on its face, applies to *any* asset. Tax Reform Act § 1012(c)(3)(A)(ii) ("[F]or purposes of determining gain or loss, the adjusted basis of *any* asset . . ." (emphasis added)). The defendant points to no reason why the Fresh Start Basis Rule would not apply to office supplies, as it applies to software. TAM 9533003. The Government also offers no rationale whatsoever for distinguishing the software at issue in TAM 9533003 from office supplies or from HSA's healthcare coverage contracts. Hence, by the defendant's own analogy, the Fresh Start Basis Rule applies to determine the basis of HSA's healthcare coverage contracts as of January 1, 1987. As the defendant highlights, failure to treat these assets in the same way would be irrational.

### C. Congress Intended the Fresh Start Basis Rule to Apply to All of HSA's Assets in Existence on January 1, 1987, Including Its Healthcare Coverage Contracts

Application of the Fresh Start Basis Rule is in accord with the express legislative purpose of section 1012 of the Tax Reform Act – to avoid taxing HSA on unrealized appreciation or depreciation that accrued when HSA was a tax-exempt entity. *See* Pl.'s Opening Br. at 16-20. The defendant's argument – that Congress did not intend for the Fresh Start Basis Rule to apply to the deductions to which HSA is entitled – assumes its conclusion. HSA dealt with the defendant's circular argument in its Opening Brief. *Id.* While the Government states confidently that Congress did not intend for the Fresh Start Basis Rule to provide BC/BS organizations "millions of dollars worth of deductions" (Def.'s Reply Br. at 12), HSA notes that the defendant cites no support for this assertion. Congress's expectation of how much the applicable deductions

under the Fresh Start Basis Rule would equal is unknown and unknowable. Moreover, its expectation is irrelevant to the interpretation of its clearly worded statute.

In response to the defendant's argument that, unlike the tax advantages found in subsection 1012(b) of the Tax Reform Act of 1986, the "Special Rules" found in subsection 1012(c)(3) are "technical in nature," HSA challenges the defendant to find a provision anywhere within the internal revenue laws that is not "technical in nature." Def.'s Reply Br. at 13. Further, it simply cannot be denied that the entire statutory scheme of section 1012 of the Tax Reform Act provides advantages to BC/BS organizations, specifically including deductions to which other taxpayers are not entitled. Congress intended these advantages to assist them in their transition from non-taxable to taxable status and did not extend them to the commercial insurer counterparts of the BC/BS organizations.

The defendant continues to provide no valid reason why the Fresh Start Basis Rule would not apply to increase the adjusted basis of these contracts from zero to their fair market values on January 1, 1987.

## III. RELYING ON THE LEGISLATIVE HISTORY TO INTERPRET THE UNAMBIGUOUS FRESH START BASIS RULE IS INAPPROPRIATE

As was stated in HSA's Opening Brief, every court that has considered this issue is in full agreement: the statutory language of the Fresh Start Basis Rule is clear and unambiguous. *Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 699-701; *Capital I*, 122 T.C. at 236-38. The Supreme Court has held that "[u]nless exceptional circumstances dictate otherwise, 'when we find the terms of a statute unambiguous, judicial inquiry is complete.'" *Burlington N. R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987) (citations omitted); *see also West Virginia Univ. Hosps. v. Casey*, 499 U.S. 83, 98-99 (1991) (explaining that unambiguous phrases cannot "be expanded or contracted by the statements of individual legislators or committees during the course of

the enactment process"). This Court would have to rewrite the statute to give it the meaning the defendant urges. *See Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 701; *Capital I*, 122 T.C. at 236. The defendant fails to offer any new explanation of why resort to the legislative history would be justified in this instance, and thus its continued reliance on legislative history to interpret the unambiguous Fresh Start Basis Rule remains inappropriate.

**A. The Phrase "Gain or Loss" Is Not Ambiguous**

As the court in *Trigon* explained, "[t]he common usage of the words 'gain or loss,' without limitation, plainly includes *any* gain or loss." *Trigon*, 215 F. Supp. 2d at 699 (emphasis in original); *accord Capital II*, 431 F.3d at 125; *Capital I*, 122 T.C. at 236. The Government's argument that the term "gain or loss" in the statutory language of the Fresh Start Basis Rule refers only to gains and losses from sales or exchanges of property contradicts the language of the statute. If Congress had intended the phrase "gain or loss" in the Fresh Start Basis Rule to refer only to gains or losses generated by sales and exchanges, Congress would have made this intent explicit in the statutory language. The defendant's reliance on *headings* of provisions, rather than on the provisions themselves, to find ambiguity nullifies its argument. As the Supreme Court has said, "headings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis." *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528 (1947); *see also* 26 U.S.C. § 7806(b). In other words, "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen*, 331 U.S. at 528-29 (citations omitted). Moreover, the use of the phrase "gain or loss" in the Code sections the defendant cited logically supports HSA's position that the phrase encompasses all types of gain or loss. While the headings in all of the defendant's examples use the same general, all-encompassing phrase, "gain or loss," the meaning of

the term "gain or loss" is limited in a different way in the *text* of each corresponding statute. There are no such limitations in the text of the statute at issue here, and such limitations cannot be read into the Fresh Start Basis Rule.

The defendant inexplicably posits that "when confronted with a type of loss . . . that does not fall within *all* recognized categories of loss, a court must consider the legislative history of the provision to determine its intended scope." Def.'s Reply Br. at 16 (emphasis added). This would lead the Court to look to the legislative history for every statute pertaining to "loss," as *no* type of loss would fit into *all* recognized categories of loss.

### B. The Purpose of the Fresh Start Basis Rule is Consistent With Application of the Rule to the Types of Losses HSA Claims

The undisputed purpose of the Fresh Start Basis Rule is to base the computation of post-1986 taxable income on amounts of gain or loss that economically accrue after January 1, 1987. Def.'s Reply Br. at 16-17 (citing H.R. Conf. Rep. No. 99-841, at II-350 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4438 ("The basis adjustment is provided because the conferees believe that such formerly tax-exempt organizations should not be taxed on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation.")). Without the Fresh Start Basis Rule, BC/BS organizations would be taxed retroactively on economic value that accrued while the organizations were tax-exempt entities, which would have the effect of denying retroactively their tax-exempt status. Any loss occuring after January 1, 1987, must be measured by the asset's fair market value on that date in order for the stated Congressional purpose to be achieved. The defendant's statement that this purpose is "applicable . . . only when a BC/BS organization *receives something of value* upon the disposition of an asset and not, as here, when a contract lapses in the ordinary course of business" (Def.'s Reply Br. at 17 (emphasis in original)) is unsupported and inconsistent with the

clear language of the statute. Repeating an unsupported position and emphasizing the point with italics does not make the position true.

As discussed in HSA's Opening Brief (at 17-18), the one sentence in the legislative history upon which the Government relies for its requirement of consideration is itself ambiguous in that it refers to formerly tax-exempt organizations being "taxed on unrealized . . . depreciation." H.R. Conf. Rep. No. 99-841, at II-350, *reprinted in* 1986 U.S.C.C.A.N. at 4438. The Government never explains how it is possible for depreciation to be taxed, or how that possibility fits its theory that "something of value" must be received for the Fresh Start Basis Rule to be operative. The Government's argument, like so much of its case, depends upon reading selected portions of the legislative history as if they were part of the statute, a fundamentally flawed approach.

The defendant's attempt to distinguish the "burning building" hypothetical in HSA's Opening Brief is ineffectual. That hypothetical did not originate with HSA. It came from the Tax Court's decision in *Capital I*. *Capital I*, 122 T.C. at 237. Like the Tax Court in *Capital I*, this Court should find that the burning building hypothetical illustrates why the Fresh Start Basis Rule must apply to the losses HSA claims and, accordingly, should dismiss the defendant's arguments to the contrary.

### C. The Government's Repetitious Analogy to Depreciation Deductions Is Another Attempt to Find Ambiguity Where None Exists

It is beyond dispute that HSA seeks section 165 loss deductions, not depreciation deductions. Def.'s Response to Pl.'s PFUF ¶ 9. In fact, the Government admits that HSA's section 165 loss deduction claims are "not legally or factually . . . depreciation deductions." Def.'s Reply Br. at 18. Nonetheless, the Government continues to repeat its argument that because the Fresh Start Basis Rule does not apply to depreciation deductions and because

HSA's loss deductions resemble depreciation deductions, the Rule should not apply to HSA's section 165 loss deductions. This argument must fail for numerous independent reasons.

As a legal matter, the Government has already made and lost this precise argument in the *Capital* case. *Capital II*, 431 F.3d at 126-27; *Capital I*, 122 T.C. at 238-40. This "novel and unsupported" argument (*Capital II*, 431 F.3d at 127 n.3) cannot create ambiguity in a statute that is clear, unambiguous, and plain on its face according to all the courts that have considered it. *See* *Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 701; *Capital I*, 122 T.C. at 237-38.

Furthermore, the Government's factual characterizations of HSA's healthcare coverage contracts continue to be just plain wrong. In particular, the Government's assertions that "[t]he deductions claimed by plaintiff amount to depreciation" and that HSA's "method of valuing the contracts at issue renders the occurrence of the losses that plaintiff claims little more than a depreciation schedule for the value attributable to the entire subscriber base" are entirely unsupported. Def.'s Reply Br. at 18, 19. These claims ignore the fact that the timing and amount of HSA's loss deductions have no relationship to a depreciation or amortization schedule, as can been seen by looking at the actual loss deductions sought by HSA and denied by the IRS:

| Year | Amount of Loss Deductions |
|---|---|
| 1987 | $414,309 |
| 1988 | $6,244,435 |
| 1989 | $3,339,163 |
| 1990 | $2,056,197 |
| 1991 | $3,553,486 |
| 1992 | $1,409,549 |
| 1993 | $1,552,289 |
| 1994 | $534,183 |
| 1995 | $2,082,601 |
| 1996 | $404,487 |
| 1997 | $154,844 |

*See* IRS Form 5701 Notice of Proposed Adjustment (Pl.'s App. B, Exh. 1 at B-10).[3] This pattern of losses bears no resemblance to the formulaic deductions found in a depreciation or amortization schedule.

The Government's reliance on *Golden State Towel & Linen Service, Ltd. v. United States*, 373 F.2d 938 (Ct. Cl. 1967) to argue that precedent in this Circuit holds that customer-based intangibles are properly considered as single assets, disregards subsequent, controlling Supreme Court case law. *Newark Morning Ledger Company v. United States*, 507 U.S. 546, 566 (1993), held that the mass asset rule does not apply to customer-based intangible assets that have ascertainable useful lives and can be valued separately from goodwill. HSA has demonstrated that each of its contracts is an individual asset that can be separately valued in that: (1) each contract is individually identifiable, and has a unique group size (*i.e.*, number of subscribers), a unique premium amount, a unique effective date, and other unique characteristics (*see* Pl's Response to Def.'s PFUF ¶ 37; Def. Ex. 18 at 13, 15, 17, 28 (Def. App. B at B-178, B-180, B-182, B-193); Pl. Ex. 5 (Pl. App. B at B-32 through B-33)); (2) Ernst & Young was able to value each individual contract (*see* Pl.'s PFUF ¶ 8; Pl's Response to Def.'s PFUF ¶ 37; Def. Ex. 18 at 28 (Def. App. B at B-193); Pl. Ex. 5 (Pl. App. B at B-32 through B-33));[4] (3) the court in *Capital*

---

[3] Only those losses from 1992 to 1997 are currently at issue in this case. *See* Compl. ¶¶ 38, 46, 55, 63, 71, 79; Pl.'s Response to Def's PFUF ¶¶ 9, 15.

[4] The Government continues to complain that the Ernst & Young valuation "failed to consider several important contract-specific variables." Def.'s Reply Br. at 19 n.15. But the Government offers no evidence supporting its conclusion that the variables its cites should have been considered on a contract-by-contract basis in order for the individual contract valuations to be reasonably accurate. Ernst & Young analyzed a variety of contract-specific factors it believed were important, used "averaged" data for other factors as it deemed appropriate, and concluded that it could use all of that data to accurately assign values to each individual contract, which it did. *See* Pl.'s PFUF ¶ 8; Pl.'s Response to Def.'s PFUF § 37; Def. Ex. 18 at 13, 15, 17, 18, 28 (Def. App. B at B-178, B-180, B-182, B-183, B-193); Pl. Ex. 5 (Pl. App. B at B-32 through B-33). The Government is not entitled to discount the valuation merely by alleging, without any evidence, that additional contract-specific factors should have been used in lieu of certain "averaged data." In addition, the Third Circuit in *Capital II* endorsed the use of "averaged" data and specifically held that there is no requirement that every possible contract-specific variable be considered in order to

*II* held that essentially identical healthcare coverage contracts were separate assets that "do not constitute part of a single indivisible asset" (*Capital II*, 431 F.3d at 127); and (4) the Government itself appears to agree that HSA's contracts are not a single mass asset because it sought and obtained an admission that "[e]ach of plaintiff's healthcare coverage contracts constitutes a separate and distinct intangible asset" (Def.'s App. B, Exh. 3 at B-36 (Request for Admission No. 14)).[5] HSA has no need to demonstrate a useful life in this case, as it is not claiming depreciation, but rather a section 165 loss upon the actual cancellation or termination of each contract. Therefore, because HSA has shown that each of its healthcare coverage contracts can be separately valued, it has met the test set forth in *Newark Morning Ledger*.

For all these reasons, the Court should reject the Government's renewed attempt to improperly equate HSA's loss deductions with depreciation deductions in order to manufacture a purported ambiguity in the statute.

## IV. HSA DID NOT MAKE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING

In its Reply Brief, the defendant attempts to buttress its argument that by failing to claim loss deductions on its original returns HSA adopted a method of accounting from which it cannot change without the consent of the Commissioner by citing a new authority and for the first time

---

accurately value the individual contracts. *See* Pl's Opening Br. at 25 n.7 (*citing Capital II*, 431 F.3d at 131, 133, 136, 139). In any event, the Court need not resolve this issue at this stage. The only question now is whether the individual contracts "are *susceptible* of separate valuation." *Capital II*, 431 F.3d at 130 (emphasis added). Determining the actual value of each contract (which presumably will involve a determination of whether HSA's valuation is accurate), is a task for a future damages phase of this case and is not an issue addressed in the parties' cross-motions. *See* Def.'s Reply Br. at 30 (citing "the January 1, 1987, fair market value of each contract" as an issue "remain[ing] to be determined" after adjudication of HSA's cross-motion).

[5] Although the Government is not necessarily bound by its Request for Admission and HSA's response thereto, these materials are admissible evidence when introduced by the party making the request (as is the case here). *See* 7 Moore's Federal Practice § 36.03[5] (3d Ed. 2007).

referring to entries in HSA's books and records. The defendant also recycles its argument that in some fashion HSA's current expense deductions for the costs of creating healthcare coverage contracts are inconsistent with its claimed loss deductions. An analysis of the defendant's new and repeated arguments, however, demonstrates that HSA never adopted a method of accounting for its stepped-up basis in its contracts prior to filing amended returns claiming section 165 deductions.

**A. HSA Has Never Treated Its Contracts as One Mass Asset**

Apparently abandoning the sole authority originally cited for its position that a failure to reflect an item on a return can constitute a choice of method, the defendant cites a new authority that on close analysis is no more helpful. The Government's new attempts to discern "mass asset" treatment in HSA's financial records and returns is facially incorrect. Prior to filing amended returns, HSA took no position on any financial or tax accounting record with respect to its basis in its healthcare coverage contracts. The defendant's continued assertion that such inaction is only consistent with the adoption of a "mass asset" method of accounting is simply wrong.

The defendant's entire method of accounting argument is dependent upon its assertion that "[t]he *absence* or *omission* of an item of income or a deduction from a return can also demonstrate the taxpayer's method of accounting." Def.'s Opening Br. at 27 (emphasis in original). The defendant cited one case as an example of authority for this proposition that by doing nothing a taxpayer can adopt a method of accounting, *Stephens Marine, Inc. v. Comm'r*, 28 T.C.M. (CCH) 199 (1969), *aff'd* 430 F.2d 679 (9th Cir. 1970). In its response, HSA clearly distinguished this case as inapplicable. *See* Pl.'s Opening Br. at 29-30. In its Reply Brief, the defendant has not attempted to explain *Stephens Marine* but rather cites a new authority, Treas. Reg. § 1.446-1(e)(2)(iii)(Example 18), for the proposition. However, defendant's reading is far too broad and oversimplified a construction of that regulation.

Example 18 of Treasury Regulation § 1.446-1(e)(2)(iii) addresses a situation in which "a taxpayer incorrectly classified . . . adding machines as items in its 'suspense account' for financial and tax accounting purposes." Items placed in this suspense account were not depreciated until reclassified to a depreciable asset account. Although treating an item as nondepreciable would result in it not being reflected on the taxpayer's tax return immediately for purposes of calculating income, the key point is that the taxpayer affirmatively treated the item on its books and records by placing it in a special account. As Treasury Regulation § 1.446-1(a)(4) makes clear, accounting records are an integral part of the tax return, and include "such other records and data as may be necessary to support the entries on his books of account and on his return." In the example cited by the Government, therefore, the taxpayer did effectively take a position on its tax returns, albeit not the actual form filed with the Internal Revenue Service. Treasury Regulation § 1.446-1(a)(4), then, does not support the sweeping proposition for which the Government cites it.

Perhaps recognizing the weakness of its argument that purely by failing to correctly reflect an item on a return a taxpayer can adopt a method of accounting, the Government attempts in a footnote to show that HSA took affirmative action to treat the contracts as a "mass asset." In its Reply Brief, the defendant suggests that mass asset treatment is reflected in various ways on HSA's annual accounting statements, which would be part of the return as discussed above. Def.'s Reply Br. at 28 n.26. Alternatively, the defendant suggests that by claiming deductions for the costs of creating the contracts, HSA in some fashion reflected them as mass assets. There is no merit in these suggestions.

The Defendant's initial statement that the "assets" exhibit to HSA's annual statements do not list individual contracts as assets is correct, but somewhat misleading, because all of HSA's

assets on that exhibit are grouped together in high-level categories.[6] The more critical point is that the healthcare coverage contracts are not reflected on the exhibit at all, either individually or collectively. Declaration of Peter G. Wood ("Wood Decl.") (Exhibit 1 hereto) ¶ 3. Furthermore, the defendant's statement (Def.'s Reply at 28 n.26) that "the value that the plaintiff now attributes to individual contracts" is "lumped together [presumably some type of "mass asset" treatment] . . . into general asset categories such as 'uncollected premiums' and 'accounts receivable'" confuses the attributes of the contracts with their actual value as an asset. As reflected in Ernst & Young's valuation report (Def.'s App. B, Exh. 18 at B-158 through B-205), HSA valued the contracts based upon the discounted cash flow they were anticipated to generate over their lives. Only a fraction of this cash flow is reflected as "uncollected premiums" and "accounts receivable" at the end of any particular year. Furthermore, these entries showing amounts of income owed to HSA represented an entirely separate asset from the underlying property producing the income, making their treatment irrelevant. This is shown by the separate entries for "Bonds" and "Stocks" and for "Interest and other investment income due and accrued." *E.g.*, Def.'s App. B, Exh. 10 at B121 (lines 1, 2, 14).

Even if correct (which it is not), the defendant's alternative suggestion that deducting the costs of creating its healthcare coverage contracts is inconsistent with treating the contracts as separate assets on its face proves nothing. The accounting method question necessarily turns on how HSA reflected on its books and records its healthcare coverage contracts and the step-up in basis granted by Congress. Thus, Treasury Regulation § 1.446-1(a)(1) provides that a method of accounting includes "the accounting treatment of any item." The defendant offers no support for

---

[6] For example, all of HSA's "Real Estate" is listed on one line of the exhibit, as are all of HSA's "Stocks" and "Bonds." *See, e.g.*, Def.'s App. B, Exh. 10 at B-121 (lines 1, 2, 4). Surely the Government would not argue that various pieces of HSA's real estate or various investments in different companies constitute one mass asset just because they are listed on the same line of HSA's annual statement.

its theory that a method of accounting for one tax "item" can be created by the consistency or inconsistency in how an altogether different item is treated. Indeed, since the defendant strongly asserts that a method of accounting can be adopted even if it is incorrect (Def.'s Reply Br. at 23), any such inconsistency would at most suggest that one of the two inconsistent methods was not correct.

The defendant can point to no HSA financial or tax accounting books or records showing that HSA affirmatively selected "mass asset" or any other treatment for its stepped-up basis in its healthcare coverage contracts prior to its filing the refund claims at issues. In fact, no such book or record exists. Wood Decl. ¶ 3. This is readily understandable, because before assembling the data for Ernst & Young, HSA had not even identified outside of its business records the contracts that were in existence on January 1, 1987. *Id.* ¶ 4. The amount at issue was entirely theoretical until Ernst & Young issued its report April 10, 1997.

In the absence of any record demonstrating an affirmative treatment by HSA of its stepped-up basis in its healthcare coverage contracts, the defendant is not surprisingly quite vague about precisely what method of accounting HSA is supposed to have adopted. The defendant asserts, for example, with regard to plaintiff's not having claimed loss deductions that there is "only one explanation for that failure: plaintiff was accounting for its contracts as a single asset." Def.'s Reply Br. at 27. The defendant further challenges that "[p]laintiff has offered no alternative to the mass-asset treatment that could explain the omission of deductions from its original return." *Id.* Actually, there are a number of plausible alternative methods of accounting that are consistent with HSA's failure to claim loss deductions on its original returns.

One possible method is suggested by the defendant's own brief. The defendant asserts that HSA is not entitled to any basis in its contracts under the Fresh Start Basis Rule for purposes of

claiming a loss under section 165. Since HSA has never yet sold a contract (Def.'s App. B, Exh. 3 at B-37 (Request for Admission No. 20)), its failure to claim loss deductions is consistent with a method of accounting that recognizes only sales or exchanges as taxable events for purposes of claiming a special basis adjustment. The "mass asset" rule itself cited by the defendant is not monolithic and would allow contracts to be grouped, with a loss allowable when the last contract of a group was lost. *Compare Newark Morning Ledger*, 507 U.S. 546 (purchased contracts amortizable as a group) with *Manhattan Co. of Virginia v. Comm'r*, 50 T.C. 78 (1968) (amortization allowed with respect to some purchased customer contracts but not others) and *Metropolitan Laundry Co. v. United States*, 100 F. Supp. 803 (N.D. Cal. 1951) (deduction allowed for abandonment of purchased laundry routes in one geographic area but not another). Some cases even treated customer related contracts as simply part of goodwill, for which a loss would presumably not be allowable until the entire business was terminated. *E.g., Golden State Towel & Linen Serv.* 373 F.2d 938. All of these methods are consistent with HSA's failure to claim loss deductions in the early years and each would provide deductions at a different time in the future making them very different methods of accounting.

As discussed in HSA's Opening Brief, the Tax Court in *Reaver v. Comm'r*, 42 T.C. 72, 81 (1964), *nonacq. withdrawn*, 1965-2 C.B. 6 (I.R.S. 1965), held that the absence of any treatment of an item on a taxpayer's return is too ambiguous to qualify as an election of a method of accounting. The wisdom of the *Reaver* decision in this regard is illustrated by the complete uncertainty as to what method HSA would be deemed to have adopted through its failure to claim loss deductions prior to filing amended returns. Contrary to the Government's assertion, the facts and the law establish that HSA never adopted a method of accounting for its basis in its healthcare coverage contracts prior to filing amended returns to claim losses under section 165.

### B. Expensing the Costs to Create its Contracts is Consistent with Loss Treatment

As was explained in HSA's Opening Brief (at 34), HSA has not in the past capitalized the costs of developing or maintaining its healthcare coverage contracts and currently continues to deduct such costs. Pl.'s Resp. to Def.'s PFUF ¶ 46. The Government argues that in determining the basis of its pre-1987 contracts under the Fresh Start Basis Rule HSA is somehow changing the way it treats the costs it incurs to maintain or develop contracts. This is not so. Apart from the fact that the Fresh Start Basis Rule results in a positive adjusted basis in contracts created before January 1, 1987, HSA treats all of its healthcare coverage contracts precisely the same way, whether they were created before or after January 1, 1987. For those healthcare coverage contracts created after January 1, 1987, the adjusted basis remains at zero, and for the healthcare coverage contracts created before January 1, 1987, the adjusted basis remains at the fair market value as of January 1, 1987, as mandated by the Fresh Start Basis Rule. Nowhere in this process did HSA shift its "recovery" of its costs to develop its healthcare coverage contracts, as the defendant claims, because HSA merely followed Congress's intention that it step-up its basis in its assets (healthcare coverage contracts) on January 1, 1987. Def.'s Reply Br. at 29.

## CONCLUSION

For all of the reasons set forth above, plaintiff HSA requests that this Court deny the Government's Motion for Summary Judgment and grant HSA's Cross-Motion for Partial Summary Judgment. Both Motions put identical issues before the Court.

Respectfully submitted,

____/s/ Frederick H. Robinson_____

Frederick H. Robinson
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005
(202) 626-5800
(202) 628-0858 (facsimile)

Counsel of Record for Plaintiff

*Of Counsel:*
Clarence T. Kipps, Jr.
Maria O. Jones
Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005
(202) 626-5800
(202) 628-0858 (facsimile)

Dated: June 18, 2007