Union Calendar No. 116

73D CONGRESS, 2d Session | HOUSE OF REPRESENTATIVES | REPORT No. 704

# THE REVENUE BILL OF 1934

FEBRUARY 12, 1934.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed

Mr. DOUGHTON of North Carolina, from the Committee on Ways and Means, submitted the following

## REPORT

[To accompany H.R. 7835]

The Committee on Ways and Means, to which was referred the bill (H.R. 7835) to provide revenue, equalize taxation, and for other purposes, having had the same under consideration, reports it back to the House without amendment and recommends that the bill do pass.

The primary purpose of the bill is to increase the revenue by preventing tax avoidance. This is accomplished by a number of changes in existing law. In addition to these changes for the prevention of tax avoidance or tax postponement, some rearrangement of the tax rate structure is provided for, which it is believed distributes the tax burden more equitably. A somewhat lower tax is imposed on earned income and a somewhat higher tax on dividends and partially tax-exempt interest.

All these changes in existing law have been the result of careful and mature consideration. A subcommittee of your Committee on Ways and Means has been engaged in studying tax avoidance and the means of preventing such avoidance since last June. Its members have been in consultation with representatives of the Treasury Department, the staff of the Joint Committee on Internal Revenue Taxation, and the Legislative Counsel's Office. The subcommittee on December 4, 1933, rendered a report on the subject to your committee. On December 15, the Secretary of the Treasury appeared before the committee and gave his views on the proposed changes. He stated:

> The changes now under consideration by the committee are specifically designed to prevent avoidance of the income tax, and thereby to increase the revenues therefrom. The Treasury Department is in hearty accord with this objective. * * *

In regard to the details of the proposals made by the subcommittee, the Secretary proposed certain modifications. The committee has

In all other cases, if the property was acquired by will or intestacy, the basis is the fair market value of the property at the time of distribution to the taxpayer.

Included within the phrase "all other cases" is personal property acquired by general or residuary bequest. Thus, where a trustee acquires personal property by general bequest, the basis of the property on a sale by him, is the value at the time of distribution to him. The basis to the executor, in all cases, is the value of the property at the date of the decedent's death.

Oftentimes, the executor and trustee under a will are one and the same person. Thus, in the case of a general bequest of personal property, he is in a position to make use of one basis of valuation or the other according to which will most benefit the estate. The trustee, of course, may use a later basis than the executor, and where it is desired to sell personal property subject to a trust during the period of administration, the executor-trustee may determine whether it would be most advantageous to sell as executor or as trustee. Where the personal property has increased in value in the hands of the executor, under a general bequest, the property may be distributed to the trustee, who may use the higher basis in computing gain or loss on the sale, thereby diminishing the taxable increment and greatly reducing or entirely avoiding the income tax.

Section 113 (a) (5) of the Revenue Act of 1932 is a reenactment of a similar provision contained in the 1928 act. The change in the 1928 act was made because there was some doubt as to the meaning of the term "date of acquisition", which was the term used under the Revenue Act of 1926. Since the 1928 act was passed, the Supreme Court has defined "the date of acquisition" to mean the date of death in the case of all property passing by bequest, devise, and inheritance, whether real or personal. (*Brewster* v. *Gage*, 280 U.S. 327.) Section 113 (a) (5) of the bill conforms to the language contained in the Revenue Act of 1926, so that a uniform basis rule may be required in the case of property passing at death, whether real or personal. The section also includes a provision relating to general powers of appointment exercised by will, which was explained in connection with section 113 (a) (4).

Section 113 (a) (9) of existing law is omitted, this being made necessary by striking out section 112 (g) of the present law.

Subsection (a) (12) is a new provision inserted to make it clear that taxpayers who have acquired property in any taxable year beginning prior to January 1, 1934, under tax-free exchanges, where the basis is provided for in section 113 (a) (6), (7), and (9) of the present law, must retain such basis for under the bill.

Subsection (a) (13) (basis for partnership property) is a new provision which is declaratory of existing law. Its purpose is explained under the heading of "Partnerships" in the first part of this report.

Under section 113 (a) (14) of existing law, the basis for determining gain or loss in the case of property acquired prior to March 1, 1913, is its cost or fair market value as of that date, whichever is greater. This rule when applied to losses in some instances grants the taxpayer a loss when no loss has been actually sustained. For instance, suppose a taxpayer bought property for $20,000 prior to March 1, 1913, which was worth $75,000 on that date. If he sells such property in 1933 for $60,000, he is allowed a loss of $15,000, although he has in



fact sold it for more than he paid for it. Your committee is of the opinion that no loss should be allowed in any case where the selling price exceeds the taxpayer's investment in the property.

Section 114. Basis for depreciation and depletion: Subsections (a) and (b) (1) prescribe as the general basis for computing depreciation and depletion allowances, the basis for determining gain upon the sale or other disposition of property. Since in some cases the basis for determining gain differs from the basis for determining loss, it is necessary to specify definitely which of these bases is to be used for depreciation and depletion purposes.

Subsection (b) (2) and (3) contain clarifying changes to make it plain that depletion is actually allowed under section 23 instead of section 114.

Section 114 (b) (4). Percentage depletion for coal and metal mines and sulphur: Under the Revenue Act of 1932, percentage depletion was first allowed in the case of coal, metal, and sulphur mines. That act required the taxpayer to make in his 1933 return an election, binding for 1934 and subsequent years, as to whether the depletion deduction in such cases was to be computed upon a percentage basis. To avoid administrative complexity, your committee is of the opinion that the taxpayer making his first return under the bill should be entitled to a new election as to whether he will compute his allowance for depletion in the case of coal, metal, and sulphur mines upon the percentage basis. This section of the bill so provides.

Section 115. Distributions by corporations: Subsection (b) omits the exemption from income tax of dividends distributed out of earnings or profits or appreciation accrued prior to March 1, 1913, provided for by existing law. The reason for this omission is explained in the first part of this report under the heading of "Dividends Out of pre-March 1, 1913, Earnings." Subsections (a), (d), and (g) of this section conform to the new policy.

Subsection (c). (Distribution in liquidation): Under existing law, a distribution in liquidation of a corporation is treated in the same manner as a sale of stock. This rule has serious objections, as it permits wealthy stockholders to escape surtax upon corporate earnings or profits distributed in the form of liquidating dividends. For instance, a corporation may have a surplus of $1,000,000. If the surplus is distributed as an ordinary dividend it is subject to the surtax rates in the hands of the shareholders. If it is distributed as a liquidating dividend it is subject only to the flat capital gain rate of 12½ percent in case the shareholder has held his stock for more than 2 years. Your committee recognizes that liquidating dividends do contain some of the elements of a sale in that the shareholder is relinquishing in whole or in part his investment in the corporation.

On the other hand, they also contain some of the elements of an ordinary dividend insofar as they represent a distribution of corporate earnings or profits.

The bill retains the principle of the present law of taxing to the shareholder only the amount by which the liquidating dividend exceeds the basis of the stock with respect to which the dividend is paid. However, to prevent avoidance of surtax through liquidating dividend, the gain to the shareholder is made subject to both normal and surtax. This is accomplished by taxing the gain in the same manner as if it were a gain from a sale or exchange of a capital asset held for not more

Westlaw.



H.R. CONF. REP. 99-841, H.R. Conf. Rep. No. 841, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N. 4075, 1986 WL 31988 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 99-841, 1986 U.S.C.C.A.N. 4075)**

P.L. **99-514**, ****4075** TAX REFORM ACT OF 1986
DATES OF CONSIDERATION AND PASSAGE
House: December 17, 1985; September 25, 1986
Senate: June 24, September 27, 1986
House Report (Ways and Means Committee) No. 99-426,
Dec. 7, 1985 [To accompany H.R. 3838]
Senate Report (Finance Committee) No. 99-313,
May 29, 1986 [To accompany H.R. 3838]
House Conference Report No. 99-841,
Sept. 18, 1986 [To accompany H.R. 3838]
Cong. Record Vol. 131 (1985)
Cong. Record Vol. 132 (1986)
The Conference Report is set out below.

HOUSE CONFERENCE REPORT NO. 99-841
September 18, 1986

***III **4076** JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

2. Tax-exempt organizations engaged in insurance activities

Present Law

Present law (sec. 501(c)) specifies various standards that an organization must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

meet in order to qualify for exemption from Federal income taxation. These standards vary depending on the basis on which the entity is seeking exemption. Certain insurance activities performed by an organization may make it ineligible for tax exemption.

At least one major organization (described in sec. 501(c)(3)), which provides life insurance and annuities to employees of tax-exempt educational institutions, has been recognized as a tax-exempt charitablecharitablecharitablecharitable ****4433** organization by the IRS. At least one major health insurance provider has been treated as a tax-exempt social welfare organization.

A fraternal beneficiary society, order, or association (sec. 501(c)(8)) is entitled to tax exemption if it operates under the lodge system or for the exclusive benefits of the members of a fraternity itself operating under the lodge system, and provides for the payment of life, sick, accident, or other benefits to the members of such society, order, or association or their dependents.

House Bill

Under the bill, an organization described in sections 501(c)(3) and (4) of the Code is exempt from tax only if no substantial part of its activities consists of providing commercial-type insurance.

In the case of such a tax-exempt organization, the activity of providing commercial-type insurance is treated as an unrelated trade of business (sec. 513), but in lieu of the usual tax on unrelated trade or business taxable income, the unrelated trade or business activity is taxed under the rules relating to insurance companies (subchapter L).

For this puprose, commercial-type insurance generally is any insurance of a type provided by commercial insurance companies. The House bill provides that the issuance of annuity contracts is treated as providing insurance.

Several exceptions are provided to the definition of commercial-type insurance. Commercial-type insurance does not include insurance provided at substantially below cost to a class of charitable recipients. Commercial-type insurance also does not include health insurance provided by a health maintenance organization that is of a kind customarily provided by such organizations and is incidental to the organization's principal activity of providing health care. Similarly, organizations that provide supplemental health maintenance organization-type services (such as dental services) are not affected if they operate in the same manner as a health maintenance organization.

In addition, commercial-type insurance does not include property and casualty insurance (such as fire insurance) provided directly or through a wholly owned corporation by a church or convention or association of churches for the church, convention or association. This exception does not apply if the insurance is provided not only to the church, convention or association, but also to other persons.

In the case of activities of Blue Cross and Blue Shield and their affiliates with respect to high risk individuals and small groups, the House bill authorizes the Treasury Department to issue regulations providing for special treatment to such organizations in connection with the unique activities (such as open

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enrollment) of Blue Cross and Blue Shield and their affiliates for high risk individuals and small groups. The special treatment is not available to the extent the activities are required by applicable law.

The House bill requires that the Treasury Department audit and study fraternal beneficiary organizations (described in sec. 501(c)(8)) that received gross insurance premiums in excess of $25 million in taxable year 1984.

****4434** The provision is effective for taxable years beginning after December 31, 1985. A special rule for Mutual of America provides that this provision shall not apply with respect to that portion of its business attributable to pension business. Another special rule for Teachers Insurance Annuity Association-College Retirement Equities Fund provides that this provision does not apply to taxable years beginning before January 1, 1988, with respect to that portion of its business attributable to pension business.

Senate Amendment

No provision.

Conference Agreement

The conference agreement follows the House bill with respect to the treatment of commercial-type insurance activities of organizations described in sections 501(c)(3) and (4), with modifications.

In general

Under the conference agreement, commercial-type insurance does not include property or casualty insurance provided directly or through an organization described in sec. 414(e)(3)(B)(ii) by a church or convention or association of churches for the church, convention or association. It also does not apply to the provision of retirement or welfare benefits by such organizations directly or indirectly through an organization described in sec. 414(e)(3)(A) or 414(e)(3)(B)(ii) for the employees of such organizations, or for employees' beneficiaries. This exception is not intended to apply if insurance is provided to persons other than the church or convention or association of churches and their employees.

The conference agreement does not alter the tax-exempt status of health maintenance organizations (HMOs). HMOs provide physician services in a variety of practice settings primarily through physicians who are either employees or partners of the HMO or through contracts with individual physicians or one or more groups of physicians (organized on a group practice or individual practice basis).

Certain health insurance providers

In lieu of the provision in the House bill authorizing Treasury regulations with respect to high risk individuals and small groups in the case of activities of Blue Cross and Blue Shield and their affiliates, the conference agreement provides

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the following treatment of existing Blue Cross or Blue Shield organizations and other organizations that meet certain requirements and substantially all of whose activities are providing health insurance. Health insurance includes insurance that provides coverage of medical expenses.

The treatment applies to Blue Cross and Blue Shield organizations providing health insurance that (1) were in existence on the date of conference action (August 16, 1986), (2) are determined at any time to be tax-exempt under a determination that has not been **4435 revoked, [FN88] and (3) were tax-exempt for the last taxable year beginning before January 1, 1987, provided that no material change occurs in the structure or operations of the organization after August 16, 1986, and before the close of 1986 or any subsequent taxable year. The conferees intend that the following principles will be applied by the Secretary in determining whether or not a material change in operations or structure has occurred.

First, the merger or split up of 1 or more existing Blue Cross/Blue Shield organizations will not constitute a material change in operation or structure.

Second, if an existing Blue Cross/Blue Shield organization acquires a new line of business or is acquired by another business (other than a health business), the acquisition does not constitute a material change in operations or structure of the organization if (1) the assets of the other business are a de minimis percentage (i.e., less than 10 percent) of the assets of the existing Blue Cross/Blue Shield organization at the time of the acquisition, or (2) the taxpayer can demonstrate to the Secretary of the Treasury that, based on all the facts and circumstances, the acquisition does not constitute a material change in operations or structure of the existing Blue Cross/Blue Shield organization.

Third, a material change in operations occurs if an existing Blue Cross/Blue Shield organization drops its high risk coverage or substantially changes the terms and conditions under which high risk coverage is offered by the organization from the terms and conditions in effect as of August 16, 1986. A change in high risk coverage is considered substantial if the effect of the change is to defeat the purpose of high risk coverage. High risk coverage for this purpose generally means the coverage of individuals and small groups to the extent the organization (1) provides such coverage under specified terms and conditions as of August 16, 1986, or (2) meets the statutory minimum definition of high risk coverage for new organizations. A material change in operations does not occur if an existing organization alters its operations to provide high risk coverage that meets the minimum standards under the conference agreement for new Blue Cross/Blue Shield organizations.

For example, if an existing Blue Cross/Blue Shield organization provides open enrollment to all individuals and small groups of less than 5 individuals, the organization could redefine a small group for purposes of this coverage to mean the lesser of 15 individuals or the minimum number of individuals required for a small group under State law. Such a redefinition of a small group (from 5 to 15 individuals) would not be considered a material change in operations because the organization would meet the minimum standard for a new organization with respect to small group coverage.

On the other hand, if an existing Blue Cross/Blue Shield organization provides,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as of August 16, 1986, high risk coverage to individuals and small groups without a premium price differential to take account of the high risk nature of the business, a change in ****4436** premium structure for such individual and small group coverage that has the effect of creating a significant price differential to take account of the high risk nature of the business would be considered a material change in operations.

The conferees intend that, to the extent such determinations of tax exemption for any taxable year beginning before 1987 were not under audit or in litigation before the date of conference action (August 16, 1986), the Internal Revenue Service will not seek to revoke such determinations.

The conference agreement provides that such existing Blue Cross and Blue Shield organizations and other organizations eligible for this treatment are subject to tax as stock property and casualty insurance companies under Part II of Subchapter L of the Code, as amended under the conference agreement. Thus, such organizations are generally subject to the provisions applicable to property and casualty insurance companies in this conference agreement, except as otherwise provided.

A special deduction is provided to such organizations with respect to their health business equal to 25 percent of the claims and expenses incurred during the taxable year less the adjusted surplus at the beginning of the year. This deduction is calculated by computing surplus, taxable income, claims incurred, expenses incurred, tax-exempt income, net operating loss carryovers, etc., attributable to health business. Thus, the deduction is not allowable with respect to such items attributable to, for example, life insurance business. The expenses attributable to health business are those incurred during the taxable year in connection with the administration, adjustment or settlement of claims under health business. The deduction may not exceed taxable income attributable to health business for the year (calculated without regard to this deduction).

For organizations eligible for this deduction in the first taxable year beginning after December 31, 1986, the amount of the adjusted surplus to be applied in the first year for which the deduction is allowable is the surplus reported on the organization's annual statement (i.e., the annual statement approved by the National Association of Insurance Commissioners) at the close of the preceding year, adjusted by not taking into account distributions (such as distributions to shareholders, or contributions or loans to affiliates that reduce surplus, but not including ordinary and necessary expenses or deductible policyholder dividends) after the date of conference action (August 16, 1986). For organizations that first become eligible for the provision in a later taxable year, the amount of the adjusted surplus for the first year of the deduction is the surplus reported on the annual statement at the close of the preceding year.

The initial surplus amount is adjusted under the provision at the close of each taxable year by adding the taxable income or loss [FN89] of the organization for the year (determined without regard to net operating loss carryovers and without regard to the deduction under ****4437** this provision), plus net tax-exempt income for the year. Net tax-exempt income means dividends for which the dividends received deduction was allowed, and interest that is tax-exempt, less the expenses of earning the tax-exempt interest that were disallowed under sec. 265, and less

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the adjustment that was made for proration of tax-exempt income under sec. 805(a) or sec. 832(b)(5) (as amended by the conference agreement). If an organization eligible for the deduction under this provision does not take the deduction in any year, adjusted surplus must be calculated for the intervening years between the last year the organization took the deduction and the next year in which it takes the deduction, so as to take account properly of the calculation of the deduction in the later year.

For example, assume a calendar year Blue Cross organization engaged only in health business, the State law surplus (as adjusted) of which was $100 million on January 1, 1987. In 1987, the organization has health claims and expenses incurred of $880 million and adjusted taxable income of $160 million (including net tax-exempt income of $10 million). In 1987, the organization would be entitled to a special deduction of $120 million, that is, the excess of $220 million (25 percent of the 1987 claims and expenses paid) over $100 million (the 1987 opening surplus).

As a further example, assume that in 1988, the organization has health claims and expenses incurred of $1.2 billion. Its special deduction for 1988 would be $40 million, that is, the excess of $300 million (25 percent of the 1988 health claims and expenses incurred) over the opening 1988 adjusted surplus balance of $260 million. The opening 1988 surplus is calculated by taking the sum of (a) 1987 opening surplus of $100 million, plus (b) 1987 adjusted taxable income of $160 million (including 1987 net tax-exempt income of $10 million).

The deduction applies only for regular tax purposes. Therefore, the deduction is treated as as preference item for purposes of the corporate minimum tax.

In addition to this special deduction, such organizations are given a fresh start with respect to changes in accounting methods resulting from the change from tax-exempt to taxable status. No adjustment is made under section 481 on account of an accounting method change.

Such organizations are not subject to the treatment of unearned premium reserves generally applicable to property and casualty insurance companies under the conference agreement. The conferees believe that during the period such organizations were tax-exempt, any mismatching of currently deductible premium acquisition expenses and deferred premiums (resulting from the unearned premium reserve deduction) had no significant tax impact, and therefore it is not appropriate to require these organizations to include in income a portion of the outstanding balance of the unearned premium reserve. To ease the transition from tax-exempt to taxable status, the conferees believe that it is appropriate to give such organizations relief from the requirement that 20 percent of the increase in unearned premium reserves be included in income.

Finally, the basis of assets of such organizations is equal, for purposes of determining gain or loss, to the amount of the assets' fair **4438 market value on the first day of the organization's taxable year beginning after December 31, 1986. Thus, for formerly tax-exempt organizations utilizing a calendar period of accounting and whose first taxable year commences January 1, 1987, the basis of each asset of such organization is equal to the amount of its fair market value on January 1, 1987. The basis step-up is provided solely for purposes of determining gain or loss upon sale or exchange of the assets, not for purposes of determining

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 99-841, H.R. Conf. Rep. No. 841, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N. 4075, 1986 WL 31988 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 99-841, 1986 U.S.C.C.A.N. 4075)**

amounts of depreciation or for other purposes. The basis adjustment is provided because the conferees believe that such formerly tax-exempt organizations should not be taxed on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation.

The foregoing special provisions apply to existing tax-exempt Blue Cross and Blue Shield organizations and and to those other organizations that satisfy the additional criteria described below.

Other organizations substantially all of whose activities are providing health insurance, in order to receive the treatment under the provisions described above, must meet certain requirements.

First, at least 10 percent of the health insurance (determined as a percentage of the total number of individuals covered annually) provided by the organization must be provided to individuals and small groups (disregarding Medicare supplemental coverage). A small group is defined as the lesser of 15 individuals or the number of individuals required for a small group under the State law where the covered groups are located.

Second, the organization is required to provide continuous full-year open enrollment for individuals and small groups. Open enrollment is intended to included conversions from group to individual coverage (for example, upon separation from service with an employer who provides group coverage), without a lapse in coverage, provided the individual seeking to convert from group to individual coverage notifies the organization providing group coverage of his conversion request by the date of his separation from service. Conversion includes any change in the type of coverage (e.g., from one type of group to another).

Third, any individual seeking health insurance is required to be offered coverage which includes coverage of pre-existing conditions, and the coverage becomes effective within a reasonable waiting period after the time such coverage is sought. A reasonable waiting period is intended to be not more than three months. Further, health insurance coverage must be provided without regard to the age, income, or employment status of persons under age 65.

Fourth, at least 35 percent of the organization's health insurance premiums are determined on a community-rated basis. This percentage is determined as a percentage of the total number of persons covered on an annual basis. Community rating means that premiums are determined on the basis of the average annual cost of health insurance over the population in the community.

Fifth, the organization must be organized and operated in a manner such that no part of the net earnings inures to the benefit of any private shareholder or individual.

The conference agreement requires that the Treasury Department audit and study fraternal beneficiary organizations (described **4439 in sec. 501(c)(8)) that received gross insurance premiums in excess of $25 million in taxable year 1984. The Treasury study is due by January 1, 1988.

Effective dates

The provision is effective for taxable years beginning after December 31, 1986.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 99-841, H.R. Conf. Rep. No. 841, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N. 4075, 1986 WL 31988 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 99-841, 1986 U.S.C.C.A.N. 4075)**

Special rules for Mutual of America and for Teachers Insurance Annuity Association-College Retirement Equities Fund provide that this provision does not apply with respect to that portion of their business attributable to pension business. For this purpose, the conference agreement provides that pension business means the administration of qualified pension plans (sec. 401(a) or 403(a)), tax-sheltered annuities (sec. 403(b)), unfunded deferred compensation plans of State and local governments (sec. 457), and individual retirement arrangements (IRA's.)

Additional special rules provide that this provision does not apply to the YMCA retirement fund, to administrative services performed by tax-exempt municipal leagues, to the Missouri Hospital Association, or to dental benefit coverage by Delta Dental Plans Association through contracts with independent service providers so long as the provision of such coverage is the principal activity of such Association. No inference is intended, under this provision, as to whether the performance of administrative services by tax-exempt municipal leagues, without more, constitutes commercial-type insurance activities. Generally, however, the performance of administrative services with respect to insurance contracts by tax-exempt organizations may be subject to unrelated business tax.

# Calendar No. 388

68TH CONGRESS, 1st Session | SENATE | REPORT No. 398

## INTERNAL REVENUE BILL OF 1924

APRIL 10 (calendar day, APRIL 12), 1924.—Ordered to be printed

Mr. SMOOT, from the Committee on Finance, submitted the following

## REPORT

[To accompany H. R. 6715]

The Committee on Finance, to whom was referred the bill (H. R. 6715) to reduce and equalize taxation, to provide revenue, and for other purposes, having had the same under consideration, report favorably thereon with certain amendments, and as amended recommend that the bill do pass.

### TREASURY SURPLUS

Under date of November 10, 1923, in a letter to the chairman of the Ways and Means Committee, the Secretary of the Treasury wrote as follows:

> After taking into account all these considerations, and making the most conservative estimates about the yield of existing taxes and the possibilities of further reductions in expenditure, it appears that for this year, and for the next four or five years, there should be a surplus of something over $300,000,000 a year, over and above all expenditures chargeable to the ordinary budget, including the fixed debt charges payable out of current revenues. This gives a reasonable margin, not merely for tax revision, but for tax reduction.

According to the estimate submitted in the annual report of the Secretary of the Treasury for the fiscal year 1923, the excess of ordinary receipts over total expenditures chargeable against ordinary receipts were, for the fiscal year 1923, $309,657,460.30. For the fiscal year 1924 the surplus is estimated to be $329,639,924, and for the fiscal year 1925, $395,681,634.

68TH CONGRESS, 1ST SESSION. H. R. 6715

liquidating dividend is, in effect, a sale by the stockholder of his stock to the corporation; he surrenders his interest in the corporation and receives money in place thereof. Treating such a transaction as a sale and within the capital gain provisions is consistent with the entire theory of the act and, furthermore, is the only method of treating such distributions which can be easily administered.

The theory of liquidating dividends is extended to distributions in partial liquidation. If a corporation retires a portion of its capital stock, the transaction is treated, from the point of view of the stockholder, as a sale of his stock. If the corporation distributes an amount in partial retirement of its capital stock, the amount thereof is to be considered as a return of capital, and taxable only if, as, and to the extent that it exceeds the basis of the stock.

The House bill also treated such dividends as a sale of the stock, for the purpose of determining the amount of the gain, but provided that the amount of such gain should be taxed (1) as a dividend to the extent that it does not exceed the taxpayer's ratable share of the undistributed earnings of the corporation accumulated since February 28, 1913; (2) as a gain from the exchange of property to the extent that it exceeds such ratable share. It is recommended that this provision of the House bill be stricken out.

(2) It is provided in the last sentence of section 201 (c) of the bill that amounts distributed in partial liquidation of a corporation shall not, to the extent that they are properly chargeable to capital account, be treated as distributions of earnings and profits for the purpose of determining the taxability of subsequent distributions by the corporation. No similar provision is contained in the existing law, although the provisions of the bill represent what is probably the correct construction of the existing law and unquestionably what is in accord with business practice.

Section 201 (d): Subdivision (d) of the bill corresponds to subdivision (c) of section 201 of the existing law. This subdivision provides that amounts distributed by a corporation which do not constitute distributions of earnings or profits or increase in value of property accrued prior to March 1, 1913 (such as distributions out of unrealized appreciation in value of property or out of depreciation or depletion reserves), constitute a return of capital to the stockholder and are taxable to him only if, as, and to the extent that they exceed the basis of his stock. It is specifically provided that the amount by which such distribution exceeds that basis of the stock constitutes taxable income, which provision accords with the Treasury Department's interpretation of the present law.

A provision has been added to this subdivision as contained in the House bill providing that there shall be included within the provisions of the subdivision amounts distributed by corporations out of depletion reserves based upon the discovery value of mines. As contained in the House bill the provision included distributions made out of depletion and depreciation reserves based upon the cost of the property depreciated or depleted, and it is thought desirable to extend this provision to distributions out of the depletion reserve based upon the discovery value of mines.

Section 201 (e): Subdivision (e) of the bill provides, as does the present law in section 201 (a), for the exemption of dividends



paid by a personal service corporation out of its earnings and profits which under the provisions of the revenue act of 1918 and the revenue act of 1921 have already been taxed to the stockholders even though not distributed.

Section 201 (f): The bill changes the existing law by providing for the case in which a corporation first redeems a portion of its stock and then declares a stock dividend as well as the case in which the corporation first declares the stock dividend and then redeems a portion of its stock.

Section 201 (g): The definition contained in the House bill of amounts distributed in partial liquidation has been rewritten for purposes of clarity.

Subdivision (e) of the present law is omitted in the bill, but is covered by a general provision in section 213 (a).

Subdivision (f) of section 201 of the present law applied only to the computation of invested capital for purposes of the excess-profits tax and was omitted because obsolete.

Section 202: There is no provision of the existing law which corresponds to this section of the bill. The purpose in embodying in the law this section is to show clearly the method of determining the amount of gain or loss from the sale or other disposition of property.

(1) Subdivision (a) of this section sets forth the general rule that the amount of the gain or loss from the sale or other disposition of property is the difference between the cost or other basis of the property sold and the amount received for the property upon the sale. This merely embodies in the law the present construction by the department and the courts of the existing law.

(2) There is no provision in the existing law which corresponds to subdivision (b). It provides that in computing gain or loss from the sale or other disposition of property the cost or other basis of the property shall be increased by the cost of capital improvements and betterments made to the property since acquisition and decreased by the depreciation and similar deductions previously allowed with respect to this property. To remove a possible ambiguity in the House bill, the deductions are limited to those "previously allowed," rather than those "properly chargeable."

(3) Subdivision (c) does not correspond to any provision of the existing law but embodies in the law what is and has always been the construction of the law adopted by the department and by the courts; that is, that where income is realized in the form of property the measure of the income is the fair market value of the property at the date of its receipt.

(4) Subdivision (d) is merely informatory, stating that the amount of the gain determined under its provisions shall be recognized as provided in section 203, which states those cases in which no gain or loss from a sale or exchange is recognized and those cases in which a limitation is placed upon the gain or loss to be recognized from the sale or exchange.

(5) Subdivision (e) of the bill is the same as section 202 (f) of the existing law.

Section 203: The existing law provides, in section 202 (c), that no gain or loss is recognized from an exchange of property unless the property received in exchange has a readily realizable market

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2007, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE JUNE 14, 2007 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 26 -- INTERNAL REVENUE
CHAPTER I -- INTERNAL REVENUE SERVICE, DEPARTMENT OF THE TREASURY
SUBCHAPTER A -- INCOME TAX
PART 1 -- INCOME TAXES
NORMAL TAXES AND SURTAXES
COMPUTATION OF TAXABLE INCOME
ITEMS SPECIFICALLY INCLUDED IN GROSS INCOME

**Go to the CFR Archive Directory**

*26 CFR 1.83-4*

§ 1.83-4 Special rules.

(a) Holding period. Under section 83(f) *[26 USCS § 83*(f)], the holding period of transferred property to which section 83(a) *[26 USCS § 83*(a)] applies shall begin just after such property is substantially vested. However, if the person who has performed the services in connection with which property is transferred has made an election under section 83(b) *[26 USCS § 83*(b)], the holding period of such property shall begin just after the date such property is transferred. If property to which section 83 *[26 USCS § 83]* and the regulations thereunder apply is transferred at arm's length, the holding period of such property in the hands of the transferee shall be determined in accordance with the rules provided in section 1223 *[26 USCS § 1223]*.

(b) Basis. (1) Except as provided in paragraph (b)(2) of this section, if property to which section 83 *[26 USCS § 83]* and the regulations thereunder apply is acquired by any person (including a person who acquires such property in a subsequent transfer which is not at arm's length), while such property is still substantially nonvested, such person's basis for the property shall reflect any amount paid for such property and any amount includible in the gross income of the person who performed the services (including any amount so includible as a result of a disposition by the person who acquired such property.) Such basis shall also reflect any adjustments to basis provided under sections 1015 and 1016 *[26 USCS §§ 1015* and 1016].

(2) If property to which § 1.83-1 applies is transferred at arm's length, the basis of the property in the hands of the transferee shall be determined under section 1012 *[26 USCS § 1012]* and the regulations thereunder.

(c) Forgiveness of indebtedness treated as an amount paid. If an indebtedness that has been treated as an amount paid under § 1.83-1(a)(1)(ii) is subsequently cancelled, forgiven or satisfied for an amount less than the amount of such indebtedness, the amount that is not, in fact, paid shall be includible in the gross income of the service provider in the taxable year in which such cancellation, forgiveness or satisfaction occurs.

**HISTORY:** [T.D. 7554, *43 FR 31918*, July 24, 1978]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*26 U.S.C. 7805.*

**NOTES:** NOTES APPLICABLE TO ENTIRE CHAPTER:
EDITORIAL NOTE: IRS published a document at *45 FR 6088,* Jan. 25, 1980, deleting statutory sections from their regulations. In Chapter I, cross references to the deleted material have been changed to the corresponding sections of the IRS Code of 1954 or to the appropriate regulations sections. When either such change produced a redundancy, the cross reference has been deleted. For further explanation, see *45 FR 20795,* March 31, 1980.
[The OMB control numbers for title 26 appear in §§ 601.9000 and 602.101 of this chapter.]

NOTES APPLICABLE TO ENTIRE SUBCHAPTER:
Supplementary Publications: Internal Revenue Service Looseleaf Regulations System, Alcohol and Tobacco Tax Regulations, and Regulations Under Tax Conventions.
EDITORIAL NOTE: Treasury Decision 6091, *19 FR 5167,* Aug. 17, 1954, provides in part as follows:
PARAGRAPH 1. All regulations (including all Treasury decisions) prescribed by, or under authority duly delegated by, the Secretary of the Treasury, or jointly by the Secretary and the Commissioner of Internal Revenue, or by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, or jointly by the Commissioner of Internal Revenue and the Commissioner of Customs or the Commissioner of Narcotics with the approval of the Secretary of the Treasury, applicable under any provision of law in effect on the date of enactment of the Code, to the extent such provision of law is repealed by the Code, are hereby prescribed under and made applicable to the provisions of the Code corresponding to the provision of law so repealed insofar as any such regulation is not inconsistent with the Code. Such regulations shall become effective as regulations under the various provisions of the Code as of the dates the corresponding provisions of law are repealed by the Code, until superseded by regulations issued under the Code.
PAR. 2. With respect to any provision of the Code which depends for its application upon the promulgation of regulations or which is to be applied in such manner as may be prescribed by regulations, all instructions or rules in effect immediately prior to the enactment of the Code, to the extent such instructions or rules could be prescribed as regulations under authority of such provision of the Code, shall be applied as regulations under such provision insofar as such instructions or rules are not inconsistent with the Code. Such instructions or rules shall be applied as regulations under the applicable provision of the Code as of the date such provision takes effect.
PAR. 3. If any election made or other act done pursuant to any provision of the Internal Revenue Code of 1939 or prior internal revenue laws would (except for the enactment of the Code ) be effective for any period subsequent to such enactment, and if corresponding provisions are contained in the Code, such election or other act shall be given the same effect under the corresponding provisions of the Code to the extent not inconsistent therewith. The term "act" includes, but is not limited to, an allocation, identification, declaration, agreemtent, option, waiver, relinquishment, or renunciation.
PAR. 4. The limits of the various internal revenue districts have not been changed by the enactment of the Code. Furthermore, delegations of authority made pursuant to the provisions of Reorganization Plan No. 26 of 1950 and Reorganization Plan No. 1 of 1952 (as well as redelegation thereunder), including those governing the authority of the Commissioner of Internal Revenue, the Regional Commissioners of Internal Revenue, or the District Directors of Internal Revenue, are applicable to the provisions of the Code to the extent consistent therewith.

429 words

1 of 2 DOCUMENTS

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2007, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE JUNE 14, 2007 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 26 -- INTERNAL REVENUE
CHAPTER I -- INTERNAL REVENUE SERVICE, DEPARTMENT OF THE TREASURY
SUBCHAPTER A -- INCOME TAX
PART 1 -- INCOME TAXES
NORMAL TAXES AND SURTAXES
GAIN OR LOSS ON DISPOSITION OF PROPERTY
BASIS RULES OF GENERAL APPLICATION

**Go to the CFR Archive Directory**

*26 CFR 1.1011-1*

§ 1.1011-1 Adjusted basis.

The adjusted basis for determining the gain or loss from the sale or other disposition of property is the cost or other basis prescribed in section 1012 or other applicable provisions of subtitle A of the code, adjusted to the extent provided in sections 1016, 1017, and 1018 or as otherwise specifically provided for under applicable provisions of internal revenue laws.

**HISTORY:** Treasury Decision 6500, *25 FR 11910*, Nov. 26, 1960; *25 FR 14021*, Dec. 31, 1960.

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*26 U.S.C. 7805.*

**NOTES:** EDITORIAL NOTE: IRS published a document at *45 FR 6088*, January 25, 1980, deleting statutory sections from their regulations. In Chapter I, cross references to the deleted material have been changed to the corresponding sections of the IRS Code of 1954 or to the appropriate regulations sections. When either such change produced a redundancy, the cross reference has been deleted. For further explanation, see *45 FR 20795*, March 31, 1980.

NOTES APPLICABLE TO ENTIRE CHAPTER:
EDITORIAL NOTE: IRS published a document at *45 FR 6088*, Jan. 25, 1980, deleting statutory sections from their regulations. In Chapter I, cross references to the deleted material have been changed to the corresponding sections of the IRS Code of 1954 or to the appropriate regulations sections. When either such change produced a redundancy, the cross reference has been deleted. For further explanation, see *45 FR 20795*, March 31, 1980.
[The OMB control numbers for title 26 appear in §§ 601.9000 and 602.101 of this chapter.]

NOTES APPLICABLE TO ENTIRE SUBCHAPTER:
Supplementary Publications: Internal Revenue Service Looseleaf Regulations System, Alcohol and Tobacco Tax Regulations, and Regulations Under Tax Conventions.
EDITORIAL NOTE: Treasury Decision 6091, *19 FR 5167,* Aug. 17, 1954, provides in part as follows:
PARAGRAPH 1. All regulations (including all Treasury decisions) prescribed by, or under authority duly delegated by, the Secretary of the Treasury, or jointly by the Secretary and the Commissioner of Internal Revenue, or by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, or jointly by the Commissioner of Internal Revenue and the Commissioner of Customs or the Commissioner of Narcotics with the approval of the Secretary of the Treasury, applicable under any provision of law in effect on the date of enactment of the Code, to the extent such provision of law is repealed by the Code, are hereby prescribed under and made applicable to the provisions of the Code corresponding to the provision of law so repealed insofar as any such regulation is not inconsistent with the Code. Such regulations shall become effective as regulations under the various provisions of the Code as of the dates the corresponding provisions of law are repealed by the Code, until superseded by regulations issued under the Code.
PAR. 2. With respect to any provision of the Code which depends for its application upon the promulgation of regulations or which is to be applied in such manner as may be prescribed by regulations, all instructions or rules in effect immediately prior to the enactment of the Code, to the extent such instructions or rules could be prescribed as regulations under authority of such provision of the Code, shall be applied as regulations under such provision insofar as such instructions or rules are not inconsistent with the Code. Such instructions or rules shall be applied as regulations under the applicable provision of the Code as of the date such provision takes effect.
PAR. 3. If any election made or other act done pursuant to any provision of the Internal Revenue Code of 1939 or prior internal revenue laws would (except for the enactment of the Code ) be effective for any period subsequent to such enactment, and if corresponding provisions are contained in the Code, such election or other act shall be given the same effect under the corresponding provisions of the Code to the extent not inconsistent therewith. The term "act" includes, but is not limited to, an allocation, identification, declaration, agreemtent, option, waiver, relinquishment, or renunciation.
PAR. 4. The limits of the various internal revenue districts have not been changed by the enactment of the Code. Furthermore, delegations of authority made pursuant to the provisions of Reorganization Plan No. 26 of 1950 and Reorganization Plan No. 1 of 1952 (as well as redelegation thereunder), including those governing the authority of the Commissioner of Internal Revenue, the Regional Commissioners of Internal Revenue, or the District Directors of Internal Revenue, are applicable to the provisions of the Code to the extent consistent therewith.

NOTES TO DECISIONS: COURT AND ADMINISTRATIVE DECISIONS SIGNIFICANTLY DISCUSSING SECTION --
*Fed. Home Loan Mortg. Corp. v Comm'r (2003) 121 TC 129*

64 words