# In the United States Court of Federal Claims

No. 05-503T

(Filed: September 14, 2007)

| | | |
|---|---|---|
| HOSPITAL SERVICES ASSOCIATION OF NORTHEASTERN PENNSYLVANIA,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | * | Blue Cross/Blue Shield Entity; Tax Reform Act of 1986; Fresh Start Basis Rule; Loss Deductions for Terminated Healthcare Coverage Contracts; Change in Accounting Method. |

*Frederick H. Robinson,* with whom were *Clarence T. Kipps, Jr.*, *Maria O. Jones,* and *Adam P. Feinberg*, Miller & Chevalier Chartered, Washington, D.C., for Plaintiff.

*Karen Servidea*, with whom were *Eileen J. O'Conner*, Assistant Attorney General, *David Gustafson*, Chief, Court of Federal Claims Section, and *W.C. Rapp*, Senior Trial Attorney, United States Department of Justice, Tax Division, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This tax case is before the Court on Defendant's February 28, 2007 Motion for Summary Judgment, and Plaintiff's April 30, 2007 Cross-Motion for Partial Summary Judgment. Plaintiff, Hospital Services Association of Northeastern Pennsylvania ("HSA"), filed this action to recover federal income taxes alleged to have been erroneously overpaid for the years 1991 through 1997.[1] HSA is a Blue Cross/Blue Shield ("BC/BS") organization that was exempt from federal income tax until the Tax Reform Act of 1986 (the "Tax Reform

[1] HSA has withdrawn its refund claim for the 1991 tax year because it was not timely filed within the applicable limitations period.

Act") took effect on January 1, 1987. Pub. L. No. 99-514, § 1012, 100 Stat. 2085, 2390 (1986). Section 1012 of the Tax Reform Act contained provisions designed to transition BC/BS organizations into taxation, including one known as the "Fresh Start Basis Rule." This rule provided that "for purposes of determining gain or loss, the adjusted basis of any asset held [by a BC/BS organization] on [January 1, 1987] shall be treated as equal to its fair market value as of such day." Id. § 1012(c)(3)(A)(ii).

The question before the Court is whether the Fresh Start Basis Rule and Internal Revenue Code ("I.R.C.") § 165[2] apply to loss deductions that HSA claims for the termination or cancellation of its healthcare coverage contracts. Four other federal courts, including most recently this Court, have answered this question in favor of the taxpaying BC/BS entity. Trigon Ins. Co. v. United States, 215 F. Supp. 2d 687 (E.D. Va. 2002); Capital Blue Cross v. Comm'r, 122 T.C. 224 (2004) ("Capital I"); Capital Blue Cross v. Comm'r, 431 F.3d 117 (3d Cir. 2005) ("Capital II"); Highmark, Inc. v. United States, No. 05-1030T, 2007 WL 2412175 (Fed. Cl. Aug. 22, 2007). For the reasons explained below, the Court agrees with the analysis from the other four decisions, and finds that the Fresh Start Basis Rule and I.R.C. § 165 do apply to the loss deductions arising from the termination or cancellation of HSA's healthcare coverage contracts. Accordingly, Plaintiff's Cross-Motion for Partial Summary Judgment is GRANTED, and Defendant's Motion for Summary Judgment is DENIED. The case will be set for further proceedings to determine the amount of HSA's loss deductions.

## Factual Background[3]

Plaintiff HSA is a Pennsylvania nonprofit corporation doing business as an independent licensee of the BC/BS organization. HSA is a provider of health insurance, and is a party to healthcare coverage contracts with individual and group subscribers. HSA's healthcare coverage contracts obligate HSA to pay the healthcare costs of the individual or group members in exchange for the subscriber's payment of an insurance premium. HSA incurs various business expenses to induce potential customers to enter into contracts. These costs include advertising, salaries, travel, actuarial fees to compute premiums, and overhead. Over the life of each healthcare coverage contract, HSA incurs additional expenses to maintain the policy.

---

[2] The Internal Revenue Code is codified in Title 26 of the United States Code. Unless otherwise indicated, the term "I.R.C." followed by a section number refers to the 1986 version of the Internal Revenue Code.

[3] The facts recited herein are taken from the parties' proposed findings of uncontroverted fact, filed with the cross-motions for summary judgment. The Court is satisfied that the material facts necessary to decide the issue presented are not in dispute.

Historically, HSA and other BC/BS organizations were not subject to federal income taxes. In 1986, Congress became concerned that the tax-exempt status of BC/BS organizations gave them an unfair competitive advantage over other healthcare insurers, and eliminated the tax exemption as of January 1, 1987. See H.R. Rep. No. 99-841, pt. 2, at 350 (1986) (Conf. Rep.), as reprinted in 1986 U.S.S.C.A.N. 4075, 4437-38. When BC/BS entities became taxable, they needed a method to determine the tax basis of their assets. Congress therefore provided that BC/BS entities could take a stepped-up basis in their assets, so that the tax basis of each asset would be its fair market value on January 1, 1987. Tax Reform Act, § 1012(c)(3)(A)(ii). This allowance of a stepped-up basis is known as the Fresh Start Basis Rule.

The purpose of the Fresh Start Basis Rule was to prevent any unrealized gain or loss that had accrued while a BC/BS organization was tax exempt from being considered in determining tax liability once the entity became a taxpayer. See H.R. Rep. No. 99-841, supra. By requiring the basis of each asset held on January 1, 1987 to be adjusted to its fair market value on that date, the Fresh Start Basis Rule ensures that the taxable income or loss of a BC/BS entity would be based solely on income and loss that accrue after the entity became subject to federal income tax. See Trigon, 215 F. Supp. 2d at 691-92.

For purposes of its financial accounting, both before and after January 1, 1987, HSA treated its business expenses of selling and maintaining health insurance contracts as current expenses, and not as capital items. For tax accounting purposes after January 1, 1987, HSA also treated these expenses as ordinary expenses, both as to the post-1986 expenses incurred to maintain pre-1987 contracts, and as to post-1986 expenses incurred to solicit and maintain post-1986 contracts.

HSA did not claim any loss deductions for terminated contracts on its originally filed income tax returns for 1987 through 1995. HSA first claimed loss deductions for terminated contracts in September 1996 on its amended returns for 1991 and 1992. After filing its amended returns for 1991 and 1992, HSA filed refund claims for the 1993, 1994, and 1995 tax years, seeking deductions for terminated healthcare coverage contracts. HSA also claimed deductions for terminated contracts on its original 1996 and 1997 tax returns. HSA did not request or secure the consent of the Internal Revenue Service ("IRS") to change its method of accounting for the termination or cancellation of healthcare coverage contracts, believing that it had not changed its method of accounting.

The amount of HSA's loss deductions will be determined in further proceedings, but one document attached to HSA's April 27, 2005 Complaint, Exhibit D, indicates that the value ascribed to HSA's healthcare coverage contracts on January 1, 1987 was $32,485,000. The IRS disagreed with this value, setting the amount instead at $22,396,000. At the July

27, 2007 oral argument, Defendant's counsel stated that the claimed deductions were in the range of "tens of millions of dollars." Summ. J. Hr'g Tr. 5, July 27, 2007.

Also at the oral argument, the Court inquired why HSA had waited until 1996 to assert loss deduction claims stemming from a 1987 valuation process. Hr'g Tr. 46. HSA's counsel explained that the BC/BS entities had little prior familiarity with the federal tax code, and were awaiting instruction from the IRS while also acquiring knowledge and expertise on their own. Hr'g Tr. 45-46. The IRS issued Technical Advice Memorandum 9533003 in 1995 indicating that the stepped-up basis in assets as of January 1, 1987 could apply to self-created assets such as software. Hr'g Tr. 46-47. The healthcare coverage contracts at issue also are regarded as self-created assets. See infra.

HSA filed administrative claims for refund with the IRS for the 1991 through 1997 tax years, which the IRS denied in their entirety in notices of claim disallowance dated April 27, 2001. Following agreements with the IRS extending the time for HSA to file suit, HSA commenced this action on April 27, 2005.

## Positions of the Parties

Plaintiff HSA contends that the language of the Fresh Start Basis Rule and I.R.C. § 165 allow loss deductions upon the termination or cancellation of healthcare coverage contracts. While acknowledging that its contracts are self-created assets that normally have a basis of zero, HSA maintains that the Fresh Start Basis Rule allowed it to adjust the cost basis of each contract to the fair market value as of January 1, 1987. HSA argues that it is not required to have incurred a capital cost to have a fair market value basis in the asset. HSA emphasizes that the Fresh Start Basis Rule is not limited to losses resulting from sales or exchanges. HSA relies upon the Trigon and Capital Care I & II cases, and asserts that this case is factually the same in all material respects. HSA claims that it has not altered its method of accounting for healthcare coverage contracts, and therefore had no obligation to request IRS approval of a change in accounting method.

Defendant contends that the Fresh Start Basis Rule does not apply to HSA's claimed loss deductions because: (1) insurance contracts have no pre-existing cost basis; and (2) the rule applies only to gains or losses upon the sale or exchange of an asset. Defendant asserts that HSA incurred no capital costs with respect to the healthcare coverage contracts prior to January 1, 1987, and the contracts had no "cost" basis on that date. Therefore, HSA could not receive an "adjusted" basis equal to the fair market value of the contracts. Application of the Fresh Start Basis Rule to contracts in which HSA never incurred a capital cost would conflict with the fundamental concept of tax basis. Defendant further contends that, even if

healthcare coverage contracts were eligible for loss deductions, HSA changed its method of accounting without notifying or requesting approval from the IRS.

## Standard for Decision

Under Rule 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986); Atwood-Leisman v. United States, 72 Fed. Cl. 142, 147 (2006). The burden of establishing that no genuine issue of material fact exists rests with the moving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A fact is "material" if it "might affect the outcome of the suit under the governing law." Id. at 248. In considering the existence of a genuine issue of material fact, a court must draw all inferences in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If the non-moving party produces sufficient evidence to raise a genuine issue of fact material to the outcome of the case, the motion for summary judgment should be denied. Liberty Lobby, 477 U.S. at 248; see also Eli Lilly and Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001).

In reviewing cross-motions for summary judgment, the Court must conduct an independent analysis for each motion and resolve any doubt on factual issues in favor of each party opposing summary judgment. The benefit of all presumptions and inferences runs in favor of the non-moving party in each analysis. See Matsushita, 475 U.S. at 587 (1986); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001). Both motions must be denied if genuine disputes exist over material facts. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). In the present case, the Court finds that the material facts are not in dispute.

## Discussion

### A. Applicability of The Fresh Start Basis Rule to Terminated Healthcare Coverage Contracts

The starting point in the Court's analysis is the statutory language of the Fresh Start Basis Rule, which provides that "for purposes of determining gain or loss, the adjusted basis of any asset held on [January 1, 1987] shall be treated as equal to its fair market value as of such day." Tax Reform Act § 1012(c)(3)(A)(ii). The phrase "any asset" in this rule includes intangible assets such as HSA's healthcare coverage contracts. Capital II, 431 F.3d at 124-27; Trigon, 215 F. Supp. at 696; Capital I, 122 T.C. at 234-38; see also Union Bankers Ins.

Co. v. Comm'r, 64 T.C. 807 (1975). Thus, the Fresh Start Basis Rule permitted HSA to set the basis of each healthcare coverage contract at its fair market value as of January 1, 1987.

HSA's healthcare coverage contracts with individual and group subscribers unquestionably are "assets" of HSA because they produce future revenue to HSA. See Capital II, 431 F.3d at 125-26 ("[E]ach contract constitutes the right to a continuing stream of future payments."). As noted in Trigon, 215 F. Supp. at 696, other courts have treated contractual relationships as "assets" of the owner. See, e.g., Super Food Servs., Inc. v. United States, 416 F.2d 1236 (7th Cir. 1969) (treating distributor contracts as assets); Comm'r v. Seaboard Fin. Corp., 367 F.2d 646 (9th Cir. 1966) (treating consumer loan contracts as assets); Hoffman v. Comm'r, 48 T.C. 176 (1967) (treating contracts for the location of vending machines as assets); N. Am. Servs. Co. v. Comm'r, 33 T.C. 677 (1960) (taxpayer entitled to fair market value basis in service contracts received upon liquidation of corporation); Silling v. Comm'r, 27 T.C. 701 (1957) (contracts for performance of services were assets and thus entitled to stepped-up basis when received by a partner upon termination of a partnership, even though contracts had a zero basis in the hands of the partnership). These precedents, and particularly the holdings in Trigon and Capital II, supra, are persuasive authority that HSA's healthcare coverage contracts are "assets."

The next step in the Court's analysis is to apply I.R.C. § 165, containing the principal statutory authorization for the allowance of loss deductions in a taxable year. Section 165 provides as follows:

> (a) General rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
>
> (b) Amount of deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

I.R.C. § 165. Section 1011 and Treasury Regulation § 1.1011-1 provide, in turn, that the adjusted basis for determining the gain or loss from the sale or other disposition of property shall be the basis (generally determined under I.R.C. § 1012) as adjusted "to the extent . . . specifically provided for under applicable provisions of internal revenue laws." Treas. Reg. § 1.1011-1. Thus, in determining whether a taxpayer has realized a loss on the disposition of an asset, the Court must look to the adjusted basis of the asset. The Fresh Start Basis Rule is "an applicable provision of internal revenue laws" within the meaning of Treasury Regulation § 1.1011-1.

Section 1012 of the Code provides generally that "[t]he basis of property shall be the cost of such property. . . ." I.R.C. § 1012.[4] HSA concedes that its section 1012 basis in a self-created intangible asset normally will be zero because the taxpayer deducts the costs of creating the asset when it incurs them. HSA agrees that it had a zero cost basis in its self-created healthcare coverage contracts entered into before January 1, 1987, and that it has a zero cost basis in its self-created healthcare coverage contracts entered into after January 1, 1987. Under the Fresh Start Basis Rule, however, HSA's basis in each healthcare coverage contract that it possessed on January 1, 1987 could be adjusted from zero to the contract's fair market value on that date. See Capital II, 431 F.3d at 124; Trigon, 215 F. Supp. 2d at 701; Capital I, 122 T.C. at 237.

The Government argues that the resetting of the basis in a self-created asset from zero to its fair market value produces an anomalous result, as well as a windfall to HSA. However, it is not unusual for the internal revenue laws to permit the resetting of the basis of assets upon the occurrence of an event, generally by increasing the basis of an asset to its fair market value on the relevant date. For example, under I.R.C. § 1014, "Basis of property acquired from a decedent," heirs may reset the fair market value of property transferred to them as of the decedent's date of death. As HSA points out, the stepped-up basis also would be permitted for a self-created asset having a basis of zero, such as a software program developed by the decedent during his or her lifetime. In such circumstance, the internal revenue laws do not require the taxpayer to incur a capital cost in order to have a fair market basis in the asset. The basis of such assets is zero, until stepped-up to fair market value as allowed by law.

Defendant argues that, for a loss to be allowed as a deduction, the loss must result from a "sale or exchange." According to Defendant, HSA could not claim a loss deduction upon the termination or cancellation of a healthcare coverage contract because a "sale or exchange" has not occurred. Defendant contends that ambiguity exists because Congress used the phrase "gain or loss" in the Fresh Start Basis Rule rather than the phrase "any loss" appearing in I.R.C. § 165. Defendant then cites a House Conference Report mentioning that the Fresh Start Basis Rule is provided solely for purposes of "determining gain or loss upon sale or exchange of the assets, not for purposes of determining amounts of depreciation or for other purposes." Def.'s Mot. for Summ. J. at 20 (citing H.R. Conf. Rep. No. 99-841, pt. 2, at 350). Before relying on legislative history, however, the Court must find that the statutory language is unclear.

---

[4] By coincidence, the Fresh Start Basis Rule is found in section 1012 of the Tax Reform Act, and the cost basis rules for property are found in section 1012 of the Code.

When interpreting a statute, a court should look first to its language, and only if the statutory language is ambiguous, does the court look to legislative history. See, e.g., W. Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98-99 (1991) ("Where [the statute] contains a phrase that is unambiguous – that has a clearly accepted meaning in both legislative and judicial practice – we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process."). Legislative history can be used only to resolve ambiguity, not to create ambiguity. See Comm'r v. Estate of Ridgway, 291 F.2d 257, 260 (3d Cir. 1961) (citing United States v. Shreveport Grain & El. Co., 287 U.S. 77, 83 (1932)). The Supreme Court has held that "[u]nless exceptional circumstances dictate otherwise, 'when we find the terms of a statute unambiguous, judicial inquiry is complete.'" Burlington N. R.R. v. Oklahoma Tax Comm'n, 481 U.S. 454, 461 (1987) (citations omitted). The principle that legislative history should not be used to contravene clear statutory language takes on greater importance in interpreting income tax laws. See Chiles v. United States, 843 F.2d 367, 370 (9th Cir. 1988).

The courts that have addressed the Fresh Start Basis Rule uniformly have found that the statutory language is clear and unambiguous. Capital II, 431 F.3d at 125; Trigon, 215 F. Supp. 2d at 699-701; Capital I, 122 T.C. at 236-38; Highmark, 2007 WL 2412175 at 2. The phrase "gain or loss" in the statute includes *any* gain or loss without limitation, and cannot be read to require a "sale or exchange," as Defendant argues. See Def.'s Mot. for Summ. J. at 17-20. Similarly, the phrase "any asset" in the statute is without limitation. Congress has had frequent experience enacting federal taxation statutes and easily could have placed restrictions on the Fresh Start Basis Rule if it had desired, but it did not do so. As the court noted in Trigon:

> [I]t would have been a simple matter to have included in the statute language such as that which appears in the Conference Report. Congress, however, did not do so and it is not the office of the judiciary to conclude that Congress inadvertently failed to include that significant limitation in the statutory text and then . . . correct that oversight.

Trigon, 215 F. Supp. 2d at 700. See also Highmark, 2007 WL 2412175 at 2 ("Nothing in the plain language of the Fresh Start Basis Rule restricts its application to those assets that already had a positive basis before the statute was enacted.").

In sum, the Fresh Start Basis Rule provides a one-time tax advantage to BC/BS entities that can be viewed as smoothing the transition from tax-exempt to taxable entity status. It applies only to healthcare coverage contracts that were in place on January 1, 1987, and the loss deduction will be recognized only when such contract is canceled or terminated.

The Fresh Start Basis Rule has no effect on healthcare coverage contracts that HSA entered into after January 1, 1987. The rule is reasonable to ensure that BC/BS entities are not taxed for economic activities prior to January 1, 1987. The Court regards this interpretation of clear statutory language as the only possible outcome of the issue presented.

B. Change in Accounting Method

Defendant also alleges that HSA relies upon an unauthorized change in accounting method in violation of I.R.C. § 446(e). Section 446(e) requires "a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books . . . [to] secure the consent of the Secretary [of Treasury]" before adopting the change. Treas. Reg. § 1.446-1(e)(2)(ii)(a); see also S. Pac. Transp. Co. v. Comm'r, 75 T.C. 497, 682 (1980) (noting that "consent is required when a taxpayer . . . retroactively attempts to alter the manner in which he accounted for an item on his tax return."). HSA admits that it did not seek or obtain approval before filing amended returns to claim losses for its terminated healthcare contracts. HSA asserts, however, that it did not change its accounting method and therefore such approval was unnecessary.

Two factors determine whether the taxpayer has adopted a change in method of accounting: (1) timing and (2) the taxpayer's selection of a method. First, a change in method of accounting must "involve the proper time for the inclusion of the item of income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(b); see also Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 798 (11th Cir. 1984) (explaining that the essential element that defines a change in accounting method is "that it determines the timing of income or deductions."). Second, to qualify as a change in a method of accounting, the item consistently must have been treated the same on the taxpayer's returns. See Treas. Reg. § 1.446-1(e). Generally, a taxpayer is not restricted to using any particular method of accounting. I.R.C. §§ 446(a-b), 471; Heaven Hill Distilleries, Inc. v. United States, 476 F.2d 1327, 1335, 201 Ct. Cl. 423, 437 (1973). Once an accounting method has been chosen, however, the taxpayer "must continue to employ the same method in the same business until the Commissioner's permission to change the method is obtained." Peterson Produce Co. v. United States, 205 F.Supp. 229, 238 (W.D. Ark. 1962), aff'd, 313 F.2d 609 (8th Cir. 1963); see also Johnson v. Comm'r, 108 T.C. 448, 494 (1997) ("If the change affects the amount of taxable income for 2 or more taxable years without altering the taxpayer's lifetime taxable income, then it is strictly a matter of timing and constitutes a change in method of accounting."), aff'd in part and rev'd in part, 184 F.3d 786 (8th Cir. 1999).

Here, HSA's refund claims do not affect the timing of loss deductions for terminated contracts, or the method of accounting. Beginning in 1996, HSA filed amended returns to claim those deductions in the years in which the losses were incurred, pursuant to the

requirement that losses must be taken "only for the taxable year in which the loss is sustained." Treas. Reg. § 1.165-1(d); see also Echols v. Comm'r, 950 F.2d 209, 214 (5th Cir. 1991) (explaining that "the loss must be deductible when the taxpayer determines that the asset has become worthless . . . ."). In fact, failure to take a deduction in the proper year results in forfeiture of the deduction. Treas. Reg. § 1.165-1(d). It follows therefore, that when HSA filed amended returns to claim loss deductions, it was not changing an existing method of accounting. Merely filing an amended return is not a change in accounting method. Diebold v. United States, 16 Cl. Ct. 193, 200 (1989) (noting that "[i]f . . . plaintiff's amended return merely corrected or adjusted items which did not involve deduction timing, consent [is] not required.").

Finally, Defendant attempts to characterize HSA's section 165 losses as deductions for capital depreciation expenses in disguise. Defendant asserts:

> Because the amount of loss plaintiff claims in each year – that is, the fair market value of the terminated contracts as of January 1, 1987 – is a substitute for plaintiff's costs of creating the pre-1987 contracts, invoking the fresh-start basis provision effectively shifts the costs of creating the contracts from the year in which the costs were incurred to the year in which the contracts terminate.

Def.'s Mot. for Summ. J. at 35. If true, HSA's recharacterization of the losses would represent a change in accounting method because it affects the timing of the deduction. It also would disqualify the losses from a section 165 deduction. See John R. Thompson Co. v. United States, 477 F.2d 164, 167 (7th Cir. 1973) (noting that "[section] 165(a), nondepreciable property, and § 167, depreciable property, are mutually exclusive."). However, Defendant's argument is without any factual basis. HSA consistently expensed the costs of obtaining and maintaining the contracts in the year in which the expenses were incurred, both before and after January 1, 1987. When invoking the Fresh Start Basis Rule, HSA simply established a fair market value for each existing contract on January 1, 1987, as the Tax Reform Act allowed. HSA then asserted the loss deduction when each contract terminated, not on any schedule of standardized depreciation. See Def.'s Mot. for Summ. J. at 24 (agreeing that "the timing of the individual § 165(a) deductions is controlled by the actual terminations of individual contracts, as opposed to a standardized depreciation schedule."). The Court thus rejects Defendant's assertion that HSA changed its method of accounting. See Capital II, 431 F.3d at 127 n.3 (rejecting the contention that section 165 deductions for terminated healthcare contracts are equivalent to depreciation deductions).

## Conclusion

For the reasons explained above, Plaintiff's Cross-motion for Partial Summary Judgment is GRANTED, and Defendant's Motion for Summary Judgment is DENIED. On or before September 28, 2007, the parties shall jointly submit to the Court a proposed schedule and method for determining the fair market value of HSA's healthcare coverage contracts that existed on January 1, 1987.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge